# In The Matter Of:

*Ismael v.*
*Roundtree, et al.*

---

*Richard Roundtree*
*December 8, 2023*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



REGENCY-BRENTANO, INC.
Certified Court Reporters

Min-U-Script® with Word Index

Case 1:22-cv-00108-JRH-BKE   Document 61-4   Filed 05/31/24   Page 2 of 42

Ismael v.                                         Richard Roundtree
Roundtree, et al.                                 December 8, 2023

## Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                     AUGUSTA DIVISION

 3   Ahmed S. Ismael,              )
                                   )  Civil Action File
 4         Plaintiff,              )  No.:  1:22-cv-108
                                   )
 5      vs.                        )
                                   )
 6   Sheriff Richard Roundtree, in his  )
     individual and official capacity   )
 7   as Sheriff of Richmond County,     )
                                   )
 8   Captain Everett Jenkins, in his    )
     individual capacity and acting     )
 9   under color of law as supervisor   )
     of the Richmond County Sheriff's   )
10   Office,                            )
                                   )
11   Sergeant William McCarty, in his   )
     individual capacity acting under   )
12   color of law as a supervisor of    )
     the Richmond County Sheriff's      )
13   Office,                            )
                                   )
14   Colonel Calvin Chew, in his        )
     individual capacity acting under   )
15   color of law as a supervisor of    )
     the Richmond County Sheriff's      )
16   Office,                            )
                                   )
17         Defendants.              )
     _____)
18

19        VIDEOCONFERENCE DEPOSITION OF
                RICHARD ROUNDTREE
20

21        Friday, December 8, 2023
               9:30 a.m.
22

23            400 Walton Way
          Augusta, Georgia  30901
24

25   Anne Marie Russell, 5756-3343-3978-4704, CCR
```

## Page 2

```
 1            APPEARANCES OF COUNSEL

 2

 3   On behalf of the Plaintiff:

 4      DOUGLAS R. KERTSCHER, ESQ.
        Hill, Kertscher & Wharton, LLP
 5      365 Cumberland Boulevard
        Suite 1050
 6      Atlanta, Georgia  30339
        770-953-0995
 7      drk@hkw-law.com

 8   On behalf of the Defendants:

 9      RANDOLPH FRAILS, ESQ.
        TAMEKA HAYNES, ESQ.
10      Frails & Wilson, LLC
        211 Pleasant Home Road
11      Suite A1
        Augusta, Georgia  30907
12      (706) 855-6715
        randyfrails@frailswilsonlaw.com
13      thaynes@frailswilsonlaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 3

```
 1

 2           INDEX TO EXAMINATIONS

 3

 4   Examination                             Page

 5   Cross-Examination by Mr. Kertscher        5

 6   Direct Examination by Mr. Frails        106

 7   Recross-Examination by Mr. Kertscher    107

 8   Redirect Examination by Mr. Frails      108

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
 1
 2            INDEX TO EXHIBITS
 3
     Plaintiff's
 4   Exhibit           Description          Page

 5

 6   P-3    Investigative Summary            48

 7   P-21   E-mail 9/28/21, 12:21 p.m.       77

 8   P-27   E-mail 11/3/21, 1:07 p.m.        96

 9   P-30   Personnel Board Hearing Video Clip  64

10   P-31   Disciplinary Report Series       80

11   P-32   4.0 Conduct                      86

12   P-33   E-mail 9/24/23                   42

13   P-35   E-mail 11/3/21, 1:03 p.m.        97

14   P-36   E-mail 11/3/21, 3:18 p.m.        98

15   P-37   E-mail 11/3/21, 6:00 p.m.        99

16   P-39   RCSO Performance Appraisal Report  37

17

18        (Electronic copies of Plaintiff's Exhibits
19   Numbers 3, 21, 27, 31 through 32, 35 through 37, and
     39 have been attached to the original transcript.
20   Plaintiff's Exhibit Number 30 has been retained by
     counsel.)
21

22

23

24

25
```

Ismael v.
Roundtree, et al.

Richard Roundtree
December 8, 2023

Page 5

1     P R O C E E D I N G
2        MR. KERTSCHER: This will be the deposition of
3     Sheriff Richard Roundtree, taken for discovery and
4     all purposes allowable under the federal rules.
5        We're going to reserve objections today except
6     as to the form of the question and responsiveness of
7     the answer, as we've done throughout this case.  Is
8     that agreeable, Counsel?
9        MR. FRAILS: It's agreeable.
10       MR. KERTSCHER: Thank you.
11       Let's swear the witness, please.
12       RICHARD ROUNDTREE,
13    having been first duly sworn, was examined and testified
14    as follows.
15       CROSS-EXAMINATION
16       BY MR. KERTSCHER:
17    Q.  Sheriff Roundtree, good morning.  Have you been
18       deposed before?
19    A.  I have.
20    Q.  How many times do you think you've been deposed?
21    A.  At least a dozen.
22    Q.  And how many times have you testified in court?
23    A.  Several hundred.
24    Q.  Thank you.  And I understand that you have been
25       the sheriff in Richmond County for eleven years; is that

Page 6

1     right?
2     A.  That's correct.
3     Q.  Prior to becoming sheriff, did you serve with
4        the Richmond County Sheriff's Department?
5     A.  That is correct.
6     Q.  Tell me about that.
7     A.  I actually started with the Augusta Police
8        Department in 1993.  When it consolidated in '96, I merged
9        into the sheriff's office.
10       I served in the sheriff's office from '96 to
11    2009.  Then I went over to the school board, and came back
12    to the sheriff's office in 2013 as sheriff.
13    Q.  And I'm sorry, sir.  I'm losing kind of every
14       other word that you're saying.
15       Where did you say you went in 2009?
16    A.  Richmond County school board as head of security
17    operations.  I came back to the sheriff's office in 2013
18    as sheriff.
19    Q.  Back to the sheriff's office when?
20    A.  January 1, 2013.
21    Q.  Thank you.
22       So how long have you known -- so I understand
23       your testimony, you served with the Richmond County
24       Sheriff's Department.  What was the highest rank from '96
25       to 2009 before you were sheriff?  Is that right?

Page 7

1     A.  That's correct.
2     Q.  Okay.  What was the highest rank you attained?
3     A.  I was investigator/sergeant over homicide.
4     Q.  And so how long have you known
5        Lieutenant Jenkins?
6     A.  Probably since '97 --
7        (Zoom "recording" message.)
8        COURT REPORTER: You can go ahead.
9        THE WITNESS: -- oh.  Since '97 after the
10    consolidation.
11    Q.  (By Mr. Kertscher) And, again, the recording
12       message interfered with your answer.  Since when?
13    A.  After the consolidation in '97.  I met him when
14       APD merged with the Richmond County Sheriff's Office.  It
15       was either late '96 or early '97.
16    Q.  All right.  So you've worked with him for
17       approximately 25 years, roughly?
18    A.  If that math adds up.
19    Q.  All right.  How would you describe your
20       relationship with Lieutenant Jenkins over those 25 years?
21    A.  We were very good friends.
22    Q.  As part of being "very good friends," how often
23       do you socialize or otherwise see Lieutenant Jenkins
24       outside of work?
25    A.  In '97, we were partnered up several times on

Page 8

1     the crime suppression team.  Since being sheriff in 2013,
2     maybe three or four times in the last eleven years.
3     Q.  All right.  You said three or four times?
4     A.  Since I became sheriff, outside of work.  Prior
5        to that, we were partners on the crime supression team, so
6        we partnered up a lot.
7     Q.  Right.  How long were you partners with
8        Lieutenant Jenkins?
9     A.  If we met in '97 on crime supression -- I got
10       promoted to investigations in 2000, so we were parters for
11       two to two-and-a-half years.
12    Q.  But after you were in the investigations
13       department, did you continue to work with
14       Lieutenant Jenkins in some kind of close capacity?
15    A.  We were both on the SWAT team together.
16    Q.  Very good.  Were you involved in a decision to
17       promote Lieutenant Jenkins to the head of the SWAT team?
18    A.  No.  That came through operations.  The
19       recommendation is made through operations, and then I
20       either agree or disagree.  But I was not directly with the
21       decision to promote him to head of SWAT.
22    Q.  I understand.  Do you remember when that was?
23    A.  I do not.
24    Q.  And you certainly accepted the recommendation to
25       make him head of the SWAT department; right?

Ismael v.
Roundtree, et al.

Richard Roundtree
December 8, 2023

Page 9

1 A.  That is correct.
2 Q.  Have you -- how long have you known
3   Sergeant McCarty?
4 A.  He used to work with investigations.  When I was
5 with the sheriff's office, we both worked investigations
6 at the same time, so maybe 2003 or '04 when I worked
7 directly with him in investigations.  He went back to
8 operations, and we didn't have a whole lot of contact.
9 But I first met him and worked with him in the early
10 2000s.
11 Q.  Okay.  And he continues here as a sergeant, in
12   December of 2023, about 20 years later, I think, in the
13   internal affairs department; is that right?
14 A.  He's a lieutenant in the road patrol division
15 now.
16 Q.  Okay.  How would you describe your relationship
17   with Lieutenant McCarty?
18 A.  I don't have direct -- as colleagues.  When I
19 became sheriff in 2013, as sheriff.  He's one of my
20 employees.
21 Q.  How long have you known Colonel Chew?
22 A.  Probably since the early 2000s when I was
23 promoted to investigations.  He was already in
24 investigations.  It was 2001 or 2002 when I was promoted
25 to violent crimes, and he was in that division.

Page 10

1 Q.  So approximately 21 years that you've known
2   Colonel Chew?
3 A.  If that's the math, yes.
4 Q.  How would you describe your relationship with
5   Colonel Chew over the years?
6 A.  Again, we were partners in investigations for
7 awhile.  We were friends, and we worked closely together
8 at times on violent crime cases.
9 Q.  Thank you, sir.
10   Were you responsible for promoting Colonel Chew
11   into what I'll call the executive leadership team?  You
12   may have another name for it, but were you part of that
13   decision?
14 A.  That is correct.
15 Q.  When did you decide to promote him to your
16   executive leadership team?
17 A.  When I first came on in 2013, Colonel Chew was
18 in investigations.  He got switched to my internal affairs
19 division when I became sheriff.  Then he eventually went
20 back to investigations.
21   When my colonel, Colonel Partain, left two years
22 ago, that's when Colonel Chew was put in that role.  He
23 was major over investigations, and then he ascended to
24 colonel when Colonel Partain, who was over admin services,
25 retired.

Page 11

1 Q.  And what was your involvement in him ascending
2   to the executive leadership team?
3 A.  Myself and Colonel Partain and
4 Chief Deputy Patrick Clayton were coming up with a
5 succession plan because we knew Colonel Partain was going
6 to retire.
7   Major Chew was over investigations at that time,
8 and he then assumed the role of lieutenant colonel over
9 operations and investigations for a one-year extension
10 plan that -- continuity of leadership that he would ascend
11 to that role after Colonel Partain left.  So that was a
12 one-year process.
13 Q.  All right.  And so the closest members to you on
14   the executive leadership team would then be Colonel Chew
15   and Mr. Clayton?
16 A.  At the time now, Patrick Clayton is resigning.
17 So he will no longer be part of the executive leadership
18 team.  As of present day, it's myself,
19 Chief Deputy Patrick Clayton, and Colonel Chew.
20 Q.  And you work closely on a day-to-day basis with
21   Colonel Chew; is that right?
22 A.  For the last two years, that is correct.
23 Q.  And he was in that position within the executive
24   leadership team in the fall of 2021; is that true?
25 A.  I believe that is correct.

Page 12

1 Q.  Okay.  When is Mr. Clayton's resignation
2   effective?
3 A.  The 31st of this month.
4 Q.  I see.  And is he retiring, or is he going to
5   another department?
6 A.  He's retiring.
7 Q.  I see.  In the time that you've been sheriff,
8   what is your involvement -- we'll start kind of broadly
9   and get more specific.  What is your involvement in
10   internal affairs complaints against your officers?
11 A.  Anytime a complaint is made in internal affairs
12 against one of my officers, I'm made aware of the
13 investigation.  It's assigned to an internal affairs
14 investigator.  As the investigation progresses, I'm
15 briefed along with the executive leadership team.
16   Once the investigation has come to a conclusion,
17 that report is sent up through executive leadership, the
18 colonel, the chief deputy, and, then, to me, for a final
19 recommendation based on the investigation.
20 Q.  All right.  And there are two internal affairs
21   investigations involved in this case.  The first one is
22   against Lieutenant Jenkins, and the other one that was
23   made on the 27th, I suppose, is against Deputy Ismael.
24   Were you kept apprised of those complaints and
25   investigations as part of the normal processes and

Case 1:22-cv-00108-JRH-BKE   Document 61-4   Filed 05/31/24   Page 5 of 42

Ismael v.                                                    Richard Roundtree
Roundtree, et al.                                            December 8, 2023

Page 13

1  procedures that you just described?
2  A.  That's correct.
3  Q.  We'll come back to that in a minute.
4      How many internal affairs complaints are going
5  on where you -- well, let me go back to it this way.  How
6  many internal affairs complaints do you typically see per
7  year in your department?
8  A.  That's hard to say.  I couldn't narrow it to a
9  number.
10 Q.  Is it more or less than 10?
11 A.  Officers or just internal affairs complaints?  I
12 get a lot of internal affairs complaints, so are you
13 specifically limiting it to officers?
14 Q.  Yeah.  Let's say limited to officers.
15 A.  Ten would be a reasonable number.
16 Q.  And of those internal affairs complaints against
17 officers, how many are typically made by other officers?
18 A.  That's difficult to say.
19 Q.  Okay.  We'll come back to that.
20     I want to go back to your answer a minute ago
21 when I asked you about how you were apprised of internal
22 affairs complaints.  You said that you're briefed as the
23 investigation goes on.
24     Does that mean that somebody comes and talks to
25 you?  Does that mean somebody sends you documents?  When

Page 14

1  you're briefed about the continuing investigation, how
2  does that look?
3  A.  We're still talking about against officers;
4  correct?
5  Q.  Yes.
6  A.  Typically what happens is the lieutenant in
7  internal affairs comes to my office and says, "We have a
8  complaint or investigation about this officer.  I just
9  want to let you know we're going to start an
10 investigation."
11     Then I say, "That's fine.  Keep me posted."
12     If anything significant happens, then they come
13 to my office and brief me in person.
14 Q.  When a complaint is made, they come and make the
15 verbal disclosure to you about the new complaint; is that
16 right?
17 A.  That's correct.
18 Q.  All right.  And, of course, you then have the
19 opportunity to ask them questions and understand further
20 what the nature of the complaint is, I guess; right?
21 A.  That's correct.
22 Q.  And I assume that you're diligent in
23 understanding what complaints have been made against your
24 officers; right?
25 A.  That is correct.

Page 15

1  Q.  All right.  When the investigation is concluded,
2  how are you apprised of that, and do you need to sign off
3  on the conclusions of that internal affairs investigation?
4  A.  It all depends if the allegation was founded or
5  unfounded.
6  Q.  Tell me about that.
7  A.  If an investigation is unfounded, then I usually
8  get a verbal briefing that the complaint was made, we
9  looked into it, and it was unfounded.  It ends with that,
10 and internal affairs does whatever paperwork they do to
11 unfound it.
12     If the complaint is founded and a disciplinary
13 action is suggested, then, again, that goes through the
14 colonel first.  He reviews it, and either agrees or
15 disagrees with the recommendation that is made or makes a
16 subsequent recommendation.
17     It's then passed over to the chief deputy who
18 does the same.  Finally, it's forwarded to me to make a
19 final decision on the status of that case.
20 Q.  All right.  In the fall of 2021, who were the --
21 well, did you follow -- strike that.
22     Who were the individuals involved in the
23 Internal Affairs department of the
24 Richmond County Sheriff's Department in the fall of 2021?
25 A.  Repeat the question, please.

Page 16

1  Q.  Yeah, sure.  Can you tell me all the people
2  working in the Internal Affairs department in the fall of
3  2021?
4  A.  If I'm not mistaken, at that time, it was
5  Captain Glen Rahn who was the head of the division,
6  Lieutenant Kimberly Lee, Sergeant William McCarty, and, I
7  believe, Sergeant Caleb Lee.
8  Q.  And who oversees Lieutenant Rahn?  Who is his
9  supervisor?
10 A.  Internal affairs reports directly to the
11 executive leadership team.
12 Q.  And that would be you and Colonel Chew?
13 A.  And Chief Deputy Clayton.
14 Q.  Now, in this case, an internal affairs complaint
15 was made against Lieutenant Jenkins on or about
16 September 20th of 2021.  Does that sound right to you?
17 A.  I can't testify to the date, but that sounds
18 correct.
19 Q.  And it was made to Lieutenant McCarty; is that
20 right?
21 A.  I believe that's correct.
22 Q.  Okay.
23 A.  Let me clarify.  I don't know if it was made to
24 him, but I believe it was assigned to him to
25 investigation.  I don't know exactly who it was made to.

Page 17

1  Q.  All right.  Fair enough.
2      How was it that, then, where there was a --
3  well, how often do internal affairs complaints get
4  initiated by anonymous phone calls?
5  A.  Again, are we referring to officers?
6  Q.  Yes, sir.
7  A.  Not many.
8  Q.  And is that because anonymous phone calls,
9  people not wanting to put their name behind a phone call,
10 might lack credibility?
11 A.  I couldn't testify as to why anonymous phone
12 calls are made or not made.
13 Q.  Just based on your investigative experience,
14 sir, how credible is an anonymous phone call to you?
15 A.  Based on the specifics of the information that's
16 given.  I worked homicide for 10 years and received
17 numerous anonymous phone calls.
18     If they're vague in nature, then, of course,
19 they don't have much credibility to it.  But if they're
20 very specific in allegations that can be verified, they're
21 of much more value.
22 Q.  Fair enough, sir.  Thank you.
23     When an anonymous phone call was received from
24 the Richmond County Sheriff's Department by the executive
25 leadership team, by the way, Colonel Chew, on the 27th,

Page 18

1  what was the process by which that was assigned to someone
2  in internal affairs?
3  A.  I can't testify to that because I didn't receive
4  the call.  That would be a better question for
5  Colonel Chew.
6  Q.  Right.  How was it that Sergeant McCarty, the
7  same person who was investigating Deputy Ismael's
8  complaint against Lieutenant Jenkins, was also assigned to
9  the anonymous complaint made against Ismael on the
10 27th of September?
11 A.  Again, I can't testify to that.
12 Q.  And is it your testimony that that decision on
13 who to assign that to was likely made by Colonel Chew?
14 A.  It was more likely made by Captain Rahn, who was
15 the head of internal affairs at the time, but I can't say
16 that with all certainty.  More than likely, it's assigned
17 by the division commander.
18 Q.  All right.  I understand that you have final
19 authority to terminate an employee and, specifically, an
20 officer; is that correct?
21 A.  That is correct.
22 Q.  And do you take that seriously?
23 A.  I do.
24 Q.  Do you believe that's an important duty for you
25 as the sheriff?

Page 19

1  A.  That is correct.
2  Q.  What do you do to make sure you're exercising
3  the serious responsibility in a cautious and diligent way?
4  A.  Can you repeat that and be a little more
5  specific, please?
6  Q.  All right.  Sure.
7      What do you do to make sure that you exercise
8  your responsibility to fire someone -- that you do that
9  diligently?
10 A.  Well, one of the things that we did when I
11 became sheriff is created the progressive discipline form,
12 whereas, again, I have final authority, but many
13 supervisors review the complaint prior to it getting to
14 me.
15     Each one of them has an opportunity to review
16 the information, make a recommendation to either agree
17 with the recommendation that is provided or to give an
18 alternate recommendation, and then it is passed up.
19     I review all of those prior to seeing what the
20 majors and lieutenants have recommended.  Then I read it
21 and go over all of it.  Then I make a final determination
22 as to what is best for this agency moving forward.
23 Q.  All right.  And you just said that you "go over
24 all of it."  Tell me what you do to go over all of it
25 before deciding to fire someone.

Page 20

1  A.  They bring me a file that, again, has been
2  reviewed by my executive leadership team.  I review all of
3  those documents.  Then, based on what is presented to me,
4  I make a final recommendation as to what is best for this
5  agency moving forward.
6  Q.  Okay.  And do you ever inquire about the
7  documents or inquire about witnesses that are presented in
8  the documents?  Do you ever your internal affairs, "Hey,
9  did you talk to this guy?  Hey, what about this?"
10 A.  On certain occasions, yes.
11 Q.  Okay.  And that's part of what you do to be
12 diligent before you decide to take the ultimate penalty
13 and fire someone; is that right?
14 A.  If I have questions, yes.
15 Q.  Okay.  What do you remember about a prior
16 harassment investigation, prior to Ismael's complaint,
17 against your friend, Lieutenant Jenkins?
18 A.  Harassment as to what specifically, sir?
19 Q.  Was there harassment involving a lady?
20 A.  You still have to be more specific.
21 Q.  Okay.  You don't remember any -- we can get you
22 some documents for that, sir, if you'd like to see them,
23 but you don't remember any prior, prior to 2021,
24 investigation and complaint against Jenkins for
25 harassment?

Ismael v.
Roundtree, et al.

Richard Roundtree
December 8, 2023

Page 21

1  A.  Yes.  But, again, you have to specific.
2  Q.  Tell me what you remember, sir.
3      MR. FRAILS: I'm going to object to the form of
4  the question.
5      THE WITNESS: If you give me a specific case, I
6  will tell you what I can remember about the specific
7  case.
8  Q.  (By Mr. Kertscher) Yes, sir.  I am asking you
9  about a specific case of a harassment allegation made
10  against Lieutenant Jenkins.
11  A.  Can you identify the person you're speaking of,
12  sir?
13  Q.  I cannot right now.  I'm just asking you what
14  you remember about any prior complaint.
15  A.  I remember there had been a complaint against
16  Lieutenant Jenkins involving an employee.  But, again, you
17  have to be specific as to which employee you're talking
18  about so I can tell you what I remember about that
19  specific complaint.  But if you ask me was there a prior
20  complaint about him and a female employee, that is
21  correct.
22  Q.  Yes, sir.  Do you remember that complaint
23  against him by a female employee?
24  A.  I remember a complaint.
25  Q.  All right.  What do you remember about it?

Page 22

1  A.  Again, you have to be specific about the
2  complaint.
3  Q.  The only one that you remember, sir.  I'm not
4  trying to ask you to create something that's not in your
5  memory.  Just tell me what you remember about that prior
6  complaint.
7  A.  Again, you have to be specific because it's not
8  just one complaint.
9  Q.  What are the other complaints against
10  Lieutenant Jenkins that you're aware of, sir, before 2021?
11  A.  Same question.  You have to give me a specific.
12  Q.  Okay.  Do you believe there were multiple
13  internal affairs complaints made against
14  Lieutenant Jenkins prior to the fall of 2021?
15  A.  That is correct.
16  Q.  Do you recall any discipline levied against your
17  friend, Lieutenant Jenkins, (cross talk).
18      MR. FRAILS: I'm going to object to the form of
19  the question.
20      MR. KERTSCHER: -- in any of the prior internal
21  affairs complaints that were made against him?
22      THE WITNESS: Against my employee,
23  Lieutenant Jenkins?
24      MR. KERTSCHER: Sure.  Your employee, Lieutenant
25  Jenkins.

Page 23

1      THE WITNESS: Repeat the question.
2  Q.  (By Mr. Kertscher) Do you remember -- you've
3  testified that you were both friends with and also the
4  employer of Lieutenant Jenkins; is that true?  Do you
5  recall that testimony from about 10 minutes ago?
6  A.  That is correct.
7  Q.  All right.  So that same Lieutenant Jenkins, do
8  you remember any discipline that has been issued against
9  him as the result of any internal affairs complaint prior
10  to the fall of 2021?
11  A.  I do.
12  Q.  Tell me about that.  Tell me what you remember.
13  A.  The most recent was that he was having
14  inappropriate conversations with a subsequent employee,
15  which resulted in his demotion.
16  Q.  And when did that occur?
17  A.  Within the last two years.
18  Q.  So we're sitting here in December of 2023.  Are
19  you saying that occurred sometime between 2021 and 2023?
20  A.  That is possible.  I don't have the documents in
21  front of me.  But at one time, he was a captain.  He got
22  demoted back to a lieutenant.  I can't give you the
23  specific dates, though.
24  Q.  Okay.  When did you become aware of the
25  EEOC complaint filed in this case by Deputy Ismael?

Page 24

1  A.  Counsel made me aware of it.
2  Q.  Do you remember the approximate date of that?
3  A.  I do not.
4  Q.  Okay.  When did you become aware of the lawsuit,
5  the lawsuit filed by Deputy Jenkins.  Did you become aware
6  of that when you received service of process of the
7  lawsuit?
8  A.  You said by Deputy Jenkins?  Did you misspeak?
9  Q.  I'm sorry.  By Deputy Ismael.  When did you
10  become aware of Deputy Ismael's lawsuit?
11  A.  When counsel made me aware of it.
12  Q.  And, again, you don't remember the date of that,
13  do you?
14  A.  I do not.
15  Q.  Okay.  So I appreciate you telling me about the
16  complaint against Jenkins in the last two years.  The
17  focus of my questions about this were complaints against
18  Jenkins prior to the spring of 2021.
19      Do you remember harassment or other complaints
20  made against Jenkins prior to the fall of 2021?
21  A.  I remember one was eight or nine years ago when
22  he made a disparaging comment to a female employee.
23  Q.  And what do you remember was the outcome of that
24  complaint against -- do you remember what the disparaging
25  comment was?

Page 25

1  A.  It was something about the size of her rear end.
2  Q.  And what do you remember being the outcome of
3     that investigation against Lieutenant Jenkins?
4  A.  I can't recall the disciplinary action.
5  Q.  Do you remember the name of the person that made
6     that complaint?
7  A.  I do not.
8  Q.  Okay.  All right.
9        When you receive an internal affairs
10    recommendation from your staff to fire someone, do you do
11    any investigation on your own at times?
12  A.  Only if I have follow-up to the file that's been
13     presented to me.
14  Q.  Do you ask questions?
15  A.  If I have any.
16  Q.  All right.  And what else do you do to satisfy
17    yourself that the recommendation made to you is the right
18    one?
19  A.  Again, I rely on my executive leadership team's
20     opinion, what comments they may put into the report.
21     Based on my reading the report, I make the final
22     recommendation based on what I think is best for this
23     agency moving forward.
24  Q.  All right.  I want to talk a little bit about
25    off-site training of your officers.  It's common for your

Page 26

1  officers to be sent off site for training; is that true?
2  A.  That is correct.
3  Q.  And that includes a training site in
4    Forsyth, Georgia; is that true?
5  A.  That is correct.
6  Q.  And, in fact, you send many deputies.  One
7    number I've heard in this case is over 80 deputies a year
8    that you send to Forsyth for training.
9  A.  I can't testify to the number.
10  Q.  Okay.  And have you yourself gone to Forsyth for
11    training?
12  A.  In the last 30 years, yes.
13  Q.  All right.  How many times?
14  A.  I couldn't say.
15  Q.  More or less than five?
16  A.  More.
17  Q.  More or less than ten?
18  A.  In my 30-year career?  More.
19  Q.  More or less than 15 times have you gone to
20    Forsyth for training?
21  A.  That's cutting it close now.
22  Q.  All right.  We'll stick with 15 then.  Did you
23    drive your County-issued patrol car to the Forsyth
24    training each of those 15 times?
25  A.  I've done both, driven my County-issued and

Page 27

1  personal vehicle.
2  Q.  Okay.  And I understand that when your officers
3    go to Forsyth for training, they can go for as long as a
4    week; is that right?
5  A.  Some for a week.  I've been gone for two weeks.
6  Q.  Okay.  And those officers -- while your gone to
7    Forsyth to training, you're paid for your whole day of
8    work; is that right?
9  A.  That is correct.
10  Q.  And you're paid the full day whether the
11    training runs the full day or not; is that right?
12  A.  That is correct.
13  Q.  Sometimes the training can go long, sometimes
14    the training ends early at Forsyth; isn't that true?
15  A.  Well, let me qualify it with the fact that I
16     haven't been to Forsyth in about 20 years.  When I went
17     though, yes, that's correct.  I don't know what the policy
18     is now.
19  Q.  Fair.  And in your department, while you're
20    sheriff, your deputies are not required to report in or
21    hit a time clock or keep any kind of time sheet about when
22    they're in training at Forsyth; is that true?
23  A.  I couldn't testify to that.
24  Q.  I'm sorry?
25  A.  I couldn't testify to that.  That would be a

Page 28

1  training issue.
2  Q.  Okay.  So you don't know --
3  A.  I do not.
4  Q.  -- whether or not your officers are required to
5    keep a time log when they're out at off-site training?
6  A.  I do not.
7  Q.  And who would know that?
8  A.  Whoever the captain over training is at the
9    time.
10  Q.  Okay.  Now, I understand that your officers,
11    when they go to off-site training, they can travel to and
12    from that off-site training in the car, I guess.  That's
13    probably the only logical way to go to Forsyth; is that
14    right?
15  A.  Repeat the question.
16  Q.  Let me just talk about current day, in the last
17    two years.  Do your officers typically take their patrol
18    cars to Forsyth for training?
19  A.  Again, that would be a training question.  When
20     I went, sometimes people took their County-issued
21     vehicles.  Some people don't have a County-issued vehicle,
22     so I couldn't testify to the last two years specifically
23     how they travel back and forth.
24  Q.  And when they take their personal vehicle, are
25    they reimbursed for gas?

Ismael v.
Roundtree, et al.

Richard Roundtree
December 8, 2023

---

Page 29

1 A.  I think they're reimbursed for mileage.
2 Q.  And when they take their County-issued car, the
3   County pays for the gas; is that fair?
4 A.  That is correct.
5 Q.  And traveling to and from this off-site
6   training, that's a work duty; would you agree with that?
7 A.  That is correct.
8 Q.  Now, they're paid a per diem, your officers,
9   when they go to off-site training; is that correct?
10 A.  That is correct.
11 Q.  And that's in addition to their full pay for the
12   day; right?
13 A.  That is correct.
14 Q.  And what is that per diem for?
15 A.  It's usually food.
16 Q.  When the training concludes for the day in
17   Forsyth, are your deputies entitled to take their patrol
18   car to take on personal missions like going to a
19   restaurant, grocery store, or movie theater?
20 A.  No.  That's why some people take their personal
21   vehicle to Forsyth because they want to do personal
22   business while they are away.
23 Q.  All right.  Now, have you talked to Colonel Chew
24   or Captain Rahn about that?
25 A.  I have not.

---

Page 30

1 Q.  And can you point to any document that says that
2   when the training is over at Forsyth, the officers cannot
3   take their patrol car to the restaurant, grocery store, or
4   movie theater?
5 A.  I don't know if that document exists or not.
6 Q.  Can you point to any specific training that your
7   officers are given that says when they are released from
8   training at Forsyth, they cannot go to a restaurant,
9   grocery store, or movie theater in their patrol car?
10 A.  I can't point to a document that specifically
11   says Forsyth, but I know it's in our policies that patrol
12   vehicles are not to be used for personal use.
13 Q.  I'm asking you about training, sir.  Can you
14   point to any --
15 A.  Again, I can't talk about training.  You asked
16   if there's a document that exists that says patrol
17   vehicles cannot be used for personal use.
18 Q.  Okay.  Well, where can I find that document,
19   sir?
20 A.  It would be in our training manual.  You'd have
21   to check with our training coordinator.  I'm sure they
22   could provide you a copy of that and our SOP.
23 Q.  All right.  And so you're not able to quote the
24   section of the training manual, you just believe it's in
25   the training manual; is that right?

---

Page 31

1 A.  I know it's in the training manual, but I cannot
2   quote it.
3 Q.  All right.  We had some testimony about this
4   earlier.
5     What are your officers supposed to do when
6   they're done with training in Forsyth and they need to go
7   take some personal mission at, say, 7:00 at night, but
8   they're in Forsyth and the only transportation they have
9   is there County patrol car?  What are they supposed to do?
10 A.  Again, I can't testify to that.
11 Q.  All right.  Would you defer to others on your
12   executive leadership team or other officers that have
13   given testimony in this case about that topic?
14 A.  I would defer to whoever is in charge of
15   training at the time.
16 Q.  Okay.  When the off-site training concludes and
17   the officers are released from training -- you said it can
18   be a week long -- what is that officer supposed to do with
19   his patrol car?
20 A.  Come back home.
21 Q.  All right.  So that's what you want them to do
22   whether the training ends at 2:00 or 5:00, just get in the
23   car and drive back home; is that fair?
24 A.  That is what I did.
25 Q.  And I haven't heard any testimony that they have

---

Page 32

1   any requirement to report to the Richmond County Sheriff's
2   Office when they're done with their off-site training for
3   the week.  Are you aware of any requirement like that?
4 A.  No.  I believe I testified that they are to
5   return home.
6 Q.  Okay.  But there's not requirement that they
7   call in or check in with the Richmond County Sheriff's
8   Office or anything like that?
9 A.  Again, I would defer that to the training
10   supervisor.
11 Q.  All right.  And when they're released from
12   training for the week, you said they're to drive back
13   home.  They don't have any duties to perform for the
14   Richmond County Sheriff's Office, do they?
15 A.  Again, I can't testify to that.  It depends on
16   what type of training they went to.
17 Q.  All right.  And when you said they're to drive
18   back home, I think we agreed earlier that Forsyth is about
19   two-and-a-half hours away; is that right?
20 A.  Thereabout, yes.
21 Q.  Okay.  And you said they're to go back home; is
22   that right?
23 A.  That is correct.
24 Q.  Are they typically on the schedule to work that
25   afternoon when they're released from training at Forsyth?

---

Page 33

1  A.  No.  That's usually considered a workday.
2  Q.  Okay.  So they're not typically on the schedule
3  to do any additional work; is that right?
4  A.  As far as the sheriff's office?
5  Q.  Yes, sir.
6  A.  That is considered their workday.
7  Q.  So they don't have any other assignments to
8  Richmond County Sheriff's Office, and you want them to
9  just drive home; is that right?
10  A.  That is typically what happens.
11  Q.  That sounds a lot like they're off duty, doesn't
12  it, sir?
13  A.  No, sir.  Some individuals, like investigators,
14  if training is out early, come back to work and come into
15  the office.  It's different for different people.
16  Q.  All right.  Are you aware of any requirement
17  that Deputy Ismael was to come back into work for the
18  Richmond County Sheriff's Office on
19  September 17th of 2021?
20  A.  I can't testify to that.
21  Q.  Let's just talk about a normal workday where
22  your patrol officers are patrolling for an 8-hour day in a
23  specific zone in Richmond County.  When their shift ends,
24  what's typically the process that you ask them to follow?
25  A.  Again, I can't testify to that.  But I can

Page 34

1  correct you that our patrol officers typically work a
2  12-hour shift, not an 8-hour shift.
3  Q.  All right.  Thank you for that correction.
4      When that 12-hour shift is over, what are they
5  supposed to do?
6  A.  Go home.
7  Q.  And when they're on the way home, they're off
8  duty; isn't that right?
9  A.  No, actually they're not, sir.  They're on duty
10  until they get home, thus, if you're going home from work
11  and you get in a car accident or something happens, that's
12  considered a line-of-duty death.
13  Q.  Well, that's interesting.  I know some workers'
14  comp lawyers that might debate that with you.  But let me
15  ask a separate question.  Are they paid for their drive
16  home, sir?
17  A.  In the County patrol car?
18  Q.  Yes, sir.
19  A.  They're paid for their time at work.  If you're
20  asking if they're paid coming to and from work, I don't
21  know if there's a specific difference in the compensation.
22  But they are paid for whatever time at work.
23  Q.  Uh-huh.  It's my understanding from prior
24  testimony in this case that officers are not paid for
25  their time to and from work.  Do you have any documents

Page 35

1  you can show that disputes that, sir?
2  A.  I do not.
3  Q.  So, for example, if someone lived far away, they
4  don't get paid any more -- if someone lives an hour away,
5  they don't get paid any more than the deputy that lives
6  10 minutes away from the office for their drive home or
7  back to work, do they?
8  A.  That is correct.
9  Q.  All right.  Now, how many officers have you had
10  that were driving home, unpaid, in their patrol car and
11  were, I think you said, in an accident and were killed?
12  A.  I haven't had any since I've been sheriff.
13  Q.  Thank you, sir.  All right.
14      Deputy Ismael, when did you first meet him?
15  A.  When he was first hired, and I can't give you
16  the date.
17  Q.  Would that be March of 2020?  Does that sound
18  right to you, sir?
19  A.  Possibly.  Like I said, I meet all applicants
20  during their final interview process to be hired here.
21  Q.  All right.  And how many -- were you aware when
22  you hired him, sir, that he was a Middle Eastern gentleman
23  originally from Iraq?
24  A.  That is correct.
25  Q.  And were you aware, sir, when you hired him that

Page 36

1  he is a Muslim?
2  A.  I'm not sure about the Muslim part, but I knew
3  he was of Middle Eastern descent.
4  Q.  Were you aware that he served with the U.S.
5  military troops in Iraq?
6  A.  I would have been if it was in his file.  If it
7  was in his personnel file, yes.
8  Q.  All right.  And have you, at any point, read his
9  performance appraisal that is in his personnel file?  Have
10  you read or reviewed that at any point, sir?
11  A.  Performance appraisal?
12  Q.  Yes, sir.
13  A.  No.  I just remember reading the citizen
14  complaint against him but not a performance appraisal.
15  Q.  Why haven't you reviewed his performance
16  appraisal, sir?
17  A.  In reference to what, sir?
18  Q.  In reference to your decision to fire him.
19  A.  It wasn't relevant at the time to my decision to
20  fire him or not.
21  Q.  Let's look at that.  That was your
22  determination, that it wasn't relevant.  Let's look --
23  A.  That is correct.
24  ///
25  ///

Page 37

1    (Plaintiff's Exhibit Number 39 was
2  previously marked for identification.)
3  Q.  (By Mr. Kertscher) Let's look at Exhibit 39.  I'm
4  just going to share this on the screen because the court
5  reporter doesn't have this one.
6    Can you see that on the screen, sir?
7  A.  I can.
8  Q.  And you'll see that's a Richmond County
9  Sheriff's Office Performance Appraisal Report form where
10  Ahmed Ismael, deputy sheriff, in the field operation, zone
11  5c shift; do you see that?
12  A.  I do.
13  Q.  This is the only performance appraisal in his
14  file.  Do you have any reason to dispute that statement?
15  A.  If you say so.
16  Q.  The first item that he's evaluated on is
17  "respect."  I honestly don't know who filled this out.  Do
18  you know who filled out this report, sir?
19  A.  I do not.
20  Q.  Do you have any reason to dispute anything in
21  this report?
22  A.  It's my first time seeing it, sir.
23  Q.  Is it typically a supervisor that fills this
24  out?
25  A.  I couldn't testify to that, sir.

Page 38

1  Q.  So you don't know who filled this out?  I don't
2  know either.  I don't have a signature page.  So you don't
3  know who signed this or who his supervisor was?
4  A.  I do not.
5  Q.  And you didn't talk to his supervisor prior to
6  firing him?
7  A.  I did not.
8  Q.  All right.  Under "Respect," whoever filled this
9  out checked the box "Yes."  Do you see that?
10  A.  Yes.
11  Q.  And then they wrote, "Deputy Ismael shows
12  respect and courtesy to his peers, supervisors, and
13  general public."  Do you see that?
14  A.  I do.
15  Q.  Do you have any reason to dispute this part of
16  his evaluation that was in his personnel file?
17  A.  Again, first time seeing it.
18  Q.  The next item says "Integrity," and, again,
19  whoever filled this out checked the box "Yes."  Do you see
20  that?
21  A.  I do.
22  Q.  And that person wrote, "Deputy Ismael shows
23  integrity on calls and his work performance.
24  Deputy Ismael has shown himself to be honest and
25  trustworthy with his peers and supervisors."

Page 39

1    Do you have any reason to dispute this part of
2  his evaluation in his personnel file?
3  A.  Again, first time seeing it.
4  Q.  Next item down says "Teamwork," and you see
5  there that someone with the Richmond County Sheriff's
6  Department checked the box "Yes."  Do you see that, sir?
7  A.  I do.
8  Q.  And they wrote, "Deputy Ismael backs his fellow
9  deputies on calls and traffic stops.  Deputy Ismael will
10  be in an available status to back his team members while
11  still leaving himself available for the zone."
12    Do you have any reason to dispute those
13  statements made in Exhibit 39 out of his personnel file?
14  A.  Again, first time seeing it.
15  Q.  And the next item down is "Excellence," and the
16  sheriff's department checked the box "Yes."  Do you see
17  that?
18  A.  I do.
19  Q.  And then they wrote, "Deputy Ismael displays
20  professionalism and excellence in his work.  Deputy Ismael
21  also shows an eagerness to learn from experienced
22  deputies."
23    Do you have any reason to dispute the statements
24  made by the Richmond County Sheriff's Department in that
25  box?

Page 40

1  A.  Again, first time seeing it.
2  Q.  Okay.  I'm going to stop the share.  That's all
3  that I have that's filled out.  I don't have a signature
4  page.
5    You would agree with me, sir, that at the time
6  the sheriff's department began investigating Deputy Ismael
7  as the result of an anonymous call on September 27th, he
8  was not on probation or suspension, was he?
9  A.  I can't testify to that.
10  Q.  That's not something you investigated, sir?
11  A.  Not something I can recall, sir.
12  Q.  You would agree with me, sir, that he was a
13  deputy in good standing with the Richmond County Sheriff's
14  Department on September 27, 2021; isn't that true?
15  A.  That is correct.
16  Q.  Now, he was initially chosen to be on the SWAT
17  team and was on the SWAT team for two months, wasn't he,
18  sir?
19  A.  I can't testify to that.
20  Q.  Was he given equipment and a pay increase for
21  the SWAT team?
22  A.  I can't testify to that either.
23  Q.  So you just don't know one way or the other
24  about either of those things; is that right?
25  A.  That is correct.

Page 41

1 Q. And was he put in charge of what Richmond County
2 Sheriff's Department calls a "special" or a side job at a
3 facility called Urban Air in Augusta called Urban Air?
4 A. I can't testify to that.
5 Q. That wasn't something that you looked into or
6 were made aware of at any point either; isn't that true?
7 A. I knew he worked a special there. I don't know
8 if he was put in charge of it.
9 Q. Okay. And who would have been in charge of
10 putting him in charge of the Urban Air special?
11 A. I'm not exactly sure how that works. We had a
12 deputy who controls special duty assignments and keeps a
13 list of which officers are in charge, so that has been
14 delegated to a deputy under my command.
15 Q. I want to make sure it's clear on the record.
16 You don't know what zone he was assigned to?
17 A. That's correct.
18 Q. And you don't know who his supervisor was?
19 A. That is correct.
20 Q. From a disciplinary standpoint, he had done
21 "okay" during his tenure with the Richmond County
22 Sheriff's Department; is that a fair statement?
23 A. That's subjective. Do you want to go with
24 "okay"? Can you be a little more specific?
25 ///

Page 42

1     (Plaintiff's Exhibit Number 33 was
2 previously marked for identification.)
3 Q. (By Mr. Kertscher) Well, let me ask you to look
4 at Exhibit 33 that the court reporter has there for you.
5 A. Thank you.
6 Q. I'll represent to you that Exhibit 33 is an
7 e-mail sent by Sergeant McCarty to Jimmy Wylds dated
8 September 24, 2021, which is a Friday.
9     You're welcome, sir, to take all the time you
10 want to look at that, but I'm only going to ask you about
11 what's on the first page.
12 A. Okay.
13 Q. Do you see, sir, where Sergeant McCarty is
14 responding to an inquiry about Ahmed Ismael from
15 Mr. Wylds, and McCarty wrote, "Discipline-wise, he is
16 okay...thus far." Do you see that?
17 A. I do.
18 Q. So let me ask you about the first part of that
19 sentence. Do you have anything -- well, Sergeant McCarty
20 was in internal affairs at this point; correct?
21 A. That is correct.
22 Q. So he would've been aware of any internal
23 affairs complaints against Deputy Ismael?
24 A. That's fair to say.
25 Q. So do you have any reason to dispute his

Page 43

1 statement here on September 24th of '21 that
2 "Discipline-wise, he is okay"?
3 A. I'm only aware of one complaint against
4 Deputy Ismael that was filed by a citizen that I reviewed.
5 Q. I understand, and we're going to talk about
6 that.
7     But, at this point, Deputy Ismael had been with
8 the department for a little bit less than two years; is
9 that right?
10 A. If the math tracks, yes.
11 Q. Do you agree or disagree with the statement,
12 "Discipline-wise, he is okay."? And if you disagree,
13 what's the factual basis for it?
14 A. Again, I can advise that I was aware of one
15 other complaint against Deputy Ismael.
16 Q. All right. So let me ask you about the second
17 part of that sentence that was on Friday, September 24th,
18 which was four days after Deputy Ismael made his complaint
19 against Lieutenant Jenkins; is that right?
20 A. I can't testify to that, sir.
21 Q. And why did McCarty write "thus far" after
22 "..."?
23 A. I can't testify to that, sir.
24 Q. How do you interpret that as you read it, sir?
25 A. I don't.

Page 44

1     MR. KERTSCHER: Okay. All right.
2     Let's go ahead and take a 10-minute break, if
3 that's okay with everyone?
4     MR. FRAILS: Okay.
5     (A recess was taken from 10:36 a.m.
6 until 10:49 a.m.)
7 Q. (By Mr. Kertscher) Sheriff Roundtree, you
8 understand that you're still under oath?
9 A. Correct.
10 Q. Okay. I want to ask you a follow-up question.
11 We were talking earlier about complaints against
12 Lieutenant Jenkins.
13     I wanted to see if you're aware of a complaint
14 made against him where he made several inappropriate
15 comments that were disrespectful toward females in general
16 and females "in our profession."
17     Do you recall that complaint against Lieutenant
18 Jenkins?
19 A. I do.
20 Q. And your internal affairs investigator,
21 Sergeant Caleb Lee, made a recommendation -- well, let me
22 withdraw that and ask if you remember the name of the
23 individuals that made that complaint against
24 Lieutenant Jenkins?
25 A. I do not.

Ismael v.
Roundtree, et al.

Richard Roundtree
December 8, 2023

Page 45

1 Q. Do you know if it was one person or several
2 persons that made that complaint against
3 Lieutenant Jenkins?
4 A. In this particular case, I believe it was one
5 individual.
6 Q. All right. Was it a female?
7 A. That is correct.
8 Q. But you don't remember her name, her position,
9 or anything about this person?
10 A. I do not.
11 Q. And would that person's identity be in
12 Sergeant Caleb Lee's file in internal affairs?
13 A. That is correct.
14 Q. All right. Thank you.
15     You were made aware of Deputy Ismael's internal
16 affairs complaint against Lieutenant Jenkins per the
17 normal processes; isn't that right?
18 A. That is correct.
19 Q. Okay. I know you don't remember the exact
20 dates, but does it sound right that you were made aware on
21 or about September 20th?
22 A. If that's what tracks.
23 Q. I'm sorry. Did you say "correct"?
24 A. I can't dispute the date.
25 Q. Okay. Thank you. I just couldn't hear you. We

Page 46

1 had some interference, so I just wanted to make sure I was
2 hearing you correctly.
3     So what were you told about Deputy Ismael's
4 complaint against Lieutenant Jenkins?
5 A. That Lieutenant Jenkins had made some derogatory
6 comments regarding Deputy Ismael's ethnicity or race.
7 Q. And what were you told about whether or not
8 there were handwritten private citizen statements
9 corroborating the harassment alleged by Deputy Ismael?
10 A. Repeat the question.
11 Q. When were you told about the private citizens
12 that wrote statements to support Deputy Ismael's complaint
13 against Lieutenant Jenkins?
14 A. That individuals wrote letters on Ismael's
15 behalf.
16 Q. All right. And was that concerning to you, that
17 private individuals had witnessed harassing behavior
18 between one of your officers against another one?
19 A. Again, I can't remember what the contents of the
20 letters were. I think they were unsigned, but I can't
21 remember the content of them.
22 Q. Who told you they were unsigned?
23 A. I'm not saying that they were. I'm saying from
24 memory, I can't remember the contents. I know the
25 citizens worked at the Urban Air facility.

Page 47

1 Q. Right. Again, that wasn't exactly my question.
2 I'm going to reask it. Did it concern you that members of
3 the public had written a statement witnessing harassing
4 actions by one of your officers against another?
5 A. Again, I can't testify to the content of what
6 was written, so I don't know exactly what was said.
7 Q. I see. And what were you told about the written
8 statements submitted by the private citizens?
9 A. Again, that individuals at Urban Air had written
10 letters on Ismael's behalf.
11 Q. Now, we're sitting here in December of 2023,
12 which I understand is over two years from when this
13 conversation would've taken place.
14     Were you made aware at the time, and you just
15 don't remember here today; is that fair?
16 A. I'm not sure if I was made aware of what the
17 contents were because all I remember is that they were
18 written on Ismael's behalf. I don't remember the specific
19 contents of what was written.
20 Q. Okay. Were you given the statements to look at?
21 A. I can't recall.
22 Q. Did you ask to see the statements?
23 A. I can't recall.
24 Q. Did you ever talk to Jenkins about the
25 allegations made against him by Deputy Ismael?

Page 48

1 A. I did not.
2     (Plaintiff's Exhibit Number 3 was
3 previously marked for identification.)
4 Q. (By Mr. Kertscher) All right. Let's look at
5 Exhibit 3 that's been used in this case.
6     I'll just represent on the record that this is
7 the report prepared by Sergeant McCarty regarding the
8 investigation and conclusion from Ismael's complaint
9 against Lieutenant Jenkins.
10 A. What is your question, sir?
11 Q. Well, when have you seen this document before,
12 sir?
13 A. On or about the 20th of September 2021.
14 Q. All right. Let me ask you to flip to the last
15 three pages of Sergeant McCarty's report and see if this
16 refreshes your recollection of what you saw.
17     The third page from the bottom is a handwritten
18 statement dated September 19, 2021, by William Gilbert,
19 owner/manager of Urban Air.
20 A. The statement I have is typed.
21 Q. Yes, sir. I apologize. It is typed, and the
22 signature there is handwritten; is that a fair statement?
23 A. That is correct.
24 Q. Thank you. Mr. Gilbert wrote, "Deputy Ismael
25 has been employed in my establishment, Urban Air, for just

Page 49

1  under a year and has been given the responsibility of
2  leading a group of off-duty special police officers to
3  oversee security during busy business hours."
4      Do you see that statement?
5  A.  I do.
6  Q.  Do you have any reason to dispute that
7  statement?
8  A.  I do not.
9  Q.  The next statement says, "As a worker, I respect
10  Ismael, his work ethic, and the leadership he provides to
11  his colleagues."
12      Do you have any reason to dispute that
13  statement?
14  A.  I do not.
15  Q.  The next the he wrote was, "I have been highly
16  satisfied with the responsibility he has shown toward the
17  job.  He is a responsible and valued member of our
18  security team.  He has taken this job seriously and
19  professionally."
20      Do you have any reason to dispute those
21  statements?
22  A.  Not by Mr. Gilbert, no.
23  Q.  I understand.  Then the next sentence says,
24  "Lieutenant Jenkins is an officer who also worked at our
25  establishment, and has been supervised under the direction

Page 50

1  of Ismael."
2      Do you have any understanding of why Ismael was
3  placed over Lieutenant Jenkins in the special?
4  A.  I do not.
5  Q.  The next sentence says, "On multiple occasions
6  Lieutenant Jenkins has reported tardy for his shift,
7  anywhere from 10-15 minutes, to 2 hours late."
8      Do you have any reason to dispute the truth of
9  that statement?
10  A.  I do not.
11  Q.  Is there anything about that statement that's
12  concerning to you, sir?
13  A.  No.  Again, it's the statement from a Urban Air
14  manager over a special-duty assignment.
15  Q.  By the way, how long has the Richmond County
16  Sheriff's Department been providing security for
17  Urban Air?
18  A.  I do not.
19  Q.  Do you know if it's more or less than
20  three years?
21  A.  I do not.
22  Q.  Richmond County Sheriff's Office currently
23  provides security now, in December of 2023, for Urban Air;
24  is that true?
25  A.  I couldn't testify to that.

Page 51

1  Q.  And how many days a week does Richmond County
2  officers work at Urban Air?
3  A.  I can't testify to that.
4  Q.  I'm sorry?
5  A.  I cannot testify to that.
6  Q.  Okay.  So you don't know whether or not it's
7  four days a week, Thursday through Sunday?
8  A.  I do not.
9  Q.  The next sentence says, "Lieutenant Jenkins had
10  the expectation to be paid his full pay for the evening,
11  even when he was missing hours on his shift."
12      Is that called wage theft, sir?
13  A.  I would not say that.
14  Q.  What would you call it?
15  A.  A complaint by an owner who is employing a
16  deputy at a special.
17  Q.  Is it theft by taking?
18      MR. FRAILS: I'm going to object to the form of
19  the question.
20  Q.  (By Mr. Kertscher) Well, do you know what theft
21  by taking is, Sheriff?
22  A.  I do.
23  Q.  And you've worked on theft-by-taking cases
24  before, haven't you?
25  A.  I have.

Page 52

1  Q.  And you're familiar with the theft-by-taking
2  statute under Georgia law in your many years of law
3  enforcement, aren't you?
4  A.  I am.
5  Q.  Is it potentially theft by taking when one of
6  your officers demands to be paid for work that they didn't
7  do?
8  A.  No.
9  Q.  Why not?
10  A.  Following Georgia statute -- not saying this is
11  the case -- if a person is being paid for work that they
12  didn't do, it'd be theft of services.
13  Q.  Thank you, sir.  Is that a different statute --
14  A.  It is.
15  Q.  -- then theft by taking?
16  A.  It is.
17  Q.  This is not an area that I practice in
18  regularly, so I do not know, but do you know the statute
19  regarding theft by services?
20  A.  I do not.
21  Q.  Would it be of concern to you that one of your
22  deputies was alleged to have engaged in theft by services?
23  A.  If that was the case.
24  Q.  All right.  You don't read this as that kind of
25  allegation?

Page 53

1  A.  I do not.
2  Q.  Okay.  Mr. Gilbert then wrote,
3  "Lieutenant Jenkins did not display a cooperative or
4  positive attitude on the job.  He was spoken to about his
5  job responsibilities and staying on task.  He was
6  repeatedly asked to come inside the establishment to make
7  rounds opposed to sitting outside in his car in the
8  parking lot during his shift.  He did not demonstrate the
9  same level of professionalism or care for the job as his
10  supervisor, Ismael."
11     Do you have any reason to dispute those
12  statements?
13  A.  Not by Mr. Gilbert, no.
14  Q.  Again, is that type of professionalism that you
15  want your officers displaying in their work in a public
16  special?
17  A.  I can't testify that that's an accurate
18  statement, sir.
19  Q.  Right.  I'm just talking about your obligation
20  as Sheriff here.  I mean, Urban Air, do you know that to
21  be a large facility that hosts many members of the
22  public --
23  A.  I do not.
24  Q.  -- there in --
25     You do not know?  Do you know anything about

Page 54

1  Urban Air, sir?
2  A.  I do not.
3  Q.  You have any idea where it is or how far it is
4  from the sheriff's department?
5  A.  I do not.
6  Q.  All right.  So you don't know whether or not
7  it's a ten-minute drive from the sheriff's department?
8  A.  I do not.
9  Q.  All right.  Then the next paragraph says, "On
10  numerous occasions, I witnessed Lieutenant Jenkins
11  challenge Ismael's authority, even though Ismael was in
12  charge.  I also heard Lieutenant Jenkins call Ismael a
13  terrorist and say, 'Watch out.  He might have a bomb.' I
14  have witnessed other insensitive, racist remarks being
15  spoken about Ismael as well."
16     Do you have any reasons to dispute those
17  statements?
18  A.  Not made by Mr. Gilbert.
19  Q.  Right.  You would expect that this kind of
20  allegation would be thoroughly investigated; right?
21  A.  That is correct.
22  Q.  And you would expect that your internal affairs
23  department would interview Mr. Gilbert about this written
24  statement, wouldn't you, sir?
25  A.  That is correct.

Page 55

1  Q.  Have you read any of -- well, you've followed
2  this lawsuit; right?  You're aware of it and have been in
3  contact with your lawyers about the developments in this
4  lawsuit; is that right?
5  A.  That is correct.
6  Q.  And have you -- have you read any of the
7  deposition testimony of Mr. Gilbert that he gave in May of
8  this year, about six months ago?
9  A.  I have not.
10  Q.  Have you taken any disciplinary action or opened
11  any kind of investigation into Lieutenant Jenkins for wage
12  theft?
13  A.  I have not.
14  Q.  I'm sorry.  Theft of services?
15  A.  I have not.
16  Q.  All right.  Let me ask you to turn the page to
17  another statement by a woman named Jordan Chambliss.
18     In the first paragraph, she wrote of
19  Deputy Ismael, "...I believe it was early October, and
20  from the first day he began working with us as an off-duty
21  special officer, we were pleased with the way he conducted
22  himself.  He was never late, he always stayed until
23  everyone was safely out of the building and was very
24  present throughout the park."
25     Do you have any reason to dispute that

Page 56

1  statement?
2  A.  Made by Chambliss, no.
3  Q.  I mean, what's the responsibility that you feel
4  your sheriff's department has towards private citizens
5  like Ms. Chambliss and Mr. Gilbert?
6  A.  You have to be more specific, sir.
7  Q.  Do you care what private citizens that live in
8  Augusta say or think about Richmond County Sheriff's
9  Department?
10  A.  Of course.
11  Q.  All right.  The next paragraph down in
12  Ms. Chambliss's statement says, "Although Lieutenant
13  Jenkins was a higher-ranking officer, he did not conduct
14  himself in a manner as professionally as Deputy Ismael."
15     Do you have any reason to dispute that
16  statement?
17  A.  Not made by Ms. Chambliss.  Well, I don't know
18  if it's Ms. or -- is Jordan a female or a male?
19  Q.  She is a female, sir.
20  A.  Not made by Ms. Chambliss, no.
21  Q.  Okay.  Continuing down in the second paragraph
22  of Ms. Chambliss's typed-up statement, What was most
23  troublesome was how he spoke to the officer in charge of
24  the special, Deputy Ismael.  He made extremely offensive,
25  racist remarks towards him.  There was not just one

Page 57

1  incident where they were working together at Urban Air and
2  Lieutenant Jenkins --
3      Oh, I'm sorry. I read that wrong. Let me try
4  that again.
5      MR. FRAILS: Wait, wait. We're going to object
6  to this form of questioning that you're doing.
7      You can call this a speaking objection.
8  Basically what you're doing is putting hearsay
9  testimony into the record. So we're going to put our
10  objection on the record for that.
11  Q. (By Mr. Kertscher) Understood. Thank you.
12      Sheriff, do you have any reason to dispute the
13  statement made by Ms. Chambliss that "There was not one
14  instance when they were working together at Urban Air when
15  Lieutenant Jenkins did not refer to him as a terrorist or
16  make some crude remark about sand, bombs, or not being
17  able to speak English and that no one could understand
18  him."
19      Do you have any reason to dispute that
20  statement?
21  A. As made by Ms. Chambliss, no.
22  Q. It is true that English is a second language for
23  Deputy Ismael; right?
24  A. I'm not certain.
25  Q. She wrote there -- well, let's turn over to the

Page 58

1  next page.
2      I asked Deputy Ismael if those remarks make him
3  uncomfortable. To which he replied, 'very much, but I --
4  A. I'm sorry. You got to tell me where you are on
5  the page.
6  Q. Sure. I'm in the top paragraph of the last page
7  of Exhibit 3.
8  A. Go ahead.
9  Q. Thank you.
10      "I asked Deputy Ismael if those remarks made him
11  uncomfortable. To which he replied, 'very much, but I
12  cannot say anything to him about it, I am afraid it will
13  jeopardize my chances of being on the SWAT team."
14      Do you have any reason to dispute those
15  statements?
16  A. Made by Ms. Chambliss, no.
17  Q. And it is true that Lieutenant Jenkins was in
18  charge of the SWAT team and thus in charge of Ismael's
19  role on the SWAT team; is that true?
20  A. That is correct.
21  Q. And Lieutenant Jenkins is given discretion to
22  determine who is on his SWAT team; isn't that true?
23  A. Not solely, no.
24  Q. Who oversees Lieutenant Jenkins's decisions
25  about the SWAT team?

Page 59

1  A. Lieutenant Jenkins was the SWAT commander.
2  There is a selection committee that determines who make
3  the SWAT team, so he doesn't have sole discretion on who
4  is added or not.
5  Q. And that selection committee, they agreed to put
6  Ismael on the SWAT team in the fall of 2021, didn't they?
7  A. I would assume that is correct.
8  Q. Now, whose decision is it to -- well, let me
9  just say it this way.
10      As the commander of the SWAT team,
11  Lieutenant Jenkins certainly has input, doesn't he, into
12  whether or not someone can be kicked off of the SWAT team?
13  A. That is correct.
14  Q. The second paragraph here talks about
15  Lieutenant Jenkins being late "to most every shift we
16  expected him to show up for."
17      Do you see that, the first sentence of the
18  second paragraph?
19  A. I do.
20  Q. Then going down to the middle of the paragraph,
21  she stated, "Yet every time this happened, he would demand
22  the same payment, and he threatened Deputy Ismael that if
23  he were not paid in full (for the time he was not
24  present), he 'would regret it.'"
25      Do you see that?

Page 60

1  A. I do.
2  Q. Was that a potential case of theft of services
3  as we discussed earlier?
4  A. I do not agree.
5  Q. Why not, sir?
6  A. Again, it seems like a complaint from a business
7  owner about a deputy who they've employed.
8  Q. Well, it's two business people; right?
9  A. Same business, though; correct?
10  Q. Yes, sir. Two different people.
11  A. Correct.
12  Q. Did you direct -- you'd expect these types of
13  allegations from private citizens to be fully
14  investigated, wouldn't you, sir?
15  A. Again, correct.
16  Q. Now, at the bottom of the next to the last
17  paragraph on the last page of Exhibit 3, Ms. Chambliss
18  wrote, "It seemed..." Do you see that?
19  A. Where?
20  Q. The next to the last paragraph of the last page
21  of Exhibit 3.
22  A. The paragraph that starts off with, "There were
23  many instances in which..."?
24  Q. Yes, sir.
25  A. Okay. And where are you in that paragraph?

Ismael v.
Roundtree, et al.

Richard Roundtree
December 8, 2023

---

Page 61

1 Q. I'm going to the last sentence of that
2 paragraph.
3 A. Okay.
4 Q. And Ms. Chambliss wrote, "It seemed that he was
5 holding any possibility of Deputy Ismael advancing in his
6 career over his head. Ismael informed that if he did not
7 receive payment in full, Jenkins would not approve his
8 training."
9     MR. FRAILS: I'm going to object again to this
10 line of questioning.
11 Q. (By Mr. Kertscher) I understand.
12     Let me just ask the sheriff: Do you have any
13 reason to dispute the truthfulness of that statement?
14 A. Made by Ms. Chambliss.
15 Q. Does that cause you any concern at all that
16 Jenkins would be using his position as SWAT commander to
17 receive payment in full for time that he didn't work?
18 A. I can't testify that that's a true statement,
19 sir.
20 Q. Right. If it were a true statement -- well,
21 whether or not it's a true statement, it's a statement
22 made by a public citizen. Does that cause you any concern
23 about Lieutenant Jenkins, sir?
24 A. It does not.
25 Q. Okay. And why not?

---

Page 62

1 A. Based on the reading of it, it seems like it's a
2 statement from Ismael being coached.
3 Q. It's from Ismael, coached? Is that what you
4 said?
5 A. From what you said -- from what you read, she
6 put, Deputy Ismael always -- hold on.
7     "It seemed that he was holding any possibility
8 of Deputy Ismael advancing in his career over his head."
9     That is subjective. How would she know what
10 Ismael was thinking unless Ismael told her that?
11 Q. We agree on that, sir. The next sentence says,
12 "Ismael informed me that if he did not receive payment in
13 full, Jenkins would not approve his training."
14 A. Again, that's why I said that seems like a
15 statement from Ismael, which I testified to.
16 Q. It was. We agree on that, sir.
17     Does it give you concern at all, sir, that one
18 of your deputies would make that statement about one of
19 your lieutenants?
20 A. No. Again, I can't say that that statement is
21 true.
22 Q. What effort did you take to make sure this was
23 fully investigated by your internal affairs department,
24 sir?
25 A. Followed the normal process of an internal

---

Page 63

1 affairs investigation.
2 Q. Does it cause you any concern that these citizen
3 witnesses who gave written statements in Exhibit 3 were
4 never interviewed by your internal affairs investigators?
5 A. I don't know if they were or not, sir.
6 Q. Okay. And why don't you know that?
7 A. I can't recall if they were or not I guess would
8 be a better response.
9 Q. Now, did you give testimony in the personnel
10 board hearing that oversaw Ismael's termination in
11 November of 2021?
12 A. I did, if that date is correct.
13     MR. KERTSCHER: Okay. I'm going to play into
14 the record your testimony to refresh your
15 recollection. It's about four-and-a-half minutes of
16 testimony that we're going to play into the record.
17     And, Madam Court Reporter, we can send this to
18 you if this goes too fast and you're unable to get it
19 all down. Is that okay?
20     COURT REPORTER: It is, yes, sir.
21     MR. KERTSCHER: I'm going to share my screen.
22 Can everyone see the video on the screen?
23     THE WITNESS: Yes.
24     MR. KERTSCHER: All right. Let's see if we can
25 get the sound to play. Are you-all able to hear

---

Page 64

1 that?
2     THE WITNESS: No.
3     MR. KERTSCHER: All right. Let's take a
4 two-minute break for me to get the sound on on this,
5 and we'll come right back.
6     Thank you, all.
7     (A recess was taken from 11:21 a.m.
8 until 11:24 a.m.)
9     MR. KERTSCHER: I'm going to play this video for
10 you now, Madam Court Reporter.
11     (Testimony from Plaintiff's Exhibit 30 was
12 played beginning at 1:08:32.)
13     MR. KENDRICK: Do any other board members have
14 any questions for clarification for --
15     MS. McCLAIN-HAYMON: Yes. Sheriff, did you have
16 an occasion to --
17     (Video glitches.)
18     MR. FRAILS: Did you get all that?
19     COURT REPORTER: I don't think so.
20     MR. KERTSCHER: All right. Start again. This
21 will be the beginning of the testimony. Thank you,
22 all.
23     (Testimony from Plaintiff's Exhibit 30 was
24 played.)
25     SHERIFF ROUNDTREE: I do.

---

Page 65

1   MS. McCLAIN-HAYMON: Thank you.
2   Well, can you please state your full name for
3   the record?
4   SHERIFF ROUNDTREE: Richard Roundtree.
5   MS. McCLAIN-HAYMON: Okay. And what is your
6   position, sir?
7   SHERIFF ROUNDTREE: I am the elected sheriff of
8   Richmond County since November of 2020.
9   MS. McCLAIN-HAYMON: And as Sheriff of the
10   Richmond County Sheriff's Office, you have -- you
11   have the final say or the authority -- the final
12   authority of the decision to terminate or discipline
13   an employee?
14   SHERIFF ROUNDTREE: That is correct, ma'am.
15   That solely lies with me.
16   MS. McCLAIN-HAYMON: Okay. In your capacity as
17   sheriff, did you have an occasion to review
18   disciplinary action involving Mr. Ahmed Ismael for
19   which we're here today, sir?
20   SHERIFF ROUNDTREE: Yes, ma'am, I did.
21   MS. McCLAIN-HAYMON: Okay. And you're familiar
22   with the context of the reasons for which he was
23   being disciplined?
24   SHERIFF ROUNDTREE: That is correct.
25   MS. McCLAIN-HAYMON: Okay. And can you tell the

Page 66

1   board why you decided to terminate Mr. Ismael?
2   SHERIFF ROUNDTREE: Absolutely.
3   When I received information from Colonel Chew
4   that Mr. Ismael had possibly went to Burke County, on
5   duty, in uniform to apply for a job, I, again, told
6   him to go ahead and proceed with an internal affairs
7   investigation to verify the information.
8   Colonel Chew and Chief Clayton, my other
9   chief deputy, had some concerns because they knew
10   that Ismael had filed a complaint.
11   I told them I understood that. This is an
12   independent investigation, it has nothing to do with
13   the complaint. The complaint investigation still
14   should continue, however, I'm not going to be held
15   hostage by a person, who files a complaint and not
16   subject to disciplinary action, so to proceed with
17   the internal affairs investigation to see if, in
18   fact, it is true.
19   That was done. I think the next day or the day
20   thereafter I received information again that internal
21   affairs had tried to contact Mr. Ismael to come in
22   for a formal review to verify the allegations.
23   That time it was advised that he was in fact
24   back in Burke County conducting an oral interview for
25   the job that he had previously applied for while on

Page 67

1   duty.
2   This -- I asked how this was verified. It was
3   to the point where when they called Captain Wylds in
4   Burke County to ask had he been down there to apply,
5   he said, "He's sitting in front of me right now."
6   At that point, once he arrived at
7   Richmond County, they conducted their interview. I
8   told them, in fact, to write up the details of the
9   report, everything that transpired, everything that
10   they had confirmed, and I would place him on
11   administrative leave, and then submit the file up the
12   chain of command for review.
13   The next day, the file was reviewed by
14   Colonel Chew. At that point, on our disciplinary
15   forms, they can either agree or disagree and offer an
16   alternative disciplinary action to the one that
17   proposed.
18   Colonel Chew agreed with the termination. It
19   was passed on to Chief Clayton. Chief Clayton
20   independently reviewed the file. He also agreed with
21   the termination, and it was ultimately placed on my
22   desk for final review.
23   When I received the file, based on all the
24   information, I took into account the previous
25   write-up that I had done maybe a month prior to with

Page 68

1   Mr. Ismael where they had proposed a disciplinary
2   action of three days and probation.
3   I actually reduced that down to two days after I
4   looked at the entirety of the investigation. So I
5   actually reduced that disciplinary request down to
6   two days instead of three days and 12-months
7   probation. That had happened, like I say, again,
8   maybe a month prior to this incident.
9   Taking into consideration the fact that he'd
10   just received two days suspension without pay for a
11   violation of conduct and the fact that he, in fact,
12   used our County vehicle, in uniform, while on duty to
13   go to another agency to apply for another job.
14   And then the subsequent day -- day after, he
15   returned back to that agency, driving the County
16   vehicle again, interviewing for this subsequent job
17   prior to coming to Richmond County to be interviewed
18   by internal affairs as he was instructed to do.
19   At that point, I made the ultimate decision that
20   I would terminate Mr. Ismael.
21   MS. McCLAIN-HAYMON: And Sheriff Roundtree,
22   would it be true that your officers, as part of their
23   training or orientation prior to working, that they
24   are instructed that they can use their marked patrol
25   units to conduct personal business? Would that be a

Page 69

1 true statement?
2     **SHERIFF ROUNDTREE:** No, ma'am.  We've had
3 instances where that has occurred before.  Other
4 deputies have been disciplined in reference to that.
5 So that has been a matter of our policy.  I think we
6 restated it in our policy, that the vehicle were not
7 to be used for personal use.
8     **MS. McCLAIN-HAYMON:** Okay.  Sheriff Roundtree,
9 that concludes my questioning.  Now, Mr. Ismael --
10     **MR. ISMAEL:** Yes, ma'am.
11     **MS. McCLAIN-HAYMON:** -- or board members may
12 have some questions for you.
13     **MR. KENDRICK:** Mr. Ismael, do you have any
14 questions for Sheriff Roundtree?
15     **MR. ISMAEL:** No, not for the sheriff.
16     **MR. KENDRICK:** Thank you.
17     Do any of the board members have any questions
18 for clarification for Sheriff Roundtree?
19     There are none.
20     Sheriff Roundtree, we thank you so much for your
21 presentation, for being part of this.
22 Q.  (By Mr. Kertscher) All right.  I stopped the
23     video.  That's the end of the testimony.
24     Were you able to hear all of that testimony,
25     Sheriff Roundtree?

Page 70

1 A.  Yes, I was.
2 Q.  Was all of that true and correct, sir?
3 A.  Correct.
4 Q.  All right.  I have some questions for you about
5     that testimony.
6     You testified beginning at 1:03:43 on the tape
7     that "Colonel Chew and Chief Clayton, my chief deputy, had
8     some concerns because they knew that Ismael had filed a
9     complaint."  Do you see that?
10 A.  Do I --
11 Q.  Do you remember that testimony that was just
12     played?  I'm sorry.  I apologize.
13 A.  I do.
14 Q.  What were the concerns that Colonel Chew and
15     Chief Clayton expressed to you?
16 A.  That -- the optics of, during the investigation,
17     he had filed a complaint against Jenkins, how that would
18     look.
19 Q.  And what were those optics that they were
20     referring to?
21 A.  That it would look like it was retaliatory.
22 Q.  And were you concerned about a possible
23     retaliatory investigation into Ismael?
24 A.  Not at all.
25 Q.  So did you do anything or undertake any actions

Page 71

1     to ensure that this was not a retaliatory investigation
2     into Ismael?
3 A.  No.  That's why I followed the normal process
4     and didn't even take it into consideration about the
5     complaint.
6 Q.  I see.  You weren't concerned about a possible
7     retaliatory complaint against Ismael even though the
8     complaint was initiated by an anonymous phone call to
9     Colonel Chew, who is on your executive team, exactly one
10     week after Ismael made his complaint against Jenkins?
11 A.  I was not.
12 Q.  That was not a concern to you?
13 A.  Not at all.
14 Q.  All right.  And what else did you and
15     Colonel Chew and Chief Clayton discuss about their
16     concerns about a possible retaliatory filing?
17 A.  That was it.
18 Q.  All right.  Turning back to your testimony, you
19     stated, at 1:04:42 of the tape, "That was done.  I think
20     the next day or the day thereafter I received information
21     again that internal affairs had tried to contact
22     Mr. Ismael to come in for a formal review to verify the
23     allegations."
24     Do you remember that testimony that was just
25     played into the record?

Page 72

1 A.  I do.
2 Q.  All right.  I'm curious about that.  What were
3     you told about the fact that internal affairs had tried to
4     contact Ismael to come in for a formal interview?
5 A.  Someone from internal affairs told me they were
6     contacting Ismael to come in for a formal interview.
7 Q.  All right.  Do you know if they had reached him?
8     Did they tell you if they had reached him, or did they
9     tell you they had left a voicemail for him?
10 A.  I'm not certain.
11 Q.  Now, you said the next day or the day
12     thereafter.  Is this on Monday or Tuesday when you were
13     told this, Monday the 27th or Tuesday the 28th?
14 A.  I can't recall.
15 Q.  Okay.  Now, you also testified later on in that
16     same sentence, "At this time, it was advised that he was,
17     in fact, back at Burke County conducting an oral interview
18     for the job that he had previously applied for while on
19     duty."
20     Do you remember that testimony that was played
21     into the record a few minutes ago?
22 A.  I do.
23 Q.  And were you aware of how when the internal
24     affairs folks came to learn about this second interview?
25 A.  The exact moment, no.

Page 73

1  Q.  Did they tell you if they learned about it on
2  Monday the 27th?
3  A.  I can't recall.
4  Q.  Do you remember, sir?
5  A.  I can't recall the exact date.
6  Q.  All right.  How was it that -- how did internal
7  affairs pick the particular time that they wanted
8  Mr. Ismael to come in for a formal interview with internal
9  affairs?
10 A.  I can't testify to that.
11 Q.  Do you know whether or not that they picked the
12 exact same time to come in and interview in
13 Richmond County as Ismael was at Burke County conducting
14 his interview?
15 A.  I can't testify to that.
16 Q.  If that were true, sir, wouldn't that be a very
17 odd coincidence?
18 A.  I don't think that's true.
19 Q.  Why not?
20 A.  Because it was explained to me that when they
21 called to call him in, they were advised at that time that
22 he was actually in Burke County.
23 Q.  Who were they advised by?
24 A.  I can't testify to that.
25 Q.  And, again, let's go with that coincidence.

Page 74

1  Isn't that an odd coincidence, that they are calling him
2  in at the exact time he's at Burke County for an
3  interview?
4  A.  I think that would be the exact definition of a
5  coincidence.
6  Q.  In your investigative history and training, have
7  you ever been taught to investigate coincidences as maybe
8  something that was intentionally planned, maybe not a
9  coincidence?
10 A.  In my investigative -- I've been taught to look
11 at all possibilities.
12 Q.  Thank you, sir.
13    Do you know whether or not they attempted to
14 contact him actually before he was in Burke County in the
15 interview and told him to come in at the time the
16 interview was set?
17 A.  I'm not certain.  But, again, that wasn't a
18 concern of mine.
19 Q.  Okay.  Wasn't it a concern of yours, sir,
20 because you testified that that was part of what was
21 disturbing to you, that he was in Burke County conducting
22 an oral interview at the time your deputies were trying to
23 reach him?
24 A.  No.  What concerned me was that he was in
25 Burke County in my County vehicle at the time that they

Page 75

1  called him.
2  Q.  And wasn't --
3  A.  That's what concerned me.
4  Q.  Wasn't he in your County vehicle because your
5  sergeant had told him to get to Richmond County as soon as
6  he could, so he knew he had to go directly to
7  Richmond County after he left Burke County?  Isn't that
8  why he was in your vehicle?
9  A.  That's a contradiction.  In your scenario, it
10 means he would have made contact prior to him going to
11 Burke County.
12 Q.  Yes, sir.  They would have made contact prior to
13 Burke County; right?
14 A.  Prior to him going to Burke County.
15 Q.  Yes, sir.
16    Have you looked into whether or not that is
17 actually what happened?
18 A.  Again, that was not my concern.
19 Q.  But you testified that part of that was part of
20 the reason that you fired him, because he was in the
21 County vehicle while he was at Burke County; right?
22 A.  That is correct.
23 Q.  Now, you testified that he -- do you know
24 whether or not he actually applied for a job the first
25 time he was there on the 17th?

Page 76

1  A.  That was my understanding.
2  Q.  Who gave you that understanding?
3  A.  The internal affairs investigation.
4  Q.  Okay.  And so he filled out an application and
5  gave it there on the 17th; is that your understanding from
6  internal affairs?
7  A.  It's my understanding that he applied and went
8  back for a subsequent interview.
9  Q.  When you reviewed the file, did you look into
10 that at all?  Well, let me go back.  Do you remember
11 reviewing the file on this as you testified to?
12 A.  I'm certain I did.
13 Q.  Okay.  And you also testified at 1:05:24 of the
14 tape that, "At that point, once he arrived in Richmond
15 County, they conducted their interview.  I told them, in
16 fact, to write up the details of the report, everything
17 that transpired, everything they confirmed.  And I would
18 place him on administrative leave and then submit the file
19 up the chain of command for review."
20    Do you remember that testimony that was played
21 into the record a few minutes ago?
22 A.  I do.
23 Q.  Okay.  That testimony wasn't supported by the
24 e-mails at the time, was it, sir?
25 A.  I'm sorry?

Page 77

1  Q.   That testimony that you gave, that's not
2  supported by the e-mails that your deputies issued at the
3  time, is it?
4      MR. FRAILS: I'm going to object to the form of
5  the question.
6      (Plaintiff's Exhibit Number 21 was
7  previously marked for identification.)
8  Q.  (By Mr. Kertscher) Well, let's just look at that.
9  Let's look at Exhibit 21.
10     While you're reading that, sir, I'll state for
11 the record that that's an e-mail from Captain Rahn to you
12 and Mr. Clayton and Colonel Chew, dated September 28th,
13 2021, at 12:21 p.m.
14     It says, "Just confirmed Deputy Ismael was in
15 Burke County in our vehicle doing an interview to be
16 hired.  He will not be hired, and we will have the DR for
17 termination ready by the time we finish talking with him."
18     Do you see that?
19 A.  I do.
20 Q.  All right.  So at this point on the 28th at
21     12:21 p.m., Captain Rahn, who is in charge of your
22 internal affairs, is talking about a DR, which is a
23 disciplinary record -- is that what it stands for?
24 A.  Report.
25 Q.  A DR, which is a disciplinary report for

Page 78

1  termination.  That's what Captain Rahn wrote; correct?
2  A.  Correct.
3  Q.  He didn't read anything about this having to go
4  up the chain or anything like that; right?  In is e-mail
5  to you, he said "the DR for termination"?
6  A.  That's what happens with DRs for termination,
7  they all go up the chain.
8  Q.  And you didn't respond back anything about
9  having to review that or there being a lengthy review
10 process.  Actually, I don't have any response from you to
11 this e-mail.  Did you respond back?
12 A.  I did not.
13 Q.  Do you know if, at this point, at 12:21 p.m., if
14 anyone had even asked Ismael about any of this?
15 A.  I do not.
16 Q.  Wasn't that something important to you when you
17 reviewed the file, that someone had asked him about these
18 allegations?
19 A.  What was concerning to me was that this was
20 confirmed to be true.
21 Q.  Is there anywhere in the file where there's any
22 discussion with him about these allegations?  I haven't
23 seen it.  Have you seen that in the file, sir?
24 A.  I can't recall.
25 Q.  When he sent you this e-mail, did you ask

Page 79

1  Captain Rahn how he knew that Deputy Ismael would not be
2  hired by Burke County?
3  A.  I did not.
4  Q.  Did that strike you as interesting, that here he
5  had just interviewed for Burke County -- well, did it
6  strike you as coincidental that he had that information
7  from Burke County?
8  A.  It did not.
9  Q.  There are a number of former Richmond County
10 employees over at Burke County; isn't that true?
11 A.  There were.
12 Q.  Jimmy Wylds is one of them; right?
13 A.  Jimmy Wylds is what?
14 Q.  He used to work in the Richmond County Sheriff's
15 Department, didn't he?
16 A.  He did.
17 Q.  And now he's at the Burke County Sheriff's
18 Department; isn't he?
19 A.  That's right.
20 Q.  And he is friends with McCarty, isn't he, sir?
21 A.  I'm not certain of their relationship, sir.
22 Q.  All right.  Are there a number of other former
23 Richmond County Sheriff's Department employees who are at
24 Burke County Sheriff's Department currently?
25 A.  There are some.

Page 80

1  Q.  Is there some kind of rule against interviewing
2  at another department, sir?
3  A.  No.
4  Q.  Now, the same day as Exhibit 21, the 28th, when
5  there's a discussion by Captain Rahn about the
6  disciplinary report for termination, you signed the
7  termination report the same day; isn't that true?
8  A.  If the number tracks.
9  Q.  All right.  Well, do you remember that you
10 testified that the next day the file was reviewed by
11 Colonel Chew?
12 A.  That's correct.
13 Q.  Okay.  But it wasn't, in fact, the next day.  It
14 was the same day that you and Colonel Chew both approved
15 the termination of the disciplinary report that was
16 written up; isn't that true?
17 A.  I can't testify to that.
18     (Plaintiff's Exhibit Number 31 was
19 previously marked for identification.)
20 Q.  (By Mr. Kertscher) All right.  Well, let's look
21 at it Exhibit 31, please.
22     Is that your signature on Exhibit 31?
23 A.  It is.
24 Q.  And is the date that you wrote there 9/28/2021?
25 A.  That is correct.

Ismael v.
Roundtree, et al.

Richard Roundtree
December 8, 2023

---

Page 81

1 Q.   And then whose handwriting is it where it says,
2   "Sheriff's or Designee Recommendation:", and then there's
3   the handwritten word "termination"?  Who wrote that?
4 A.   I did.
5 Q.   All right.  Good.  And did you also do that on
6   the 28th?
7 A.   That is correct.
8 Q.   Thank you, sir.
9     So I have a number of questions about this
10   document.  Did you read this report before you signed it,
11   sir?
12 A.   I did.
13 Q.   And it says, "The Richmond County Sheriff's
14   Office Internal Affairs Division received information that
15   on September 17, 2021 around 3:00 pm, Deputy Ahmed Ismael
16   arrived at the Burke County Sheriff's Office...", and it
17   goes on.
18     Do you know why neither you or anyone else that
19   reviewed or prepared this report wrote in the word
20   "anonymous information"?
21 A.   What are you reading from?
22 Q.   The first line of the first paragraph, sir.
23 A.   Doesn't that say September the 17th?
24 Q.   Yes, sir.
25 A.   You said the 21st.

---

Page 82

1 Q.   All right.  My apologies if I read it wrong.
2     Did anyone think to put in that this was
3   anonymous information?
4 A.   Are you asking me why they didn't word it
5   differently?
6 Q.   Yeah.
7 A.   I can't testify to that.
8 Q.   Okay.  Now, do you know who prepared this
9   report?
10 A.   Sergeant William McCarty.
11 Q.   All right.  And what time of day did you sign
12   this termination report on the 28th?
13 A.   I can't recall.
14 Q.   Do you know how close it was in relation to the
15   e-mail, Exhibit 21, that we just looked at that was
16   written at 12:21 p.m.?
17 A.   I can't recall.
18 Q.   And this termination decision and form looks
19   like it came into existence 36 hours after the
20   investigation had been initiated.  Do you have any reason
21   to dispute that?
22 A.   From the 17th to the 28th is nine days; isn't
23   it?
24 Q.   All right.  When did the Richmond County
25   Sheriff's Office learn that Ismael was in Burke County?  I

---

Page 83

1   agree that it happened on the 17th, but when did y'all
2   learn about it?
3 A.   I can't recall.
4 Q.   Do you know whether or not Colonel Chew alleged
5   the anonymous phone call came on the 27th?
6 A.   I can't recall.
7 Q.   The last sentence of the first paragraph states,
8   "Deputy Ismael was assigned to training that day and was
9   still on Richmond County time."
10     Do you see that?
11 A.   I do.
12 Q.   You were aware, weren't you, sir, that he had
13   been released from training for the day and was driving
14   home?
15 A.   That is correct.
16 Q.   Thank you.
17     So the next paragraph you wrote, "On Tuesday,
18   September 28, 2021 at 11:00 am, Sgt. McCarty made contact
19   with Dep. Ismael and advised him to report to Internal
20   Affairs as soon as he could."
21     Do you see that?
22 A.   I do.
23 Q.   Why was it that that particular time,
24   Sergeant McCarty called him?
25 A.   I can't testify to that.

---

Page 84

1 Q.   Why would he ask him to come in "as soon as he
2   could"?
3 A.   I couldn't testify to that.
4 Q.   Okay.  The next statement says, "Deputy Ismael
5   advised that he would be on the way and would try to be
6   here by 12:00 pm."
7     Do you see that?
8 A.   I do.
9 Q.   Do you know whether or not it's true that
10   McCarty actually ever talked to Ismael that day?
11 A.   I can't testify to that.
12 Q.   The next sentence says, "At 11:54 am that same
13   day, Sgt. McCarty received information that Dep. Ismael
14   was currently at Burke County Sheriff's Office
15   interviewing for a position."
16     Now, how did McCarty receive that information?
17 A.   I can't testify to that.
18 Q.   Wouldn't that all be in the file that you
19   reviewed before you approved the termination
20   recommendation, sir?
21 A.   No.
22 Q.   Do you remember what all was in the file that
23   you reviewed before you approved the termination
24   recommendation, sir?
25 A.   I do not.

---

Page 85

1 Q.  Thank you, sir.
2     And the next sentence says, "This information
3 was confirmed by Sgt. McCarty and it was also discovered
4 that he was operating his Richmond County Sheriff's Office
5 vehicle."
6     Was that a fact that was important to you in
7 your termination of Deputy Ismael?
8 A.  That is correct.
9 Q.  And that occurrence could have happened because
10 it was a set up by Sergeant McCarty, to call him when he
11 knew he was at Burke County interviewing and would have to
12 come straight in in his County vehicle; right?
13     MR. FRAILS: I'm going to object to the form of
14 the question.
15     THE WITNESS: I have no evidence to support
16 that.
17 Q.  (By Mr. Kertscher) Okay.  Well, you haven't --
18 I'm sorry, sir.  I'll strike that.
19     Now, as "Violation of S.O.P.," you and your
20 department chose "Manner of Conduct 4.4 (A, B, C)."
21     Why did you choose that SOP?
22 A.  That's an internal affairs protocol.
23 Q.  Are you done with your answer, sir?
24 A.  I am.
25 Q.  Right.  You signed that document; correct?

Page 86

1 A.  Correct.
2 Q.  And so why did you approve or sign the use of
3 4.4 as the SOP that Ismael violated?
4 A.  That is the recommendation from internal affairs
5 based on the matrix that they use, and I concurred with
6 it.
7 Q.  And what's the matrix that they use?
8 A.  That's a question for internal affairs.
9 Q.  Are you familiar with what 4.4 (A, B, C) says,
10 sir?
11 A.  Not verbatim, no.
12     (Plaintiff's Exhibit Number 32 was
13 previously marked for identification.)
14 Q.  (By Mr. Kertscher) We've got that for you, sir.
15 Let's look at Exhibit 32.
16 A.  I have it.
17 Q.  While you're looking through it, I'll represent
18 to you that this is exactly how it was produced to us by
19 your attorneys so that the highlighting in the middle of
20 the page is something that was provided to us and not
21 something that my office has added.
22     Do you know if you highlighted this or was it
23 Sergeant McCarty or someone else?
24 A.  I can't testify to that.
25 Q.  And you see in the middle of the page, the

Page 87

1 highlighted section, 4.4 Manner of Conduct (A, B, C)?
2 A.  Yes.
3 Q.  And, then, "4.4.1 Certified:  An officer, in the
4 performance of duty, or while off duty and in uniform, or
5 while in any manner identifiable as a police officer will
6 maintain control of their temper."
7     Was that why you fired him on September 28th?
8 A.  That's incorrect.
9 Q.  And subpart a. says, "An officer will not use
10 harsh, violent, profane, or insolent language to any
11 citizen, or other officers, whether superior or
12 subordinate."
13     Is that why you fired him under 4.4.1 a.?
14 A.  That is not correct.
15 Q.  And subpart b. writes, "An officer will not use
16 any language that tends to belittle, show contempt for, or
17 defame any race or ethnic group except when it is
18 necessary in police reports or testimony."
19     Is that why you fired him, sir?
20 A.  That's not correct.
21 Q.  Then subpart c. has been highlighted by someone
22 at the sheriff's department, and it says, "An off duty
23 officer will not conduct themselves in a manner as to
24 reflect discredit upon the Sheriff's Office."
25     Is that why you fired him, sir?

Page 88

1 A.  That is correct.
2 Q.  All right.  Is there any other reason that you
3 filed Ismael for, sir, that's not here in 4.4?
4 A.  It is the totality of the offense.  You asked
5 about manner of conduct and that's what applies in the
6 matrix.
7 Q.  All right.  What did he do to reflect discredit
8 upon the sheriff's office?
9 A.  I am an elected official.  All of my employees
10 are employees of the Sheriff and not the County.  If an
11 employee wants to work at another agency, that is fine.
12     But when they take a County vehicle on County
13 time and apply for another sheriff's office, that reflects
14 negatively on the sheriff's office at which he is
15 currently employed.
16 Q.  How is that negatively refecting on the
17 sheriff's office, sir?  Can you explain that to us?
18 A.  It shows that a person who is dissatisfied with
19 his current position is willing to use County assets to
20 further their career.
21 Q.  Well, sir, if they went in plain clothes and
22 private vehicles, they're still going to identify
23 themselves as a current Richmond County officer, aren't
24 they, sir?
25 A.  I wouldn't know that.  (Cross talk.)

Ismael v.
Roundtree, et al.

Richard Roundtree
December 8, 2023

Page 89

1  Q.  When people interview for another job, they
2  don't say where they're currently working?  You don't
3  believe that happens?
4     MR. FRAILS: Excuse me.  Can you let the Sheriff
5  finish his answer?
6  Q.  (By Mr. Kertscher) I'm sorry.  It looked to me on
7  the Zoom like you were done.  What was your answer?
8  A.  I was saying that I can't testify to the fact
9  that they'd identify the sheriff's office.  But when
10  you're in a County vehicle and in a County uniform, that
11  leaves no doubt that you work for another agency.
12  Q.  Right.  And how does that reflect discredit upon
13  the sheriff's office, sir?
14  A.  Because, again, if a person is going to go while
15  on duty and in uniform and in a County vehicle to another
16  sheriff's office and apply for a job, then that reflects
17  negatively on the sheriff's office at which they're
18  employed.  Again, I'm an elected official.
19  Q.  I understand, sir.  Wouldn't that same logic
20  about discredit upon the sheriff's office apply if one of
21  your lieutenants was demanding payment for time he didn't
22  work and threatening subordinate to give that time?
23     Wouldn't that also reflect discredit upon the
24  sheriff's office?
25  A.  That hasn't been proven.

Page 90

1  Q.  Well, it wasn't investigated, was it?
2  A.  I believe it was, sir.
3  Q.  All right.  Who told you that?
4  A.  Investigator McCarty, I believe, looked into the
5  case.
6  Q.  Did McCarty tell you that, or did you see
7  evidence of investigation in the file you reviewed before
8  you terminated Ismael?
9  A.  No.  It had nothing to do with the Ismael file.
10  I told you that one had nothing to do with the other.
11  Q.  Right.  So how do you know, sir, that the
12  allegation that Jenkins threatened a subordinate in front
13  of private citizens --
14     MR. FRAILS: I'm going to object to the form of
15  the question.
16     MR. KERTSCHER: I'm not done yet.  You can get
17  your objection in as soon as I get my question on the
18  record.
19     MR. FRAILS: Right.
20  Q.  (By Mr. Kertscher) If the allegation that Jenkins
21  had threatened his subordinate to pay for time he didn't
22  work were true, that would reflect discredit upon the
23  sheriff's office, wouldn't it?
24  A.  I have no reason to believe that is true.
25  Q.  I understand.  That's not my question, though.

Page 91

1     My question is, if it were true, that would reflect
2  discredit upon the sheriff's office?
3  A.  That would be true of any deputy that worked for
4  Richmond County.
5  Q.  Thank you, sir.
6     And do you have any idea why that wasn't even
7  followed on for weeks after it was reported to the County?
8  A.  I can't testify to that.
9  Q.  And do you have any understanding why Ismael's
10  "investigation" was completed and over in 36 hours?
11  A.  The file was presented to me, and I reviewed it,
12  and I concurred with the recommendation.
13  Q.  And you concurred with the reason that he
14  was being terminated was because Ismael had conducted
15  himself in a manner to reflect discredit upon the
16  sheriff's office?
17  A.  That is correct.
18  Q.  Okay.  And anyone that does that, that ought to
19  be thoroughly investigated in your view; right?
20  A.  I believe that is the policy.
21  Q.  Who conduct themselves in a manner as to reflect
22  discredit upon the sheriff's office, that should be
23  thoroughly investigated?
24  A.  I think all of our policies should be thoroughly
25  investigated.  That's what internal affairs is designed to

Page 92

1  do.
2  Q.  Why was it that your office chose this
3  particular SOP, and not any other SOP, to put here on this
4  termination report, Exhibit 32?
5  A.  Again, that is the internal affairs matrix.
6  Q.  Okay.  Do you know if Ismael was ever trained on
7  what the policies are when he was released from training
8  and driving home from off-site training?
9  A.  I can't testify to that.
10  Q.  Do you have any doubt that his training had
11  ended on September 17th when he left Forsyth, Georgia?
12  A.  I'm sorry?
13  Q.  Do you have any doubt that Ismael's training had
14  ended on September 17th when he left Forsyth, Georgia?
15  A.  His training was terminated because he failed.
16  He was dismissed from class.  His training didn't end; he
17  was dismissed for failing.
18  Q.  Yes, sir.  Well, it was Friday afternoon, the
19  17th, and his training was terminated.  We agree on that;
20  right?
21  A.  I'm not sure exactly what time, but it was that
22  Friday, yes.
23  Q.  All right.  But you don't dispute that his
24  training was terminated when he left Forsyth, Georgia on
25  the 17th?

Page 93

1  A.  I do not.
2      MR. KERTSCHER: Thank you, sir.
3      All right.  Let's take a short break.  My guess
4  is that we have another 45 minutes to an hour to go.
5      I'm happy to just take a 15-minute break and
6  push through and get done before 1:30, if that's
7  agreeable with everyone else?
8      MR. FRAILS: That's good.
9      MR. KERTSCHER: All right.  We'll come back in
10  about ten minutes or so.
11     (A recess was taken from 12:05 p.m.
12  until 12:14 p.m.)
13  Q.  (By Mr. Kertscher) Sheriff Roundtree, you
14  understand you're still under oath?
15  A.  Yes.
16  Q.  You testified at the personnel board hearing, at
17      1:06:22 on the tape, that, "When I received the file,
18      based on all the information I took into account, the
19      previous write up that I had done maybe a month prior with
20      Mr. Ismael, where they had a proposed disciplinary action
21      of three days suspension and probation."
22      Do you remember that testimony that was read
23      into the record about thirty minutes ago?
24  A.  I do.
25  Q.  It's true, isn't it, sir, that you weren't sent

Page 94

1  the prior disciplinary form that you were talking about
2  there until November, were you?
3  A.  I'd have to be given the exhibit back again to
4  testify to that.
5  Q.  (By Mr. Kertscher) Let's look at Exhibit 26,
6  please.  I'll represent that this is an e-mail from
7  Sergeant McCarty to you, to Colonel Chew, and to
8  Captain Rahn, dated November 3, at 12:47 p.m.
9      It shows an attachment, and the attachment is
10  the prior disciplinary form.  Is that attachment there to
11  Exhibit 26 the prior disciplinary form you were referring
12  to in your November 4th personnel board hearing testimony?
13  A.  Yes.
14  Q.  And you see there on page 1 of Exhibit 26 that
15  you were sent this by Sergeant McCarty on November 3rd,
16  the day before the personnel board hearing; right?
17  A.  Repeat the question.
18  Q.  You were sent this prior disciplinary form, via
19  e-mail, by Sergeant McCarty on November 3rd, the day
20  before the personnel board hearing; correct?
21  A.  If that's correct.  If that was the date of the
22  hearing, yes.
23  Q.  All right.  Do you know why there's no written
24  evidence of this having been sent to you at any time
25  before November 3rd?

Page 95

1  A.  Because it was hand-delivered to me.
2  Q.  I see.  And why is there no evidence that
3      anybody signed the sign-out form to check this out of the
4      personnel file room?
5  A.  I'm not familiar with the question.
6  Q.  Sir, if someone wanted to get a personnel file
7      out of the personnel room and bring it to you and hand it
8      to you, they'd have to sign a form, wouldn't they, sir?
9  A.  I'm not familiar with that process.
10  Q.  All right.  What do you know about looking at
11      the documents in someone's personnel file?
12  A.  I say, "Bring me the person's personnel file."
13  Q.  All right.  Why did they e-mail it to you on
14      November 3rd but not in September when you were actually
15      considering firing Ismael?
16  A.  I'm not certain why it was sent on this day.
17  Q.  Was that because it was the day before the
18      personnel board hearing and Sergeant McCarty wanted to
19      make sure you had all the dirt on Deputy Ismael?
20      MR. FRAILS: Object to the form of the question.
21      THE WITNESS: I'm not certain why he sent it on
22  this date.  I don't know if it was sent or requested.
23  Q.  (By Mr. Kertscher) He sent it to you and
24      Corporal Chew --
25  A.  Colonel.

Page 96

1  Q.  Colonel Chew, excuse me.  I apologize.
2  A.  Like I say, I'm not sure exactly why.  It may
3  have been requested by me.  I'm not certain.
4  Q.  Uh-huh.  Well, let's see if we can solve that
5  mystery.  Now, other documents were sent around on that
6  day, the day before the personnel board hearing; right?
7  A.  I'm not familiar.
8      (Plaintiff's Exhibit Number 27 was
9  previously marked for identification.)
10  Q.  (By Mr. Kertscher) Let's look at Exhibit 27,
11  please.  I'll represent that this is an e-mail sent by
12      Captain Rahn to Colonel Chew and to you on November 3rd at
13      1:07 p.m.
14      Captain Rahn wrote, "Here is the background done
15      on Ismael and why he was terminated from Bryan County.
16      One of the reasons was using his patrol vehicle for
17      personal business.  The county attorney is aware of this
18      as well."
19      Now, this was sent to you less than an hour
20      after Exhibit 26 was sent to you; is that right?
21  A.  That appears correct.
22  Q.  There are no e-mails of anybody sending you any
23      of Ismael's personnel file or any background on Ismael on
24      September 28th, is there, sir?
25  A.  I'm not familiar.

Page 97

1     (Plaintiff's Exhibit Number 35 was
2   previously marked for identification.)
3   Q.  (By Mr. Kertscher) Let's look at Exhibit 35.
4       I'll represent that this is an e-mail chain
5   started by Captain Rahn on November 3rd, at 1:03 p.m., to
6   Paul Johnson where Captain Rahn wrote, "See me..." -- and
7   I think he's testified that he should've wrote "send me."
8       "Send me anything as far as notes you have on
9   Ismael.  He has his appeal hearing tomorrow."
10      Do you know why Captain Rahn was trying to
11  gather information on Ismael before his personnel board
12  hearing?
13  A.  I can't testify to that.
14  Q.  And do you know why there's no evidence that
15  anybody gathered or looked at any of this information
16  before Ismael was actually terminated on September 28th?
17  A.  I can't testify to that.
18  Q.  Now, in Exhibit 35, Mr. Johnson said, "I don't
19  have anything on him.  I believe he might be with
20  Lt. Parker Zone 7."
21      And then Rahn has e-mailed to McCarty, "Don't
22  forget to email Steve and Parker."
23      Do you know who Rahn is referring to when he
24  says "Steve"?
25  A.  I do not.

Page 98

1   Q.  Did you ask these individuals to get together
2   and find dirt on Ismael before his personnel board
3   hearing?
4   A.  I did not.
5   Q.  Do you know why they're trying to get notes that
6   Mr. Johnson has on Ismael?
7   A.  I can't testify to that.
8       (Plaintiff's Exhibit Number 36 was
9   previously marked for identification.)
10  Q.  (By Mr. Kertscher) Let's look at Exhibit 36.
11      While you're looking at that, I'll represent
12  that this is an e-mail from Steve Fanning to McCarty with
13  the subject line, "Ismael Notes," dated November 3, at
14  3:18 p.m., and there are seven attachments.
15      Am I reading that into the record correctly,
16  sir?
17  A.  I believe it's accurate.
18  Q.  And Lieutenant Fanning wrote, "Here is what I
19  was able to dig up."
20      Do you have any understanding about why Fanning
21  was trying to "dig up" seven different attachments and
22  send them to McCarty on the day before the personnel board
23  hearing?
24  A.  I can't testify to that.
25  Q.  Now, McCarty did not testify at the personnel

Page 99

1   board hearing, did he?
2   A.  I can't recall.
3   Q.  And I may have made a mistake.  He may have
4   testified.  I don't mean to state something in the record
5   that isn't correct.  I withdraw that question.
6       Do you know whether McCarty actually called up
7   and spoke with Parker about trying to dig up dirt on
8   Ismael?
9   A.  I can't testify to that.
10      (Plaintiff's Exhibit Number 37 was
11  previously marked for identification.)
12  Q.  (By Mr. Kertscher) Let's look at Exhibit 37.
13      I'll represent to the court that this is an
14  e-mail dated November 3rd, at 6:00 p.m., from Elijah
15  Parker to Sergeant McCarty.
16      This is an e-mail regarding a prior incident
17  from July 19, 2021, where -- who is Elijah Parker?  What
18  is his position?
19  A.  He's a zone lieutenant.
20  Q.  The Zone 7 lieutenant?
21  A.  At the time, I believe so.
22  Q.  What is his position now?
23  A.  He's still a zone lieutenant.  I'm not sure
24  which zone.
25  Q.  If he was the lieutenant of Zone 7 at the time,

Page 100

1   he would've been Ismael's direct supervisor; is that
2   right?
3   A.  I can't say that for sure.
4   Q.  And then he wrote that there was a conflicting
5   statement between Mr. Cannon and Deputy Ismael.  Is that
6   how you take this?
7   A.  (No response.)
8   Q.  Lieutenant Parker wrote, "I had both parties in
9   my office, and they resolved whatever issues they had.
10  There were no entries in his Deputy Diary."
11      Do you see that?
12  A.  I do.
13  Q.  What is the deputy diary that Lieutenant Parker
14  was talking about there?
15  A.  I can't testify to that.
16  Q.  You don't know anything about a deputy diary
17  kept by your zone commanders?
18  A.  I do not.
19  Q.  Do you have any idea why Sergeant McCarty would
20  be asking Elijah Parker what's in his deputy diary for
21  Ismael on November 3rd?
22  A.  I cannot testify to that.
23  Q.  Let's go back to Exhibit 26 for a minute.  The
24  attachment to Exhibit 26 is this incident involving Ismael
25  earlier in the year in 2021 that you testified about

Page 101

1  previously.  Do you see that?
2  A.  I do.
3  Q.  And you apparently changed the recommendation.
4  You reduced the penalty that was recommended against
5  Ismael.  You reduced it from three days suspension to
6  two days, and you took off the recommendation that he
7  receive anger management counseling; is that right?
8  A.  That is correct.
9  Q.  And why did you reduce the recommended
10  discipline?
11  A.  Based on the complaint and me watching the
12  video, I thought the two day suspension was satisfactory.
13  Q.  So in that one, you went as far as to watch the
14  video on your own; is that right?
15  A.  That is correct.
16  Q.  And that's the body cam video that you're
17  talking about; is that right?
18  A.  That is correct.
19  Q.  Okay.  And just out of curiosity, what does this
20  incident where there were elderly people being removed
21  from a car that was on fire have to do with him stopping
22  by Burke County on his way back from training?
23  A.  Your question to me was did I have any other
24  prior knowledge, and I said that the only other one I knew
25  about was this incident.

Page 102

1  Q.  All right.  So the two don't really have
2  anything to do with each other, then?  Would you agree
3  with that?  They're two very different incidents?
4  A.  Correct.
5  Q.  I'm sorry.  Did you say "correct"?
6  A.  Correct.
7  Q.  Thank you.
8      Now, you also testified at the personnel board
9  hearing, beginning at 1:07:40 of the tape -- well, the
10  question posed to you, "Would it be true that your
11  officers, as part of their training or orientation prior
12  to work, that they're instructed that they can use their
13  marked patrol cars to conduct personal business?"
14      And then you answered, "We've had instances
15  where that occurred.  Before all that, deputies have been
16  disciplined in reference to that.  So I think that has
17  been a matter of our policy."
18      Do you recall that testimony that was played
19  into the record a little while ago today?
20  A.  I do.
21  Q.  And we've asked in interrogatories, sir, that
22  the Richmond County Sheriff's Office identify these
23  instances, and they haven't provided any.
24      So let me just ask you who the people were that
25  were previously disciplined for using their marked patrol

Page 103

1  cars?
2  A.  I couldn't testify to that.
3  Q.  When was the last time someone was disciplined
4  for that?
5  A.  I couldn't testify to that.
6  Q.  It's true that deputies do often take their
7  patrol cars to get food after their shift is over; isn't
8  that true?
9  A.  I can't testify to that.
10  Q.  It's true, isn't it, that deputies often take
11  their patrol cars, after their shift is over, to go to a
12  local store?
13  A.  I couldn't testify to that.
14  Q.  And isn't it true -- did you ever do that, sir,
15  when you were on patrol?
16  A.  25 years ago?
17  Q.  Yes, sir.
18  A.  Can't recall.
19  Q.  Did you ever stop by the grocery store on your
20  way home after your shift in your patrol car?
21  A.  I can testify to that, no.
22  Q.  Isn't it true, sir, that deputies go to the gym,
23  once they're off their shift, in their patrol car?
24  A.  I can't testify to that.
25  Q.  You're not aware of these things being commonly

Page 104

1  done at the Richmond County Sheriff's Department, sir?
2  A.  I can't testify to the commonality of that.
3  Q.  Okay.  Have you ever heard the term, "Blue Wall
4  of Silence"?
5  A.  I have.
6  Q.  What does that refer to, in your understanding?
7  A.  It was told to me in the academy 30 years ago
8  that it was a code amongst police officers.
9  Q.  And the code is that they don't rat on each
10  other; right?
11  A.  That was the code 30 years ago.
12  Q.  How many whistleblowers, where one officer
13  reported another's potential crime or racially-related
14  harassment, have you had like in your 12 years as sheriff?
15      MR. FRAILS:  I'm going to object to the form of
16  the question.
17      THE WITNESS:  I can't recall how many complaints
18  deputies have filed against other deputies.
19  Q.  (By Mr. Kertscher)  All right.  Well,
20  specifically, how many instances have you had where one
21  officer filed a complaint against another for violating
22  the law?
23  A.  I can't testify to that.
24  Q.  How many times have you had one officer blow the
25  whistle against another for engaging in racial harassment?

Page 105

1    MR. FRAILS: I'm going to object to the form of
2  the question.
3    THE WITNESS: I can't testify to that.
4  Q.  (By Mr. Kertscher) How would we find out the
5  answers to that, sir?
6  A.  I guess you would ask every deputy I employee.
7  Q.  Do you remember if it's ever happened where you
8  have a whistleblower (cross talk).
9    MR. FRAILS: Object to the form of the question.
10   THE WITNESS: I can't recall.
11 Q.  (By Mr. Kertscher) So you don't know whether it's
12 happened or not in your 12 years as sheriff; is that
13 right?
14 A.  That is correct.
15 Q.  As you sit here today, can you identify any
16 deputy that was fired, or even disciplined, for doing
17 anything similar to what Ismael did?
18 A.  In my 12 years, we've fired deputies for a range
19 of things.  I can't say specifically which.
20 Q.  You mentioned earlier that you instituted a
21 progressive discipline policy.  Do you remember that
22 testimony from earlier this morning?
23 A.  That is correct.
24 Q.  And did you consider any discipline other than
25 termination against Ismael?

Page 106

1  A.  Based on the circumstances, I did not.
2    MR. KERTSCHER: Thank you, sir.  That's all the
3  questions I have for you at this time.
4    THE WITNESS: Thank you.
5    MR. KERTSCHER: Give us a moment.
6    (Off the record.)
7    DIRECT EXAMINATION
8    BY MR. FRAILS:
9  Q.  Sheriff, when a private citizen such as
10 Urban Air employes deputies to work specials, are they
11 required to keep deputies on that they're dissatisfied
12 with?
13 A.  No.  It's up to their discretion.
14 Q.  And if, in fact, some of the comments concerning
15 Jenkins were true such as demanding to be paid for time
16 that he didn't work, what would be the recourse for the
17 business owner?
18 A.  That Lieutenant Jenkins, or any other deputy,
19 could have been terminated from the special.
20 Q.  And who would do that termination?
21 A.  The business owner.
22 Q.  In addition to that, are they required to hire
23 Richmond County deputies to provide security?
24 A.  No.
25 Q.  What other option would any business owner have

Page 107

1  regarding security if they did not use Richmond County
2  deputies?
3  A.  They can use any private security entity or the
4  Richmond County Marshall's Office.  They supplement
5  security when we don't have enough Richmond County
6  deputies.
7  Q.  If, in fact, the derogatory comments toward
8  Ismael were overheard by an employer or an employer's
9  supervisor, what course of action could they have taken
10 regarding his comments?
11 A.  They could have filed a complaint with our
12 internal affairs division.
13 Q.  Are you aware as to whether or not they filed a
14 complaint with the internal affairs division?
15 A.  None that I'm aware of.
16   MR. FRAILS: I have no further questions.
17   RECROSS-EXAMINATION
18   BY MR. KERTSCHER:
19 Q.  One follow-up question, Sheriff Roundtree.  Have
20 you read Mr. Gilbert's deposition where he testified about
21 why he kept security with the Richmond County Sheriff's
22 Department?
23 A.  I did not.
24 Q.  So you don't have any knowledge about his
25 explanation and why he wanted Richmond County deputies on

Page 108

1  site because they have arrest powers?
2  A.  I'm not.
3    MR. KERTSCHER: Thank you, sir.  No further
4  questions.
5    REDIRECT EXAMINATION
6    BY MR. FRAILS:
7  Q.  Even if they kept on Richmond County deputies,
8  was there any requirement that they keep Jenkins on their
9  special?
10 A.  None whatsoever.
11   MR. FRAILS: Thank you.
12   MR. KERTSCHER: No further questions, sir.
13 Thank you very much.
14   Everyone have a very nice weekend.
15   COURT REPORTER: Thank you.  You as well.
16   MR. KERTSCHER: I would like a transcript,
17 please.
18   (Deposition concluded at 12:48 p.m.)
19   (The reading and signing of the deposition
20 by the witness was waived.)
21
22
23
24
25

Page 109

1                DISCLOSURE

2          DEPONENT:  RICHARD ROUNDTREE

3 STATE OF GEORGIA:

4 COUNTY OF DEKALB:

5      Pursuant to Article 10.B. of the Rules and
6 Regulations of the Board of Court Reporting of the
  Judicial Council of Georgia, I make the following
7 disclosure:

     I am a Georgia Certified Court Reporter.  I am here
8 as a representative of Regency-Brentano, Inc.

9     Regency-Brentano, Inc., was contacted by the offices
  of Hill, Kertscher & Wharton, LLP to provide court
10 reporting services for this deposition.  Regency-Brentano,
  Inc., will not be taking this deposition under any
11 contract that is prohibited by O.C.G.A.  Sec. 15-14-37(a)
  and (b).

12
     Regency-Brentano, Inc., has no contract/agreement to
13 provide reporting services with any party to the case, any
  counsel in the case, or any reporter or reporting agency
14 from whom a referral might have been made to cover this
  deposition. Regency-Brentano, Inc., will charge its usual
15 and customary rates to all parties in the case, and a
  financial discount will not be given to any party to this
16 litigation.

17

18

19

20

21

22

23 Dated: 12/8/23; Anne Marie Russell, 5756-3343-3978-4704,
            CCR, CVR
24

25

---

Page 110

1        C E R T I F I C A T E

2 STATE OF GEORGIA:

3 COUNTY OF DEKALB:

4     I hereby certify that the foregoing transcript was

5 taken down by me, as stated in the caption, and the

6 colloquy, questions, and answers thereto were reduced to

7 typewriting under my direction; that the foregoing pages 1

8 through 108 represent a true, complete, and correct

9 transcript of the evidence given.

10    The above certification is expressly withdrawn and

11 denied upon the disassembly or photocopying of the

12 foregoing transcript unless said disassembly or

13 photocopying is done under the auspices of

14 Regency-Brentano, Inc., and the signature and original

15 seal is attached thereto.

16    I further certify that I am not related to or of

17 counsel to the parties in the case; am not in the regular

18 employ of counsel for any of said parties; nor am I in any

19 way interested in the result of said case.

20    This 26th day of December 2023.

21

22

23
      ANNE MARIE RUSSELL, CCR, CVR, 5756-3343-3978-4704
24

25

**/**

**/// (3)**
36:24,25;41:25

**A**

**able (5)**
30:23;57:17;63:25;
69:24;98:19
**Absolutely (1)**
66:2
**academy (1)**
104:7
**accepted (1)**
8:24
**accident (2)**
34:11;35:11
**account (2)**
67:24;93:18
**accurate (1)**
53:17;98:17
**action (9)**
15:13;25:4;55:10;
65:18;66:16;67:16;
68:2;93:20;107:9
**actions (2)**
47:4;70:25
**actually (13)**
6:7;34:9;68:3,5;
73:22;74:14;75:17,24;
78:10;84:10;95:14;
97:16;99:6
**added (2)**
59:4;86:21
**addition (2)**
29:11;106:22
**additional (1)**
33:3
**adds (1)**
7:18
**admin (1)**
10:24
**administrative (2)**
67:11;76:18
**advancing (2)**
61:5;62:8
**advise (1)**
43:14
**advised (6)**
66:23;72:16;73:21,
23;83:19;84:5
**affairs (58)**
9:13;10:18;12:10,11,
13,20;13:4,6,11,12,16,
22;14:7;15:3,10,23;
16:2,10,14;17:3;18:2,
15;20:8;22:13,21;23:9;
25:9;42:20,23;44:20;
45:12,16;54:22;62:23;
63:1,4;66:6,17,21;
68:18;71:21;72:3,5,24;

73:7,9;76:3,6;77:22;
81:14;83:20;85:22;
86:4,8;91:25;92:5;
107:12,14
**afraid (1)**
58:12
**afternoon (2)**
32:25;92:18
**again (50)**
7:11;10:6;15:13;
17:5;18:11;19:12;20:1;
21:1,16;22:1,7;24:12;
25:19;28:19;30:15;
31:10;32:9,15;33:25;
38:17,18;39:3,14;40:1;
43:14;46:19;47:1,5,9;
50:13;53:14;57:4;60:6,
15;61:9;62:14,20;
64:20;66:5,20;68:7,16;
71:21;73:25;74:17;
75:18;89:14,18;92:5;
94:3
**against (52)**
12:10,12,22,23;
13:16;14:3,23;16:15;
18:8,9;20:17,24;21:10,
15,23;22:9,13,16,21,
22;23:8;24:16,17,20,
24;25:3;36:14;42:23;
43:3,15,19;44:11,14,
17,23;45:2,16;46:4,13,
18;47:4,25;48:9;70:17;
71:7,10;80:1;101:4;
104:18,21,25;105:25
**agency (7)**
19:22;20:5;25:23;
68:13,15;88:11;89:11
**ago (12)**
10:22;13:20;23:5;
24:21;55:8;72:21;
76:21;93:23;102:19;
103:16;104:7,11
**agree (13)**
8:20;19:16;29:6;
40:5,12;43:11;60:4;
62:11,16;67:15;83:1;
92:19;102:2
**agreeable (3)**
5:8,9;93:7
**agreed (4)**
32:18;59:5;67:18,20
**agrees (1)**
15:14
**ahead (4)**
7:8;44:2;58:8;66:6
**Ahmed (4)**
37:10;42:14;65:18;
81:15
**Air (15)**
41:3,10;46:25;47:9;
48:19,25;50:13,17,23;
51:2;53:20;54:1;57:1,
14;106:10

**allegation (6)**
15:4;21:9;52:25;
54:20;90:12,20
**allegations (7)**
17:20;47:25;60:13;
66:22;71:23;78:18,22
**alleged (3)**
46:9;52:22;83:4
**allowable (1)**
5:4
**along (1)**
12:15
**alternate (1)**
19:18
**alternative (1)**
67:16
**Although (1)**
56:12
**always (2)**
55:22;62:6
**amongst (1)**
104:8
**anger (1)**
101:7
**anonymous (12)**
17:4,8,11,14,17,23;
18:9;40:7;71:8;81:20;
82:3;83:5
**another's (1)**
104:13
**answered (1)**
102:14
**APD (1)**
7:14
**apologies (1)**
82:1
**apologize (3)**
48:21;70:12;96:1
**apparently (1)**
101:3
**appeal (1)**
97:9
**appears (1)**
96:21
**applicants (1)**
35:19
**application (1)**
76:4
**applied (4)**
66:25;72:18;75:24;
76:7
**applies (1)**
88:5
**apply (6)**
66:5;67:4;68:13;
88:13;89:16,20
**appraisal (6)**
36:9,11,14,16;37:9,
13
**appreciate (1)**
24:15
**apprised (3)**
12:24;13:21;15:2

**approve (3)**
61:7;62:13;86:2
**approved (3)**
80:14;84:19,23
**approximate (1)**
24:2
**approximately (2)**
7:17;10:1
**area (1)**
52:17
**around (2)**
81:15;96:5
**arrest (1)**
108:1
**arrived (3)**
67:6;76:14;81:16
**ascend (1)**
11:10
**ascended (1)**
10:23
**ascending (1)**
11:1
**assets (1)**
88:19
**assign (1)**
18:13
**assigned (7)**
12:13;16:24;18:1,8,
16;41:16;83:8
**assignment (1)**
50:14
**assignments (2)**
33:7;41:12
**assume (2)**
14:22;59:7
**assumed (1)**
11:8
**attachment (4)**
94:9,9,10;100:24
**attachments (2)**
98:14,21
**attained (1)**
7:2
**attempted (1)**
74:13
**attitude (1)**
53:4
**attorney (1)**
96:17
**attorneys (1)**
86:19
**Augusta (3)**
6:7;41:3;56:8
**authority (5)**
18:19;19:12;54:11;
65:11,12
**available (2)**
39:10,11
**aware (29)**
12:12;22:10;23:24;
24:1,4,5,10,11;32:3;
33:16;35:21,25;36:4;
41:6;42:22;43:3,14;

44:13;45:15,20;47:14,
16;55:2;72:23;83:12;
96:17;103:25;107:13,
15
**away (5)**
29:22;32:19;35:3,4,6
**awhile (1)**
10:7

**B**

**back (33)**
6:11,17,19;9:7;
10:20;13:3,5,19,20;
23:22;28:23;31:20,23;
32:12,18,21;33:14,17;
35:7;39:10;64:5;66:24;
68:15;71:18;72:17;
76:8,10;78:8,11;93:9;
94:3;100:23;101:22
**background (2)**
96:14,23
**backs (1)**
39:8
**based (12)**
12:19;17:13,15;20:3;
25:21,22;62:1;67:23;
86:5;93:18;101:11;
106:1
**Basically (1)**
57:8
**basis (2)**
11:20;43:13
**became (2)**
8:4;9:19;10:19;
19:11
**become (4)**
23:24;24:4,5,10
**becoming (1)**
6:3
**began (2)**
40:6;55:20
**beginning (4)**
64:12,21;70:6;102:9
**behalf (3)**
46:15;47:10,18
**behavior (1)**
46:17
**behind (1)**
17:9
**belittle (1)**
87:16
**best (3)**
19:22;20:4;25:22
**better (2)**
18:4;63:8
**bit (2)**
25:24;43:8
**blow (1)**
104:24
**Blue (1)**
104:3
**board (18)**

6:11,16;63:10;64:13;
66:1;69:11,17;93:16;
94:12,16,20;95:18;
96:6;97:11;98:2,22;
99:1;102:8
**body (1)**
101:16
**bomb' (1)**
54:13
**bombs (1)**
57:16
**both (6)**
8:15;9:5;23:3;26:25;
80:14;100:8
**bottom (2)**
48:17;60:16
**box (5)**
38:9;19;39:6,16,25
**break (4)**
44:2;64:4;93:3,5
**brief (1)**
14:13
**briefed (3)**
12:15;13:22;14:1
**briefing (1)**
15:8
**bring (3)**
20:1;95:7,12
**broadly (1)**
12:8
**Bryan (1)**
96:15
**building (1)**
55:23
**Burke (27)**
66:4,24;67:4;72:17;
73:13,22;74:2,14,21,
25;75:7,11,13,14,21;
77:15;79:2,5,7,10,17,
24;81:16;82:25;84:14;
85:11;101:22
**business (11)**
29:22;49:3;60:6,8,9;
68:25;96:17;102:13;
106:17,21,25
**busy (1)**
49:3

## C

**Caleb (3)**
16:7;44:21;45:12
**call (14)**
10:11;17:9,14,23;
18:4;32:7;40:7;51:14;
54:12;57:7;71:8;73:21;
83:5;85:10
**called (7)**
41:3;51:12;67:3;
73:21;75:1;83:24;99:6
**calling (1)**
74:1
**calls (7)**

17:4,8,12,17;38:23;
39:9;41:2
**cam (1)**
101:16
**came (7)**
6:11,17;8:18;10:17;
72:24;82:19;83:5
**can (40)**
7:8;16:1;17:20;19:4;
20:21;21:6,11,18;27:3,
13;28:11;30:1,6,13,18;
31:17;33:25;35:1;37:6,
7;40:11;41:24;43:14;
57:7;59:12;63:17,22,
24;65:2,25;67:15;
68:24;88:17;89:4;
90:16;96:4;102:12;
103:21;105:15;107:3
**Cannon (1)**
100:5
**capacity (2)**
8:14;65:16
**Captain (17)**
16:5;18:14;23:21;
28:8;29:24;67:3;77:11,
21;78:1;79:1;80:5;
94:8;96:12,14;97:5,6,
10
**car (16)**
26:23;28:12;29:2,18;
30:3,9;31:9,19,23;
34:11,17;35:10;53:7;
101:21;103:20,23
**care (2)**
53:9;56:7
**career (2)**
26:18;61:6;62:8;
88:20
**cars (5)**
28:18;102:13;103:1,
7,11
**case (17)**
5:7;12:21;15:19;
16:14;21:5,7,9;23:25;
26:7;31:13;34:24;45:4;
48:5;52:11,23;60:2;
90:5
**cases (2)**
10:8;51:23
**cause (3)**
61:15,22;63:2
**cautious (1)**
19:3
**certain (9)**
20:10;57:24;72:10;
74:17;76:12;79:21;
95:16,21;96:3
**certainly (2)**
8:24;59:11
**certainty (1)**
18:16
**Certified (1)**
87:3

**chain (5)**
67:12;76:19;78:4,7;
97:4
**challenge (1)**
54:11
**Chambliss (11)**
55:17;56:2,5,17,20;
57:13,21;58:16;60:17;
61:4,14
**Chambliss's (2)**
56:12,22
**chances (1)**
58:13
**changed (1)**
101:3
**charge (11)**
31:14;41:1,8,9,10,
13;54:12;56:23;58:18,
18;77:21
**check (3)**
30:21;32:7;95:3
**checked (4)**
38:9,19;39:6,16
**Chew (31)**
9:21;10:2,5,10,17,
22;11:7,14,19,21;
16:12;17:25;18:5,13;
29:23;66:3,8;67:14,18;
70:7,14;71:9,15;77:12;
80:11,14;83:4;94:7;
95:24;96:1,12
**Chief (13)**
11:4,19;12:18;15:17;
16:13;66:8,9;67:19,19;
70:7,7,15;71:15
**choose (1)**
85:21
**chose (2)**
85:20;92:2
**chosen (1)**
40:16
**circumstances (1)**
106:1
**citizen (7)**
36:13;43:4;46:8;
61:22;63:2;87:11;
106:9
**citizens (7)**
46:11,25;47:8;56:4,
7;60:13;90:13
**clarification (2)**
64:14;69:18
**clarify (1)**
16:23
**class (1)**
92:16
**Clayton (12)**
11:4,15,16,19;16:13;
66:8;67:19,19;70:7,15;
71:15;77:12
**Clayton's (1)**
12:1
**clear (1)**

41:15
**clock (1)**
27:21
**close (3)**
8:14;26:21;82:14
**closely (2)**
10:7;11:20
**closest (1)**
11:13
**clothes (1)**
88:21
**coached (2)**
62:2,3
**code (3)**
104:8,9,11
**coincidence (5)**
73:17,25;74:1,5,9
**coincidences (1)**
74:7
**coincidental (1)**
79:6
**colleagues (2)**
9:18;49:11
**Colonel (40)**
9:21;10:2,5,10,17,21,
21,22,24,24;11:3,5,8,
11,14,19,21;12:18;
15:14;16:12;17:25;
18:5,13;29:23;66:3,8;
67:14,18;70:7,14;71:9,
15;77:12;80:11,14;
83:4;94:7;95:25;96:1,
12
**coming (3)**
11:4;34:20;68:17
**command (3)**
41:14;67:12;76:19
**commander (4)**
18:17;59:1,10;61:16
**commanders (1)**
100:17
**comment (2)**
24:22,25
**comments (6)**
25:20;44:15;46:6;
106:14;107:7,10
**committee (2)**
59:2,5
**common (1)**
25:25
**commonality (1)**
104:2
**commonly (1)**
103:25
**comp (1)**
34:14
**compensation (1)**
34:21
**complaint (55)**
12:11;14:8,14,15,20;
15:8,12;16:14;18:8,9;
19:13;20:16,24;21:14,
15,19,20,22,24;22:2,6,

8;23:9,25;24:16,24;
25:6;36:14;43:3,15,18;
44:13,17,23;45:2,16;
46:4,12;48:8;51:15;
60:6;66:10,13,13,15;
70:9,17;71:5,7,8,10;
101:11;104:21;107:11,
14
**complaints (18)**
12:10,24;13:4,6,11,
12,16,22;14:23;17:3;
22:9,13,21;24:17,19;
42:23;44:11;104:17
**completed (1)**
91:10
**concern (10)**
47:2;52:21;61:15,22;
62:17;63:2;71:12;
74:18,19;75:18
**concerned (4)**
70:22;71:6;74:24;
75:3
**concerning (4)**
46:16;50:12;78:19;
106:14
**concerns (4)**
66:9;70:8,14;71:16
**concluded (2)**
15:1;108:18
**concludes (3)**
29:16;31:16;69:9
**conclusion (2)**
12:16;48:8
**conclusions (1)**
15:3
**concurred (3)**
86:5;91:12,13
**conduct (9)**
56:13;68:11,25;
85:20;87:1,23;88:5;
91:21;102:13
**conducted (4)**
55:21;67:7;76:15;
91:14
**conducting (4)**
66:24;72:17;73:13;
74:21
**confirmed (4)**
67:10;76:17;77:14;
78:20;85:3
**conflicting (1)**
100:4
**consider (1)**
105:24
**consideration (2)**
68:9;71:4
**considered (3)**
33:1,6;34:12
**considering (1)**
95:15
**consolidated (1)**
6:8
**consolidation (2)**

7:10,13
**contact (9)**
9:8;55:3;66:21;
71:21;72:4;74:14;
75:10,12;83:18
**contacting (1)**
72:6
**contempt (1)**
87:16
**content (2)**
46:21;47:5
**contents (4)**
46:19,24;47:17,19
**context (1)**
65:22
**continue (2)**
8:13;66:14
**continues (1)**
9:11
**continuing (2)**
14:1;56:21
**continuity (1)**
11:10
**contradiction (1)**
75:9
**control (1)**
87:6
**controls (1)**
41:12
**conversation (1)**
47:13
**conversations (1)**
23:14
**cooperative (1)**
53:3
**coordinator (1)**
30:21
**copy (1)**
30:22
**Corporal (1)**
95:24
**correction (1)**
34:3
**correctly (2)**
46:2;98:15
**corroborating (1)**
46:9
**Counsel (3)**
5:8;24:1,11
**counseling (1)**
101:7
**County (95)**
5:25;6:4,16,23;7:14;
15:24;17:24;29:3;31:9;
32:1,7,14;33:8,18,23;
34:17;37:8;39:5,24;
40:13;41:1,21;50:15,
22;51:1;56:8;65:8,10;
66:4,24;67:4,7;68:12,
15,17;72:17;73:13,13,
22;74:2,14,21,25,25;
75:4,5,7,7,11,13,14,21,
21;76:15;77:15;79:2,5,

7,9,10,14,17,23,24;
81:13,16;82:24,25;
83:9;84:14;85:4,11,12;
88:10,12,12,19,23;
89:10,10,15;91:4,7;
96:15,17;101:22;
102:22;104:1;106:23;
107:1,4,5,21,25;108:7
**County-issued (5)**
26:23,25;28:20,21;
29:2
**course (4)**
14:18;17:18;56:10;
107:9
**court (10)**
5:22;7:8;37:4;42:4;
63:17,20;64:10,19;
99:13;108:15
**courtesy (1)**
38:12
**create (1)**
22:4
**created (1)**
19:11
**credibility (2)**
17:10,19
**credible (1)**
17:14
**crime (5)**
8:1,5,9;10:8;104:13
**crimes (1)**
9:25
**cross (3)**
22:17;88:25;105:8
**CROSS-EXAMINATION (1)**
5:15
**crude (1)**
57:16
**curiosity (1)**
101:19
**curious (1)**
72:2
**current (3)**
28:16;88:19,23
**currently (5)**
50:22;79:24;84:14;
88:15;89:2
**cutting (1)**
26:21

# D

**date (10)**
16:17;24:2,12;35:16;
45:24;63:12;73:5;
80:24;94:21;95:22
**dated (6)**
42:7;48:18;77:12;
94:8;98:13;99:14
**dates (2)**
23:23;45:20
**day (36)**
11:18;27:7,10,11;

28:16;29:12,16;33:22;
55:20;66:19,19;67:13;
68:14,14;71:20,20;
72:11,11;80:4,7,10,13,
14;82:11;83:8,13;
84:10,13;94:16,19;
95:16,17;96:6,6;98:22;
101:12
**days (12)**
43:18;51:1,7;68:2,3,
6,6,10;82:22;93:21;
101:5,6
**day-to-day (1)**
11:20
**death (1)**
34:12
**debate (1)**
34:14
**December (4)**
9:12;23:18;47:11;
50:23
**decide (2)**
10:15;20:12
**decided (1)**
66:1
**deciding (1)**
19:25
**decision (11)**
8:16,21;10:13;15:19;
18:12;36:18,19;59:8;
65:12;68:19;82:18
**decisions (1)**
58:24
**defame (1)**
87:17
**defer (3)**
31:11,14;32:9
**definition (1)**
74:4
**delegated (1)**
41:14
**demand (1)**
59:21
**demanding (2)**
89:21;106:15
**demands (1)**
52:6
**demonstrate (1)**
53:8
**demoted (1)**
23:22
**demotion (1)**
23:15
**Dep (2)**
83:19;84:13
**Department (37)**
6:4,8,24;8:13,25;
9:13;12:5;13:7;15:23,
24;16:2;17:24;27:19;
39:6,16,24;40:6,14;
41:2,22;43:8;50:16;
54:4,7,23;56:4,9;
62:23;79:15,18,23,24;

80:2;85:20;87:22;
104:1;107:22
**depends (2)**
15:4;32:15
**deposed (2)**
5:18,20
**deposition (5)**
5:2;55:7;107:20;
108:18,19
**deputies (25)**
26:6,7;27:20;29:17;
39:9,22;52:22;62:18;
69:4;74:22;77:2;
102:15;103:6,10,22;
104:18,18;105:18;
106:10,11,23;107:2,6,
25;108:7
**Deputy (69)**
11:4,19;12:18,23;
15:17;16:13;18:7;
23:25;24:5,8,9,10;
33:17;35:5,14;37:10;
38:11,22,24;39:8,9,19,
20;40:6,13;41:12,14;
42:23;43:4,7,15,18;
45:15;46:3,6,9,12;
47:25;48:24;51:16;
55:19;56:14,24;57:23;
58:2,10;59:22;60:7;
61:5;62:6,8;66:9;70:7;
77:14;79:1;81:15;83:8;
84:4;85:7;91:3;95:19;
100:5,10,13,16,20;
105:6,16;106:18
**derogatory (2)**
46:5;107:7
**descent (1)**
36:3
**describe (3)**
7:19;9:16;10:4
**described (1)**
13:1
**designed (1)**
91:25
**Designee (1)**
81:2
**desk (1)**
67:22
**details (2)**
67:8;76:16
**determination (2)**
19:21;36:22
**determine (1)**
58:22
**determines (1)**
59:2
**developments (1)**
55:3
**Diary (4)**
100:10,13,16,20
**diem (2)**
29:8,14
**difference (1)**

34:21
**different (6)**
33:15,15;52:13;
60:10;98:21;102:3
**differently (1)**
82:5
**difficult (1)**
13:18
**dig (3)**
98:19,21;99:7
**diligent (3)**
14:22;19:3;20:12
**diligently (1)**
19:9
**direct (4)**
9:18;60:12;100:1;
106:7
**direction (1)**
49:25
**directly (4)**
8:20;9:7;16:10;75:6
**dirt (3)**
95:19;98:2;99:7
**disagree (4)**
8:20;43:11,12;67:15
**disagrees (1)**
15:15
**disciplinary (19)**
15:12;25:4;41:20;
55:10;65:18;66:16;
67:14,16;68:1,5;77:23,
25;80:6,15;93:20;94:1,
10,11,18
**discipline (7)**
19:11;22:16;23:8;
65:12;101:10;105:21,
24
**disciplined (6)**
65:23;69:4;102:16,
25;103:3;105:16
**Discipline-wise (3)**
42:15;43:2,12
**disclosure (1)**
14:15
**discovered (1)**
85:3
**discovery (1)**
5:3
**discredit (9)**
87:24;88:7;89:12,20,
23;90:22;91:2,15,22
**discretion (3)**
58:21;59:3;106:13
**discuss (1)**
71:15
**discussed (1)**
60:3
**discussion (2)**
78:22;80:5
**dismissed (2)**
92:16,17
**disparaging (2)**
24:22,24

Ismael v.
Roundtree, et al.

Richard Roundtree
December 8, 2023

**display (1)**
53:3

**displaying (1)**
53:15

**displays (1)**
39:19

**dispute (22)**
37:14,20;38:15;39:1,
12,23;42:25;45:24;
49:6,12,20;50:8;53:11;
54:16;55:25;56:15;
57:12,19;58:14;61:13;
82:21;92:23

**disputes (1)**
35:1

**disrespectful (1)**
44:15

**dissatisfied (2)**
88:18;106:11

**disturbing (1)**
74:21

**division (8)**
9:14,25;10:19;16:5;
18:17;81:14;107:12,14

**document (8)**
30:1,5,10,16,18;
48:11;81:10;85:25

**documents (8)**
13:25;20:3,7,8,22;
23:20;34:25;95:11;
96:5

**done (15)**
5:7;26:25;31:6;32:2;
41:20;66:19;67:25;
71:19;85:23;89:7;
90:16;93:6,19;96:14;
104:1

**doubt (3)**
89:11;92:10,13

**down (9)**
39:4,15;56:11,21;
59:20;63:19;67:4;68:3,
5

**dozen (1)**
5:21

**DR (4)**
77:16,22,25;78:5

**drive (8)**
26:23;31:23;32:12,
17;33:9;34:15;35:6;
54:7

**driven (1)**
26:25

**driving (4)**
35:10;68:15;83:13;
92:8

**DRs (1)**
78:6

**duly (1)**
5:13

**during (5)**
35:20;41:21;49:3;
53:8;70:16

**duties (1)**
32:13

**duty (14)**
18:24;29:6;33:11;
34:8,9;41:12;66:5;
67:1;68:12;72:19;87:4,
4,22;89:15

**E**

**eagerness (1)**
39:21

**earlier (7)**
31:4;32:18;44:11;
60:3;100:25;105:20,22

**early (4)**
7:15;9:9,22;27:14;
33:14;55:19

**Eastern (2)**
35:22;36:3

**EEOC (1)**
23:25

**effective (1)**
12:2

**effort (1)**
62:22

**eight (1)**
24:21

**either (9)**
7:15;8:20;15:14;
19:16;38:2;40:22,24;
41:6;67:15

**elderly (1)**
101:20

**elected (3)**
65:7;88:9;89:18

**eleven (2)**
5:25;8:2

**Elijah (3)**
99:14,17;100:20

**else (5)**
25:16;71:14;81:18;
86:23;93:7

**email (1)**
97:22

**e-mail (14)**
42:7;77:11;78:4,11,
25;82:15;94:6,19;
95:13;96:11;97:4;
98:12;99:14,16

**e-mailed (1)**
97:21

**e-mails (3)**
76:24;77:2;96:22

**employed (4)**
48:25;60:7;88:15;
89:18

**employee (12)**
18:19;21:16,17,20,
23;22:22,24;23:14;
24:22;65:13;88:11;
105:6

**employees (5)**

9:20;79:10,23;88:9,
10

**employer (2)**
23:4;107:8

**employer's (1)**
107:8

**employes (1)**
106:10

**employing (1)**
51:15

**end (3)**
25:1;69:23;92:16

**ended (2)**
92:11,14

**ends (4)**
15:9;27:14;31:22;
33:23

**enforcement (1)**
52:3

**engaged (1)**
52:22

**engaging (1)**
104:25

**English (2)**
57:17,22

**enough (3)**
17:1,22;107:5

**ensure (1)**
71:1

**entirety (1)**
68:4

**entitled (1)**
29:17

**entity (1)**
107:3

**entries (1)**
100:10

**equipment (1)**
40:20

**establishment (3)**
48:25;49:25;53:6

**ethic (1)**
49:10

**ethnic (1)**
87:17

**ethnicity (1)**
46:6

**evaluated (1)**
37:16

**evaluation (2)**
38:16;39:2

**even (8)**
51:11;54:11;71:4,7;
78:14;91:6;105:16;
108:7

**evening (1)**
51:10

**eventually (1)**
10:19

**everyone (5)**
44:3;55:23;63:22;
93:7;108:14

**evidence (5)**

85:15;90:7;94:24;
95:2;97:14

**exact (6)**
45:19;72:25;73:5,12;
74:2,4

**exactly (8)**
16:25;41:11;47:1,6;
71:9;86:18;92:21;96:2

**EXAMINATION (2)**
106:7;108:5

**examined (1)**
5:13

**example (1)**
35:3

**Excellence (2)**
39:15,20

**except (2)**
5:5;87:17

**Excuse (2)**
89:4;96:1

**executive (14)**
10:11,16;11:2,14,17,
23;12:15,17;16:11;
17:24;20:2;25:19;
31:12;71:9

**exercise (1)**
19:7

**exercising (1)**
19:2

**Exhibit (40)**
37:1,3;39:13;42:1,4,
6;48:2,5;58:7;60:17,
21;63:3;64:11,23;77:6,
9;80:4,18,21,22;82:15;
86:12,15;92:4;94:3,5,
11,14;96:8,10,20;97:1,
3,18;98:8,10;99:10,12;
100:23,24

**existence (1)**
82:19

**exists (2)**
30:5,16

**expect (3)**
54:19,22;60:12

**expectation (1)**
51:10

**expected (1)**
59:16

**experience (1)**
17:13

**experienced (1)**
39:21

**explain (1)**
88:17

**explained (1)**
73:20

**explanation (1)**
107:25

**expressed (1)**
70:15

**extension (1)**
11:9

**extremely (1)**

56:24

**F**

**facility (3)**
41:3;46:25;53:21

**fact (16)**
26:6;27:15;66:18,23;
67:8;68:9,11,11;72:3,
17;76:16;80:13;85:6;
89:8;106:14;107:7

**factual (1)**
43:13

**failed (1)**
92:15

**failing (1)**
92:17

**Fair (9)**
17:1,22;27:19;29:3;
31:23;41:22;42:24;
47:15;48:22

**fall (8)**
11:24;15:20,24;16:2;
22:14;23:10;24:20;
59:6

**familiar (4)**
52:1;65:21;86:9;
95:5,9;96:7,25

**Fanning (3)**
98:12,18,20

**far (7)**
33:4;35:3;42:16;
43:21;54:3;97:8;
101:13

**fast (1)**
63:18

**federal (1)**
5:4

**feel (1)**
56:3

**fellow (1)**
39:8

**female (6)**
21:20,23;24:22;45:6;
56:18,19

**females (2)**
44:15,16

**few (2)**
72:21;76:21

**field (1)**
37:10

**file (32)**
20:1;25:12;36:6,7,9;
37:14;38:16;39:2,13;
45:12;67:11,13,20,23;
76:9,11,18;78:17,21,
23;80:10;84:18,22;
90:7,9;91:11;93:17;
95:4,6,11,12;96:23

**filed (11)**
23:25;24:5;43:4;
66:10;70:8,17;88:3;
104:18,21;107:11,13

**files (1)**
66:15
**filing (1)**
71:16
**filled (7)**
37:17,18;38:1,8,19;
40:3;76:4
**fills (1)**
37:23
**final (11)**
12:18;15:19;18:18;
19:12,21;20:4;25:21;
35:20;65:11,11;67:22
**Finally (1)**
15:18
**find (3)**
30:18;98:2;105:4
**fine (2)**
14:11;88:11
**finish (2)**
77:17;89:5
**fire (7)**
19:8,25;20:13;25:10;
36:18,20;101:21
**fired (7)**
75:20;87:7,13,19,25;
105:16,18
**firing (2)**
38:6;95:15
**first (22)**
5:13;9:9;10:17;
12:21;15:14;35:14,15;
37:16,22;38:17;39:3,
14;40:1;42:11,18;
55:18,20;59:17;75:24;
81:22,22;83:7
**five (1)**
26:15
**flip (1)**
48:14
**focus (1)**
24:17
**folks (1)**
72:24
**follow (2)**
15:21;33:24
**followed (4)**
55:1;62:25;71:3;
91:7
**Following (1)**
52:10
**follows (1)**
5:14
**follow-up (3)**
25:12;44:10;107:19
**food (2)**
29:15;103:7
**forget (1)**
97:22
**form (21)**
5:6;19:11;21:3;
22:18;37:9;51:18;57:6;
77:4;82:18;85:13;

**formal (5)**
66:22;71:22;72:4,6;
73:8
**former (2)**
79:9,22
**forms (1)**
67:15
**Forsyth (24)**
26:4,8,10,20,23;27:3,
7,14,16,22;28:13,18;
29:17,21;30:2,8,11;
31:6,8;32:18,25;92:11,
14,24
**forth (1)**
28:23
**forward (3)**
19:22;20:5;25:23
**forwarded (1)**
15:18
**founded (2)**
15:4,12
**four (4)**
8:2,3;43:18;51:7
**four-and-a-half (1)**
63:15
**FRAILS (22)**
5:9;21:3;22:18;44:4;
51:18;57:5;61:9;64:18;
77:4;85:13;89:4;90:14,
19;93:8;95:20;104:15;
105:1,9;106:8;107:16;
108:6,11
**Friday (4)**
42:8;43:17;92:18,22
**friend (2)**
20:17;22:17
**friends (5)**
7:21,22;10:7;23:3;
79:20
**front (3)**
23:21;67:5;90:12
**full (9)**
27:10,11;29:11;
51:10;59:23;61:7,17;
62:13;65:2
**fully (2)**
60:13;62:23
**further (5)**
14:19;88:20;107:16;
108:3,12

**G**

**gas (2)**
28:25;29:3
**gather (1)**
97:11
**gathered (1)**
97:15
**gave (5)**

90:14;94:1,10,11,18;
95:3,8,20;104:15;
105:1,9
**general (2)**
38:13;44:15
**gentleman (1)**
35:22
**Georgia (6)**
26:4;52:2,10;92:11,
14,24
**Gilbert (9)**
48:18,24;49:22;53:2,
13;54:18,23;55:7;56:5
**Gilbert's (1)**
107:20
**given (8)**
17:16;30:7;31:13;
40:20;47:20;49:1;
58:21;94:3
**Glen (1)**
16:5
**glitches (1)**
64:17
**goes (4)**
13:23;15:13;63:18;
81:17
**good (7)**
5:17;7:21,22;8:16;
40:13;81:5;93:8
**grocery (4)**
29:19;30:3,9;103:19
**group (2)**
49:2;87:17
**guess (5)**
14:20;28:12;63:7;
93:3;105:6
**guy (1)**
20:9
**gym (1)**
103:22

**H**

**hand (1)**
95:7
**hand-delivered (1)**
95:1
**handwriting (1)**
81:1
**handwritten (4)**
46:8;48:17,22;81:3
**happened (7)**
59:21;68:7;75:17;
83:1;85:9;105:7,12
**happens (6)**
14:6,12;33:10;34:11;
78:6;89:3
**happy (1)**
93:5
**harassing (2)**
46:17;47:3
**harassment (9)**
20:16,18,19,25;21:9;
24:19;46:9;104:14,25

**hard (1)**
13:8
**harsh (1)**
87:10
**head (8)**
6:16;8:17,21,25;
16:5;18:15;61:6;62:8
**hear (3)**
45:25;63:25;69:24
**heard (4)**
26:7;31:25;54:12;
104:3
**hearing (15)**
46:2;63:10;93:16;
94:12,16,20,22;95:18;
96:6;97:9,12;98:3,23;
99:1;102:9
**hearsay (1)**
57:8
**held (1)**
66:14
**Hey (2)**
20:8,9
**higher-ranking (1)**
56:13
**highest (2)**
6:24;7:2
**highlighted (3)**
86:22;87:1,21
**highlighting (1)**
86:19
**highly (1)**
49:15
**himself (5)**
38:24;39:11;55:22;
56:14;91:15
**hire (1)**
106:22
**hired (7)**
35:15,20,22,25;
77:16,16;79:2
**history (1)**
74:6
**hit (1)**
27:21
**hold (1)**
62:6
**holding (2)**
61:5;62:7
**home (17)**
31:20,23;32:5,13,18,
21;33:9;34:6,7,10,10,
16;35:6,10;83:14;92:8;
103:20
**homicide (2)**
7:3;17:16
**honest (1)**
38:24
**honestly (1)**
37:17
**hostage (1)**
66:15
**hosts (1)**

53:21
**hour (3)**
35:4;93:4;96:19
**hours (6)**
32:19;49:3;50:7;
51:11;82:19;91:10
**hundred (1)**
5:23

**I**

**idea (3)**
54:3;91:6;100:19
**identifiable (1)**
87:5
**identification (10)**
37:2;42:2;48:3;77:7;
80:19;86:13;96:9;97:2;
98:9;99:11
**identify (5)**
21:11;88:22;89:9;
102:22;105:15
**identity (1)**
45:11
**important (3)**
18:24;78:16;85:6
**inappropriate (2)**
23:14;44:14
**incident (6)**
57:1;68:8;99:16;
100:24;101:20,25
**incidents (1)**
102:3
**includes (1)**
26:3
**incorrect (1)**
87:8
**increase (1)**
40:20
**independent (1)**
66:12
**independently (1)**
67:20
**individual (1)**
45:5
**individuals (7)**
15:22;33:13;44:23;
46:14,17;47:9;98:1
**information (7)**
17:15;19:16;66:3,7,
20;67:24;71:20;79:6;
81:14,20;82:3;84:13,
16;85:2;93:18;97:11,
15
**informed (2)**
61:6;62:12
**initially (1)**
40:16
**initiated (3)**
17:4;71:8;82:20
**input (1)**
59:11
**inquire (2)**

20:6,7
**inquiry (1)**
  42:14
**insensitive (1)**
  54:14
**inside (1)**
  53:6
**insolent (1)**
  87:10
**instance (1)**
  57:14
**instances (5)**
  60:23;69:3;102:14,
  23;104:20
**instead (1)**
  68:6
**instituted (1)**
  105:20
**instructed (3)**
  68:18,24;102:12
**Integrity (2)**
  38:18,23
**intentionally (1)**
  74:8
**interesting (2)**
  34:13;79:4
**interfered (1)**
  7:12
**interference (1)**
  46:1
**internal (58)**
  9:13;10:18;12:10,11,
  13,20;13:4,6,11,12,16,
  21;14:7;15:3,10,23;
  16:2,10,14;17:3;18:2,
  15;20:8;22:13,20;23:9;
  25:9;42:20,22;44:20;
  45:12,15;54:22;62:23,
  25;63:4;66:6,17,20;
  68:18;71:21;72:3,5,23;
  73:6,8;76:3,6;77:22;
  81:14;83:19;85:22;
  86:4,8;91:25;92:5;
  107:12,14
**interpret (1)**
  43:24
**interrogatories (1)**
  102:21
**interview (19)**
  35:20;54:23;66:24;
  67:7;72:4,6,17,24;73:8,
  12,14;74:3,15,16,22;
  76:8,15;77:15;89:1
**interviewed (3)**
  63:4;68:17;79:5
**interviewing (4)**
  68:16;80:1;84:15;
  85:11
**into (28)**
  6:9;10:11;15:9;
  25:20;33:14,17;41:5;
  55:11;57:9;59:11;
  63:13,16;67:24;68:9;

70:23;71:2,4,25;72:21;
75:16;76:9,21;82:19;
90:4;93:18,23;98:15;
102:19
**investigate (1)**
  74:7
**investigated (8)**
  40:10;54:20;60:14;
  62:23;90:1;91:19,23,
  25
**investigating (2)**
  18:7;40:6
**investigation (31)**
  12:13,14,16,19;
  13:23;14:1,8,10;15:1,3,
  7;16:25;20:16,24;25:3,
  11;48:8;55:11;63:1;
  66:7,12,13,17;68:4;
  70:16,23;71:1;76:3;
  82:20;90:7;91:10
**investigations (15)**
  8:10,12;9:4,5,7,23,
  24;10:6,18,20,23;11:7,
  9;12:21,25
**investigative (3)**
  17:13;74:6,10
**investigator (3)**
  12:14;44:20;90:4
**investigator/sergeant (1)**
  7:3
**investigators (2)**
  33:13;63:4
**involved (3)**
  8:16;12:21;15:22
**involvement (3)**
  11:1;12:8,9
**involving (4)**
  20:19;21:16;65:18;
  100:24
**Iraq (2)**
  35:23;36:5
**Ismael (106)**
  12:23;18:9;23:25;
  24:9;33:17;35:14;
  37:10;38:11,22,24;
  39:8,9,19,20;40:6;
  42:14,23;43:4,7,15,18;
  46:9;47:25;48:24;
  49:10;50:1,2;53:10;
  54:11,12,15;55:19;
  56:14,24;57:23;58:2,
  10;59:6,22;61:5,6;
  62:2,3,6,8,10,10,12,15;
  65:18;66:1,4,10,21;
  68:1,20;69:9,10,13,15;
  70:8,23;71:2,7,10,22;
  72:4,6;73:8,13;77:14;
  78:14;79:1;81:15;
  82:25;83:8,19;84:4,10,
  13;85:7;86:3;88:3;
  90:8,9;91:14;92:6;
  93:20;95:15,19;96:15,
  23;97:9,11,16;98:2,6,

13;99:8;100:5,21,24;
101:5;105:17,25;107:8
**Ismael's (18)**
  18:7;20:16;24:10;
  45:15;46:3,6,12,14;
  47:10,18;48:8;54:11;
  58:18;63:10;91:9;
  92:13;96:23;100:1
**issue (1)**
  28:1
**issued (2)**
  23:8;77:2
**issues (1)**
  100:9
**it' (1)**
  59:24
**item (4)**
  37:16;38:18;39:4,15

## J

**January (1)**
  6:20
**Jenkins (64)**
  7:5,20,23;8:8,14,17;
  12:22;16:15;18:8;
  20:17,24;21:10,16;
  22:10,14,17,23,25;
  23:4,7;24:5,8,16,18,20;
  25:3;43:19;44:12,18,
  24;45:3,16;46:4,5,13;
  47:24;48:9;49:24;50:3,
  6;51:9;53:3;54:10,12;
  55:11;56:13;57:2,15;
  58:17,21;59:1,11,15;
  61:7,16,23;62:13;
  70:17;71:10;90:12,20;
  106:15,18;108:8
**Jenkins's (1)**
  58:24
**jeopardize (1)**
  58:13
**Jimmy (3)**
  42:7;79:12,13
**job (14)**
  41:2;49:17,18;53:4,
  5,9;66:5,25;68:13,16;
  72:18;75:24;89:1,16
**Johnson (3)**
  97:6,18;98:6
**Jordan (2)**
  55:17;56:18
**July (1)**
  99:17

## K

**Keep (5)**
  14:11;27:21;28:5;
  106:11;108:8
**keeps (1)**
  41:12
**KENDRICK (3)**

64:13;69:13,16
**kept (4)**
  12:24;100:17;
  107:21;108:7
**KERTSCHER (48)**
  5:2,10,16;7:11;21:8;
  22:20,24;23:2;37:3;
  42:3;44:1,7;48:4;
  51:20;57:11;61:11;
  63:13,21,24;64:3,9,20;
  69:22;77:8;80:20;
  85:17;86:14;89:6;
  90:16,20;93:2,9,13;
  94:5;95:23;96:10;97:3;
  98:10;99:12;104:19;
  105:4,11;106:2,5;
  107:18;108:3,12,16
**kicked (1)**
  59:12
**killed (1)**
  35:11
**Kimberly (1)**
  16:6
**kind (8)**
  6:13;8:14;12:8;
  27:21;52:24;54:19;
  55:11;80:1
**knew (9)**
  11:5;36:2;41:7;66:9;
  70:8;75:6;79:1;85:11;
  101:24
**knowledge (2)**
  101:24;107:24
**known (5)**
  6:22;7:4;9:2,21;10:1

## L

**lack (1)**
  17:10
**lady (1)**
  20:19
**language (3)**
  57:22;87:10,16
**large (1)**
  53:21
**last (16)**
  8:2;11:22;23:17;
  24:16;26:12;28:16,22;
  48:14;58:6;60:16,17,
  20,20;61:1;83:7;103:3
**late (4)**
  7:15;50:7;55:22;
  59:15
**later (2)**
  9:12;72:15
**law (3)**
  52:2,2;104:22
**lawsuit (6)**
  24:4,5,7,10;55:2,4
**lawyers (2)**
  34:14;55:3
**leadership (15)**

10:11,16;11:2,10,14,
17,24;12:15,17;16:11;
17:25;20:2;25:19;
31:12;49:10
**leading (1)**
  49:2
**learn (4)**
  39:21;72:24;82:25;
  83:2
**learned (1)**
  73:1
**least (1)**
  5:21
**leave (2)**
  67:11;76:18
**leaves (1)**
  89:11
**leaving (1)**
  39:11
**Lee (3)**
  16:6,7;44:21
**Lee's (1)**
  45:12
**left (7)**
  10:21;11:11;72:9;
  75:7;92:11,14,24
**lengthy (1)**
  78:9
**less (7)**
  13:10;26:15,17,19;
  43:8;50:19;96:19
**letters (3)**
  46:14,20;47:10
**level (1)**
  53:9
**levied (1)**
  22:16
**lies (1)**
  65:15
**Lieutenant (64)**
  7:5,20,23;8:8,14,17;
  9:14,17;11:8;12:22;
  14:6;16:6,8,15,19;
  18:8;20:17;21:10,16;
  22:10,14,17,23,24;
  23:4,7,22;25:3;43:19;
  44:12,17,24;45:3,16;
  46:4,5,13;48:9;49:24;
  50:3,6;51:9;53:3;
  54:10,12;55:11;56:12;
  57:2,15;58:17,21,24;
  59:1,11,15;61:23;
  98:18;99:19,20,23,25;
  100:8,13;106:18
**lieutenants (3)**
  19:20;62:19;89:21
**likely (3)**
  18:13,14,16
**limited (1)**
  13:14
**limiting (1)**
  13:13
**line (3)**

61:10;81:22;98:13
**line-of-duty (1)**
34:12
**list (1)**
41:13
**little (5)**
19:4;25:24;41:24;
43:8;102:19
**live (1)**
56:7
**lived (1)**
35:3
**lives (2)**
35:4,5
**local (1)**
103:12
**log (1)**
28:5
**logic (1)**
89:19
**logical (1)**
28:13
**long (9)**
6:22;7:4;8:7;9:2,21;
27:3,13;31:18;50:15
**longer (1)**
11:17
**look (21)**
14:2;36:21,22;37:3;
42:3,10;47:20;48:4;
70:18,21;74:10;76:9;
77:8,9;80:20;86:15;
94:5;96:10;97:3;98:10;
99:12
**looked (8)**
15:9;41:5;68:4;
75:16;82:15;89:6;90:4;
97:15
**looking (3)**
86:17;95:10;98:11
**looks (1)**
82:18
**losing (1)**
6:13
**lot (5)**
8:6;9:8;13:12;33:11;
53:8
**Lt (1)**
97:20

## M

**ma'am (4)**
65:14,20;69:2,10
**Madam (2)**
63:17;64:10
**maintain (1)**
87:6
**major (2)**
10:23;11:7
**majors (1)**
19:20
**makes (1)**

15:15
**male (1)**
56:18
**management (1)**
101:7
**manager (1)**
50:14
**manner (8)**
56:14;85:20;87:1,5,
23;88:5;91:15,21
**manual (4)**
30:20,24,25;31:1
**many (19)**
5:20,22;13:4,6,17;
17:7;19:12;26:6,13;
35:9,21;51:1;52:2;
53:21;60:23;104:12,
17,20,24
**March (1)**
35:17
**marked (13)**
37:2;42:2;48:3;
68:24;77:7;80:19;
86:13;96:9;97:2;98:9;
99:11;102:13,25
**Marshall's (1)**
107:4
**math (3)**
7:18;10:3;43:10
**matrix (4)**
86:5,7;88:6;92:5
**matter (2)**
69:5;102:17
**may (7)**
10:12;25:20;55:7;
69:11;96:2;99:3,3
**maybe (7)**
8:2;9:6;67:25;68:8;
74:7,8;93:19
**McCarty (34)**
9:3,17;16:6,19;18:6;
42:7,13,15,19;43:21;
48:7;79:20;82:10;
83:18,24;84:10,13,16;
85:3,10;86:23;90:4,6;
94:7,15,19;95:18;
97:21;98:12,22,25;
99:6,15;100:19
**McCarty's (1)**
48:15
**McCLAIN-HAYMON (10)**
64:15;65:1,5,9,16,21,
25;68:21;69:8,11
**mean (5)**
13:24,25;53:20;56:3;
99:4
**means (1)**
75:10
**meet (2)**
35:14,19
**member (1)**
49:17
**members (7)**

11:13;39:10;47:2;
53:21;64:13;69:11,17
**memory (2)**
22:5;46:24
**mentioned (1)**
105:20
**merged (2)**
6:8;7:14
**message (1)**
7:7,12
**met (3)**
7:13;8:9;9:9
**Middle (5)**
35:22;36:3;59:20;
86:19,25
**might (4)**
17:10;34:14;54:13;
97:19
**mileage (1)**
29:1
**military (1)**
36:5
**mine (1)**
74:18
**minute (3)**
13:3,20;100:23
**minutes (9)**
23:5;35:6;50:7;
63:15;72:21;76:21;
93:4,10,23
**missing (1)**
51:11
**mission (1)**
31:7
**missions (1)**
29:18
**misspeak (1)**
24:8
**mistake (1)**
99:3
**mistaken (1)**
16:4
**moment (2)**
72:25;106:5
**Monday (3)**
72:12,13;73:2
**month (4)**
12:3;67:25;68:8;
93:19
**months (2)**
40:17;55:8
**more (17)**
12:9;13:10;17:21;
18:14,16;19:4;20:20;
26:15,16,17,18,19;
35:4,5;41:24;50:19;
56:6
**morning (2)**
5:17;105:22
**most (3)**
23:13;56:22;59:15
**movie (3)**
29:19;30:4,9

**moving (3)**
19:22;20:5;25:23
**much (6)**
17:19,21;58:3,11;
69:20;108:13
**multiple (2)**
22:12;50:5
**Muslim (2)**
36:1,2
**Myself (2)**
11:3,18
**mystery (1)**
96:5

## N

**name (6)**
10:12;17:9;25:5;
44:22;45:8;65:2
**named (1)**
55:17
**narrow (1)**
13:8
**nature (2)**
14:20;17:18
**necessary (1)**
87:18
**need (2)**
15:2;31:6
**negatively (3)**
88:14,16;89:17
**neither (1)**
81:18
**new (1)**
14:15
**next (24)**
38:18;39:4,15;49:9,
15,23;50:5;51:9;54:9;
56:11;58:1;60:16,20;
62:11;66:19;67:13;
71:20;72:11;80:10,13;
83:17;84:4,12;85:2
**nice (1)**
108:14
**night (1)**
31:7
**nine (2)**
24:21;82:22
**none (3)**
69:19;107:15;108:10
**normal (5)**
12:25;33:21;45:17;
62:25;71:3
**notes (3)**
97:8;98:5,13
**November (14)**
63:11;65:8;94:2,8,
12,15,19,25;95:14;
96:12;97:5;98:13;
99:14;100:21
**number (18)**
13:9,15;26:7,9;37:1;
42:1;48:2;77:6;79:9,

22;80:8,18;81:9;86:12;
96:8;97:1;98:8;99:10
**numerous (2)**
17:17;54:10

## O

**oath (2)**
44:8;93:14
**object (12)**
21:3;22:18;51:18;
57:5;61:9;77:4;85:13;
90:14;95:20;104:15;
105:1,9
**objection (3)**
57:7,10;90:17
**objections (1)**
5:5
**obligation (1)**
53:19
**occasion (2)**
64:16;65:17
**occasions (3)**
20:10;50:5;54:10
**occur (1)**
23:16
**occurred (3)**
23:19;69:3;102:15
**occurrence (1)**
85:9
**October (1)**
55:19
**odd (2)**
73:17;74:1
**off (11)**
15:2;26:1;33:11;
34:7;59:12;60:22;87:4,
22;101:6;103:23;106:6
**off-duty (2)**
49:2;55:20
**offense (1)**
88:4
**offensive (1)**
56:24
**offer (1)**
67:15
**office (45)**
6:9,10,12,17,19;
7:14;9:5;14:7,13;32:2,
8,14;33:4,8,15,18;35:6;
37:9;50:22;65:10;
81:14,16;82:25;84:14;
85:4;86:21;87:24;88:8,
13,14,17;89:9,13,16,
17,20,24;90:23;91:2,
16,22;92:2;100:9;
102:22;107:4
**officer (16)**
14:8;18:20;31:18;
49:24;55:21;56:13,23;
87:3,5,9,15,23;88:23;
104:12,21,24
**officers (38)**

12:10,12;13:11,13,
14,17,17;14:3,24;17:5;
25:25;26:1;27:2,6;
28:4,10,17;29:8;30:2,
7;31:5,12,17;33:22;
34:1,24;35:9;41:13;
46:18;47:4;49:2;51:2;
52:6;53:15;68:22;
87:11;102:11;104:8
**official (2)**
88:9;89:18
**off-site (9)**
25:25;28:5,11,12;
29:5,9;31:16;32:2;92:8
**often (4)**
7:22;17:3;103:6,10
**okaythus (1)**
42:16
**Once (4)**
12:16;67:6;76:14;
103:23
**one (40)**
9:19;12:12,21,22;
19:10,15;22:3,8;23:21;
24:21;25:18;26:6;37:5;
40:23;43:3,14;45:1,4;
46:18,18;47:4;52:5,21;
56:25;57:13,17;62:17,
18;67:16;71:9;79:12;
89:20;90:10;96:16;
101:13,24;104:12,20,
24;107:19
**one-year (2)**
11:9,12
**only (8)**
22:3;25:12;28:13;
31:8;37:13;42:10;43:3;
101:24
**opened (1)**
55:10
**operating (1)**
85:4
**operation (1)**
37:10
**operations (5)**
6:17;8:18,19;9:8;
11:9
**opinion (1)**
25:20
**opportunity (2)**
14:19;19:15
**opposed (1)**
53:7
**optics (2)**
70:16,19
**option (1)**
106:25
**oral (3)**
66:24;72:17;74:22
**orientation (2)**
68:23;102:11
**originally (1)**
35:23

**others (1)**
31:11
**otherwise (1)**
7:23
**ought (1)**
91:18
**out (17)**
28:5;33:14;37:17,18,
24;38:1,9,19;39:13;
40:3;54:13;55:23;76:4;
95:3,7;101:19;105:4
**outcome (2)**
24:23;25:2
**outside (3)**
7:24;8:4;53:7
**over (26)**
6:11;7:3,20;10:5,23,
24;11:7,8;15:17;19:21,
23,24;26:7;28:8;30:2;
34:4;47:12;50:3,14;
57:25;61:6;62:8;79:10;
91:10;103:7,11
**overheard (1)**
107:8
**oversaw (1)**
63:10
**oversee (1)**
49:3
**oversees (2)**
16:8;58:24
**own (2)**
25:11;101:14
**owner (5)**
51:15;60:7;106:17,
21,25
**owner/manager (1)**
48:19

## P

**page (13)**
38:2;40:4;42:11;
48:17;55:16;58:1,5,6;
60:17,20;86:20,25;
94:14
**pages (1)**
48:15
**paid (15)**
27:7,10;29:8;34:15,
19,20,22,24;35:4,5;
51:10;52:6,11;59:23;
106:15
**paperwork (1)**
15:10
**paragraph (16)**
54:9;55:18;56:11,21;
58:6;59:14,18,20;
60:17,20,22,25;61:2;
81:22;83:7,17
**park (1)**
55:24
**Parker (8)**
97:20,22;99:7,15,17;

100:8,13,20
**parking (1)**
53:8
**part (16)**
7:22;10:12;11:17;
12:25;20:11;36:2;
38:15;39:1;42:18;
43:17;68:22;69:21;
74:20;75:19,19;102:11
**Partain (5)**
10:21,24;11:3,5,11
**parters (1)**
8:10
**particular (4)**
45:4;73:7;83:23;
92:3
**parties (1)**
100:8
**partnered (2)**
7:25;8:6
**partners (3)**
8:5,7;10:6
**passed (3)**
15:17;19:18;67:19
**Patrick (3)**
11:4,16,19
**patrol (23)**
9:14;26:23;28:17;
29:17;30:3,9,11,16;
31:9,19;33:22;34:1,17;
35:10;68:24;96:16;
102:13,25;103:7,11,15,
20,23
**patrolling (1)**
33:22
**Paul (1)**
97:6
**pay (5)**
29:11;40:20;51:10;
68:10;90:21
**payment (5)**
59:22;61:7,17;62:12;
89:21
**pays (1)**
29:3
**peers (2)**
38:12,25
**penalty (2)**
20:12;101:4
**people (11)**
16:1;17:9;28:20,21;
29:20;33:15;60:8,10;
89:1;101:20;102:24
**per (4)**
13:6;29:8,14;45:16
**perform (1)**
32:13
**performance (8)**
36:9,11,14,15;37:9,
13;38:23;87:4
**person (11)**
14:13;18:7;21:11;
25:5;38:22;45:1,9;

52:11;66:15;88:18;
89:14
**personal (12)**
27:1;28:24;29:18,20,
21;30:12,17;31:7;
68:25;69:7;96:17;
102:13
**personnel (23)**
36:7,9;38:16;39:2,
13;63:9;93:16;94:12,
16,20;95:4,6,7,11,12,
18;96:6,23;97:11;98:2,
22,25;102:8
**persons (1)**
45:2
**person's (2)**
45:11;95:12
**phone (9)**
17:4,8,9,11,14,17,23;
71:8;83:5
**pick (1)**
73:7
**picked (1)**
73:11
**place (3)**
47:13;67:10;76:18
**placed (2)**
50:3;67:21
**plain (1)**
88:21
**Plaintiff's (12)**
37:1;42:1;48:2;
64:11,23;77:6;80:18;
86:12;96:8;97:1;98:8;
99:10
**plan (2)**
11:5,10
**planned (1)**
74:8
**play (4)**
63:13,16,25;64:9
**played (7)**
64:12,24;70:12;
71:25;72:20;76:20;
102:18
**please (8)**
5:11;15:25;19:5;
65:2;80:21;94:6;96:11;
108:17
**pleased (1)**
55:21
**pm (14)**
77:13,21;78:13;
81:15;82:16;84:6;
93:11,12;94:8;96:13;
97:5;98:14;99:14;
108:18
**point (16)**
30:1,6,10,14;36:8,
10;41:6;42:20;43:7;
67:3,6,14;68:19;76:14;
77:20;78:13
**Police (5)**

6:7;49:2;87:5,18;
104:8
**policies (1)**
30:11;91:24;92:7
**policy (6)**
27:17;69:5,6;91:20;
102:17;105:21
**posed (1)**
102:10
**position (8)**
11:23;45:8;61:16;
65:6;84:15;88:19;
99:18,22
**positive (1)**
53:4
**possibilities (1)**
74:11
**possibility (2)**
61:5;62:7
**possible (4)**
23:20;70:22;71:6,16
**Possibly (2)**
35:19;66:4
**posted (1)**
14:11
**potential (2)**
60:2;104:13
**potentially (1)**
52:5
**powers (1)**
108:1
**practice (1)**
52:17
**prepared (3)**
48:7;81:19;82:8
**present (3)**
11:18;55:24;59:24
**presentation (1)**
69:21
**presented (4)**
20:3,7;25:13;91:11
**previous (2)**
67:24;93:19
**previously (14)**
37:2;42:2;48:3;
66:25;72:18;77:7;
80:19;86:13;96:9;97:2;
98:9;99:11;101:1;
102:25
**Prior (33)**
6:3;8:4;19:13,19;
20:15,16,23,23;21:14,
19;22:5,14,20;23:9;
24:18,20;34:23;38:5;
67:25;68:8,17,23;
75:10,12,14;93:19;
94:1,10,11,18;99:16;
101:24;102:11
**private (11)**
46:8,11,17;47:8;
56:4;7;60:13;88:22;
90:13;106:9;107:3
**Probably (3)**

Ismael v.
Roundtree, et al.

Richard Roundtree
December 8, 2023

7:6;9:22;28:13
**probation (4)**
40:8;68:2,7;93:21
**procedures (1)**
13:1
**proceed (2)**
66:6,16
**process (9)**
11:12;18:1;24:6;
33:24;35:20;62:25;
71:3;78:10;95:9
**processes (2)**
12:25;45:17
**produced (1)**
86:18
**profane (1)**
87:10
**profession (1)**
44:16
**professionalism (3)**
39:20;53:9,14
**professionally (2)**
49:19;56:14
**progresses (1)**
12:14
**progressive (2)**
19:11;105:21
**promote (3)**
8:17,21;10:15
**promoted (3)**
8:10;9:23,24
**promoting (1)**
10:10
**proposed (3)**
67:17;68:1;93:20
**protocol (1)**
85:22
**proven (1)**
89:25
**provide (2)**
30:22;106:23
**provided (3)**
19:17;86:20;102:23
**provides (2)**
49:10;50:23
**providing (1)**
50:16
**public (5)**
38:13;47:3;53:15,22;
61:22
**purposes (1)**
5:4
**push (1)**
93:6
**put (10)**
10:22;17:9;25:20;
41:1,8;57:9;59:5;62:6;
82:2;92:3
**putting (2)**
41:10;57:8

**Q**

**qualify (1)**
27:15
**quote (2)**
30:23;31:2

**R**

**race (2)**
46:6;87:17
**racial (1)**
104:25
**racially-related (1)**
104:13
**racist (2)**
54:14;56:25
**Rahn (5)**
16:5;8;18:14;29:24;
77:11,21;78:1;79:1;
80:5;94:8;96:12,14;
97:5,6,10,21,23
**range (1)**
105:18
**rank (2)**
6:24;7:2
**rat (1)**
104:9
**reach (1)**
74:23
**reached (2)**
72:7,8
**read (14)**
19:20;36:8,10;43:24;
52:24;55:1,6;57:3;
62:5;78:3;81:10;82:1;
93:22;107:20
**reading (3)**
25:21;36:13;62:1;
77:10;81:21;98:15;
108:19
**ready (1)**
77:17
**really (1)**
102:1
**rear (1)**
25:1
**reask (1)**
47:2
**reason (23)**
37:14,20;38:15;39:1,
12,23;42:25;49:6,12,
20;50:8;53:11;55:25;
56:15;57:12,19;58:14;
61:13;75:20;82:20;
88:2;90:24;91:13
**reasonable (1)**
13:15
**reasons (3)**
54:16;65:22;96:16
**recall (21)**
22:16;23:5;25:4;
40:11;44:17;47:21,23;
63:7;72:14;73:3,5;
78:24;82:13,17;83:3,6;

99:2;102:18;103:18;
104:17;105:10
**receive (7)**
18:3;25:9;61:7,17;
62:12;84:16;101:7
**received (11)**
17:16,23;24:6;66:3,
20;67:23;68:10;71:20;
81:14;84:13;93:17
**recent (1)**
23:13
**recess (3)**
44:5;64:7;93:11
**recollection (2)**
48:16;63:15
**recommendation (20)**
8:19,24;12:19;15:15,
16;19:16,17,18;20:4;
25:10,17,22;44:21;
81:2;84:20,24;86:4;
91:12;101:3,6
**recommended (3)**
19:20;101:4,9
**record (18)**
41:15;48:6;57:9,10;
63:14,16;65:3;71:25;
72:21;76:21;77:11,23;
90:18;93:23;98:15;
99:4;102:19;106:6
**recording (2)**
7:7,11
**recourse (1)**
106:16
RECROSS-EXAMINATION (1)
107:17
**REDIRECT (1)**
108:5
**reduce (1)**
101:9
**reduced (4)**
68:3,5;101:4,5
**refecting (1)**
88:16
**refer (2)**
57:15;104:6
**reference (4)**
36:17,18;69:4;
102:16
**referring (4)**
17:5;70:20;94:11;
97:23
**reflect (8)**
87:24;88:7;89:12,23;
90:22;91:1,15,21
**reflects (2)**
88:13;89:16
**refresh (1)**
63:14
**refreshes (1)**
48:16
**regarding (6)**
46:6;48:7;52:19;
99:16;107:1,10

**regret (1)**
59:24
**regularly (1)**
52:18
**reimbursed (2)**
28:25;29:1
**relation (1)**
82:14
**relationship (4)**
7:20;9:16;10:4;
79:21
**released (6)**
30:7;31:17;32:11,25;
83:13;92:7
**relevant (2)**
36:19,22
**rely (1)**
25:19
**remark (1)**
57:16
**remarks (4)**
54:14;56:25;58:2,10
**remember (46)**
8:22;20:15,21,23;
21:2,6,14,15,18,22,24,
25;22:3,5;23:2,8,12;
24:2,12,19,21,23,24;
25:2,5;36:13;44:22;
45:8,19;46:19,21,24;
47:15,17,18;70:11;
71:24;72:20;73:4;
76:10,20;80:9;84:22;
93:22;105:7,21
**removed (1)**
101:20
**Repeat (6)**
15:25;19:4;23:1;
28:15;46:10;94:17
**repeatedly (1)**
53:6
**replied (2)**
58:3,11
**report (23)**
12:17;25:20,21;
27:20;32:1;37:9,18,21;
48:7,15;67:9;76:16;
77:24,25;80:6,7,15;
81:10,19;82:9,12;
83:19;92:4
**reported (3)**
50:6;91:7;104:13
**REPORTER (8)**
7:8;37:5;42:4;63:17,
20;64:10,19;108:15
**reports (2)**
16:10;87:18
**represent (8)**
42:6;48:6;86:17;
94:6;96:11;97:4;98:11;
99:13
**request (1)**
68:5
**requested (2)**

95:22;96:3
**required (4)**
27:20;28:4;106:11,
22
**requirement (5)**
32:1,3,6;33:16;108:8
**reserve (1)**
5:5
**resignation (1)**
12:1
**resigning (1)**
11:16
**resolved (1)**
100:9
**respect (4)**
37:17;38:8,12;49:9
**respond (2)**
78:8,11
**responding (1)**
42:14
**response (3)**
63:8;78:10;100:7
**responsibilities (1)**
53:5
**responsibility (5)**
19:3,8;49:1,16;56:3
**responsible (2)**
10:10;49:17
**responsiveness (1)**
5:6
**restated (1)**
69:6
**restaurant (3)**
29:19;30:3,8
**result (2)**
23:9;40:7
**resulted (1)**
23:15
**retaliatory (5)**
70:21,23;71:1,7,16
**retire (1)**
11:6
**retired (1)**
10:25
**retiring (2)**
12:4,6
**return (1)**
32:5
**returned (1)**
68:15
**review (12)**
19:13,15,19;20:2;
65:17;66:22;67:12,22;
71:22;76:19;78:9,9
**reviewed (14)**
20:2;36:10,15;43:4;
67:13,20;76:9;78:17;
80:10;81:19;84:19,23;
90:7;91:11
**reviewing (1)**
76:11
**reviews (1)**
15:14

**Richard (3)**
5:3,12;65:4
**Richmond (49)**
5:25;6:4,16,23;7:14;
15:24;17:24;32:1,7,14;
33:8,18,23;37:8;39:5,
24;40:13;41:1,21;
50:15,22;51:1;56:8;
65:8,10;67:7;68:17;
73:13;75:5,7;76:14;
79:9,14,23;81:13;
82:24;83:9;85:4;88:23;
91:4;102:22;104:1;
106:23;107:1,4,5,21,
25;108:7
**right (138)**
6:1,25;7:16,19;8:3,7,
25;9:13;11:13,21;
12:20;14:16,18,20,24;
15:1,20;16:16,20;17:1;
18:6,18;19:6,23;20:13;
21:13,25;23:7;25:8,16,
17,24;26:13,22;27:4,8,
11;28:14;29:12,23;
30:23,25;31:3,11,21;
32:11,17,19,22;33:3,9,
16;34:3,8;35:9,13,18,
21;36:8;38:8;40:24;
43:9,16,19;44:1;45:6,
14,17,20;46:16;47:1;
48:4,14;52:24;53:19;
54:6,9,19,20;55:2,4,16;
56:11;57:23;60:8;
61:20;63:24;64:3,5,20;
67:5;69:22;70:4;71:14,
18;72:2,7;73:6;75:13,
21;77:20;78:4;79:12,
19,22;80:9,20;81:5;
82:1,11,24;85:12,25;
88:2,7;89:12;90:3,11,
19;91:19;92:20,23;
93:3,9;94:16,23;95:10,
13;96:6,20;100:2;
101:7,14,17;102:1;
104:10,19;105:13
**road (1)**
9:14
**role (4)**
10:22;11:8,11;58:19
**room (2)**
95:4,7
**roughly (1)**
7:17
**rounds (1)**
53:7
**Roundtree (21)**
5:3,12,17;44:7;
64:25;65:4,4,7,14,20,
24;66:2;68:21;69:2,8,
14,18,20,25;93:13;
107:19
**rule (1)**
80:1

**rules (1)**
5:4
**runs (1)**
27:11

**S**

**safely (1)**
55:23
**same (15)**
9:6;15:18;18:7;
22:11;23:7;53:9;59:22;
60:9;72:16;73:12;80:4,
7,14;84:12;89:19
**sand (1)**
57:16
**satisfactory (1)**
101:12
**satisfied (1)**
49:16
**satisfy (1)**
25:16
**saw (1)**
48:16
**saying (6)**
6:14;23:19;46:23,23;
52:10;89:8
**scenario (1)**
75:9
**schedule (2)**
32:24;33:2
**school (2)**
6:11,16
**screen (4)**
37:4,6;63:21,22
**second (6)**
43:16;56:21;57:22;
59:14,18;72:24
**section (2)**
30:24;87:1
**security (10)**
6:16;49:3,18;50:16,
23;106:23;107:1,3,5,21
**seeing (6)**
19:19;37:22;38:17;
39:3,14;40:1
**seemed (3)**
60:18;61:4;62:7
**seems (3)**
60:6;62:1,14
**selection (2)**
59:2,5
**send (6)**
26:6,8;63:17;97:7,8;
98:22
**sending (1)**
96:22
**sends (1)**
13:25
**sent (16)**
12:17;26:1;42:7;
78:25;93:25;94:15,18,
24;95:16,21,22,23;

96:5,11,19,20
**sentence (12)**
42:19;43:17;49:23;
50:5;51:9;59:17;61:1;
62:11;72:16;83:7;
84:12;85:2
**separate (1)**
34:15
**September (21)**
16:16;18:10;33:19;
40:7,14;42:8;43:1,17;
45:21;48:13,18;77:12;
81:15,23;83:18;87:7;
92:11,14;95:14;96:24;
97:16
**Sergeant (23)**
9:3,11;16:6,7;18:6;
42:7,13,19;44:21;
45:12;48:7,15;75:5;
82:10;83:24;85:10;
86:23;94:7,15,19;
95:18;99:15;100:19
**serious (1)**
19:3
**seriously (2)**
18:22;49:18
**serve (1)**
6:3
**served (3)**
6:10,23;36:4
**service (1)**
24:6
**services (6)**
10:24;52:12,19,22;
55:14;60:2
**set (2)**
74:16;85:10
**seven (2)**
98:14,21
**Several (4)**
5:23;7:25;44:14;
45:1
**Sgt (3)**
83:18;84:13;85:3
**share (3)**
37:4;40:2;63:21
**sheet (1)**
27:21
**Sheriff (49)**
5:3,17,25;6:3,12,18,
25;8:1,4;9:19,19;
10:19;12:7;18:25;
19:11;27:20;35:12;
37:10;44:7;51:21;
53:20;57:12;61:12;
64:15,25;65:4,7,7,9,14,
17,20,24;66:2;68:21;
69:2,8,14,15,18,20,25;
88:10;89:4;93:13;
104:14;105:12;106:9;
107:19
**Sheriff's (61)**
6:4,9,10,12,17,19,24;

7:14;9:5;15:24;17:24;
32:1,7,14;33:4,8,18;
37:9;39:5,16,24;40:6,
13;41:2,22;50:16,22;
54:4,7;56:4,8;65:10;
79:14,17,23,24;81:2,
13,16;82:25;84:14;
85:4;87:22,24;88:8,13,
14,17;89:9,13,16,17,
20,24;90:23;91:2,16,
22;102:22;104:1;
107:21
**shift (13)**
33:23;34:2,2,4;
37:11;50:6;51:11;53:8;
59:15;103:7,11,20,23
**short (1)**
93:3
**show (3)**
35:1;59:16;87:16
**shown (2)**
38:24;49:16
**shows (5)**
38:11,22;39:21;
88:18;94:9
**side (1)**
41:2
**sign (4)**
15:2;82:11;86:2;
95:8
**signature (4)**
38:2;40:3;48:22;
80:22
**signed (5)**
38:3;80:6;81:10;
85:25;95:3
**significant (1)**
14:12
**signing (1)**
108:19
**sign-out (1)**
95:3
**Silence (1)**
104:4
**similar (1)**
105:17
**sit (1)**
105:15
**site (3)**
26:1,3;108:1
**sitting (4)**
23:18;47:11;53:7;
67:5
**six (1)**
55:8
**size (1)**
25:1
**socialize (1)**
7:23
**sole (1)**
59:3
**solely (2)**
58:23;65:15

**solve (1)**
96:4
**somebody (2)**
13:24,25
**someone (15)**
18:1;19:8,25;20:13;
25:10;35:3,4;39:5;
59:12;72:5;78:17;
86:23;87:21;95:6;
103:3
**someone's (1)**
95:11
**sometime (1)**
23:19
**sometimes (3)**
27:13,13;28:20
**soon (4)**
75:5;83:20;84:1;
90:17
**SOP (6)**
30:22;85:19,21;86:3;
92:3,3
**sorry (14)**
6:13;24:9;27:24;
45:23;51:4;55:14;57:3;
58:4;70:12;76:25;
85:18;89:6;92:12;
102:5
**sound (5)**
16:16;35:17;45:20;
63:25;64:4
**sounds (2)**
16:17;33:11
**speak (1)**
57:17
**speaking (2)**
21:11;57:7
**special (12)**
41:2,7,10,12;49:2;
50:3;51:16;53:16;
55:21;56:24;106:19;
108:9
**special-duty (1)**
50:14
**specials (1)**
106:10
**specific (20)**
12:9;17:20;19:5;
20:20;21:1,5,6,9,17,19;
22:1,7,11;23:23;30:6;
33:23;34:21;41:24;
47:18;56:6
**specifically (7)**
13:13;18:19;20:18;
28:22;30:10;104:20;
105:19
**specifics (1)**
17:15
**spoke (2)**
56:23;99:7
**spoken (2)**
53:4;54:15
**spring (1)**

24:18
**staff (1)**
  25:10
**standing (1)**
  40:13
**standpoint (1)**
  41:20
**stands (1)**
  77:23
**start (3)**
  12:8;14:9;64:20
**started (2)**
  6:7;97:5
**starts (1)**
  60:22
**state (3)**
  65:2;77:10;99:4
**stated (2)**
  59:21;71:19
**statement (36)**
  37:14;41:22;43:1,11;
  47:3;48:18,20,22;49:4,
  7,9,13;50:9,11,13;
  53:18;54:24;55:17;
  56:1,12,16,22;57:13,
  20;61:13,18,20,21,21;
  62:2,15,18,20;69:1;
  84:4;100:5
**statements (12)**
  39:13,23;46:8,12;
  47:8,20,22;49:21;
  53:12;54:17;58:15;
  63:3
**states (1)**
  83:7
**status (2)**
  15:19;39:10
**statute (4)**
  52:2,10,13,18
**stayed (1)**
  55:22
**staying (1)**
  53:5
**Steve (3)**
  97:22,24;98:12
**stick (1)**
  26:22
**still (9)**
  14:3;20:20;39:11;
  44:8;66:13;83:9;88:22;
  93:14;99:23
**stop (2)**
  40:2;103:19
**stopped (1)**
  69:22
**stopping (1)**
  101:21
**stops (1)**
  39:9
**store (5)**
  29:19;30:3,9;103:12,
  19
**straight (1)**

85:12
**strike (4)**
  15:21;79:4,6;85:18
**subject (2)**
  66:16;98:13
**subjective (2)**
  41:23;62:9
**submit (2)**
  67:11;76:18
**submitted (1)**
  47:8
**subordinate (4)**
  87:12;89:22;90:12,
  21
**subpart (3)**
  87:9,15,21
**subsequent (5)**
  15:16;23:14;68:14,
  16;76:8
**succession (1)**
  11:5
**suggested (1)**
  15:13
**Sunday (1)**
  51:7
**superior (1)**
  87:11
**supervised (1)**
  49:25
**supervisor (9)**
  16:9;32:10;37:23;
  38:3,5;41:18;53:10;
  100:1;107:9
**supervisors (3)**
  19:13;38:12,25
**supplement (1)**
  107:4
**support (2)**
  46:12;85:15
**supported (2)**
  76:23;77:2
**suppose (1)**
  12:23
**supposed (4)**
  31:5,9,18;34:5
**suppression (1)**
  8:1
**supression (2)**
  8:5,9
**sure (18)**
  16:1;19:2,6,7;22:24;
  30:21;36:2;41:11,15;
  46:1;47:16;58:6;62:22;
  92:21;95:19;96:2;
  99:23;100:3
**suspension (5)**
  40:8;68:10;93:21;
  101:5,12
**SWAT (18)**
  8:15,17,21,25;40:16,
  17,21;58:13,18,19,22,
  25;59:1,3,6,10,12;
  61:16

swear (1)
  5:11
switched (1)
  10:18
sworn (1)
  5:13

**T**

**talk (11)**
  20:9;22:17;25:24;
  28:16;30:15;33:21;
  38:5;43:5;47:24;88:25;
  105:8
**talked (2)**
  29:23;84:10
**talking (9)**
  14:3;21:17;44:11;
  53:19;77:17,22;94:1;
  100:14;101:17
**talks (2)**
  13:24;59:14
**tape (5)**
  70:6;71:19;76:14;
  93:17;102:9
**tardy (1)**
  50:6
**task (1)**
  53:5
**taught (2)**
  74:7,10
**team (30)**
  8:1,5,15,17;10:11,
  16;11:2,14,18,24;
  12:15;16:1;17:25;
  20:2;31:12;39:10;
  40:17,17,21;49:18;
  58:13,18,19,22,25;
  59:3,6,10,12;71:9
**team's (1)**
  25:19
**Teamwork (1)**
  39:4
**telling (1)**
  24:15
**temper (1)**
  87:6
**Ten (3)**
  13:15;26:17;93:10
**tends (1)**
  87:16
**ten-minute (1)**
  54:7
**tenure (1)**
  41:21
**term (1)**
  104:3
**terminate (4)**
  18:19;65:12;66:1;
  68:20
**terminated (5)**
  90:8;91:14;92:15,19,
  24;96:15;97:16;106:19

**termination (19)**
  63:10;67:18,21;
  77:17;78:1,5,6;80:6,7,
  15;81:3;82:12,18;
  84:19,23;85:7;92:4;
  105:25;106:20
**terrorist (2)**
  54:13;57:15
**testified (19)**
  5:13,22;23:3;32:4;
  62:15;70:6;72:15;
  74:20;75:19,23;76:11,
  13;80:10;93:16;97:7;
  99:4;100:25;102:8;
  107:20
**testify (56)**
  16:17;17:11;18:3,11;
  26:9;27:23,25;28:22;
  31:10;32:15;33:20,25;
  37:25;40:9,19,22;41:4;
  43:20,23;47:5;50:25;
  51:3,5;53:17;61:18;
  73:10,15,24;80:17;
  82:7;83:25;84:3,11,17;
  86:24;89:8;91:8;92:9;
  94:4;97:13,17;98:7,24,
  25;99:9;100:15,22;
  103:2,5,9,13,21,24;
  104:2,23;105:3
**testimony (30)**
  6:23;18:12;23:5;
  31:3,13,25;34:24;55:7;
  57:9;63:9,14,16;64:11,
  21,23;69:23,24;70:5,
  11;71:18,24;72:20;
  76:20,23;77:1;87:18;
  93:22;94:12;102:18;
  105:22
**theater (3)**
  29:19;30:4,9
**theft (11)**
  51:12,17,20;52:5,12,
  15,19,22;55:12,14;60:2
**theft-by-taking (2)**
  51:23;52:1
**Thereabout (1)**
  32:20
**thereafter (3)**
  66:20;71:20;72:12
**thinking (1)**
  62:10
**third (1)**
  48:17
**thirty (1)**
  93:23
**thoroughly (4)**
  54:20;91:19,23,24
**though (6)**
  23:23;27:17;54:11;
  60:9;71:7;90:25
**thought (1)**
  101:12
**threatened (3)**

59:22;90:12,21
**threatening (1)**
  89:22
**three (8)**
  8:2,3;48:15;50:20;
  68:2,6;93:21;101:5
**throughout (2)**
  5:7;55:24
**Thursday (1)**
  51:7
**thus (3)**
  34:10;43:21;58:18
**times (11)**
  5:20,22;7:25;8:2,3;
  10:8;25:11;26:13,19,
  24;104:24
**today (5)**
  5:5;47:15;65:19;
  102:19;105:15
**together (5)**
  8:15;10:7;57:1,14;
  98:1
**told (18)**
  46:3,7,11,22;47:7;
  62:10;66:5,11;67:8;
  72:3,5,13;74:15;75:5;
  76:15;90:3,10;104:7
**tomorrow (1)**
  97:9
**took (4)**
  28:20;67:24;93:18;
  101:6
**top (1)**
  58:6
**topic (1)**
  31:13
**totality (1)**
  88:4
**toward (3)**
  44:15;49:16;107:7
**towards (2)**
  56:4,25
**tracks (3)**
  43:10;45:22;80:8
**traffic (1)**
  39:9
**trained (1)**
  92:6
**training (60)**
  25:25;26:1,3,8,11,20,
  24;27:3,7,11,13,14,22;
  28:1,5,8,11,12,18,19;
  29:6,9,16;30:2,6,8,13,
  15,20,21,24,25;31:1,6,
  15,16,17,22;32:2,9,12,
  16,25;33:14;61:8;
  62:13;68:23;74:6;83:8,
  13;92:7,8,10,13,15,16,
  19,24;101:22;102:11
**transcript (1)**
  108:16
**transpired (2)**
  67:9;76:17

Ismael v.
Roundtree, et al.

Richard Roundtree
December 8, 2023

transportation (1)
  31:8
travel (2)
  28:11,23
traveling (1)
  29:5
tried (3)
  66:21;71:21;72:3
troops (1)
  36:5
troublesome (1)
  56:23
true (40)
  11:24;23:4;26:1,4;
  27:14,22;40:14;41:6;
  50:24;57:22;58:17,19,
  22;61:18,20,21;62:21;
  66:18;68:22;69:1;70:2;
  73:16,18;78:20;79:10;
  80:7,16;84:9;90:22,24;
  91:1,3;93:25;102:10;
  103:6,8,10,14,22;
  106:15
trustworthy (1)
  38:25
truth (1)
  50:8
truthfulness (1)
  61:13
try (2)
  57:3;84:5
trying (6)
  22:4;74:22;97:10;
  98:5,21;99:7
Tuesday (3)
  72:12,13;83:17
turn (2)
  55:16;57:25
Turning (1)
  71:18
two (21)
  8:11;10:21;11:22;
  12:20;23:17;24:16;
  27:5;28:17,22;40:17;
  43:8;47:12;60:8,10;
  68:3,6,10;101:6,12;
  102:1,3
two-and-a-half (2)
  8:11;32:19
two-minute (1)
  64:4
type (2)
  32:16;53:14
typed (2)
  48:20,21
typed-up (1)
  56:22
types (1)
  60:12
typically (10)
  13:6,17;14:6;28:17;
  32:24;33:2,10,24;34:1;
  37:23

## U

ultimate (2)
  20:12;68:19
ultimately (1)
  67:21
unable (1)
  63:18
uncomfortable (2)
  58:3,11
under (9)
  5:4;38:8;41:14;44:8;
  49:1,25;52:2;87:13;
  93:14
Understood (2)
  57:11;66:11
undertake (1)
  70:25
unfound (1)
  15:11
unfounded (3)
  15:5,7,9
uniform (5)
  66:5;68:12;87:4;
  89:10,15
units (1)
  68:25
unless (1)
  62:10
unpaid (1)
  35:10
unsigned (2)
  46:20,22
up (21)
  7:18,25;8:6;11:4;
  12:17;19:18;59:16;
  67:8,11;76:16,19;78:4,
  7;80:16;85:10;93:19;
  98:19,21;99:6,7;
  106:13
upon (9)
  87:24;88:8;89:12,20,
  23;90:22;91:2,15,22
Urban (15)
  41:3,10;46:25;47:9;
  48:19,25;50:13,17,23;
  51:2;53:20;54:1;57:1,
  14;106:10
use (13)
  30:12,17;68:24;69:7;
  86:2,5,7;87:9,15;
  88:19;102:12;107:1,3
used (7)
  9:4;30:12,17;48:5;
  68:12;69:7;79:14
using (3)
  61:16;96:16;102:25
usually (3)
  15:7;29:15;33:1

## V

vague (1)
  17:18
value (1)
  17:21
valued (1)
  49:17
vehicle (18)
  27:1;28:21,24;29:21;
  68:12,16;69:6;74:25;
  75:4,8,21;77:15;85:5,
  12;88:12;89:10,15;
  96:16
vehicles (4)
  28:21;30:12,17;
  88:22
verbal (2)
  14:15;15:8
verbatim (1)
  86:11
verified (2)
  17:20;67:2
verify (3)
  66:7,22;71:22
via (1)
  94:18
video (7)
  63:22;64:9,17;69:23;
  101:12,14,16
view (1)
  91:19
violated (1)
  86:3
violating (1)
  104:21
violation (2)
  68:11;85:19
violent (3)
  9:25;10:8;87:10
voicemail (1)
  72:9

## W

wage (2)
  51:12;55:11
wait (2)
  57:5,5
waived (1)
  108:20
Wall (1)
  104:3
wants (1)
  88:11
Watch (2)
  54:13;101:13
watching (1)
  101:11
way (12)
  13:5;17:25;19:3;
  28:13;34:7;40:23;
  50:15;55:21;59:9;84:5;
  101:22;103:20
week (8)

27:4,5;31:18;32:3,
12;51:1,7;71:10
weekend (1)
  108:14
weeks (2)
  27:5;91:7
welcome (1)
  42:9
weren't (3)
  71:6;83:12;93:25
what's (6)
  33:24;42:11;43:13;
  56:3;86:7;100:20
whatsoever (1)
  108:10
whereas (1)
  19:12
whistle (1)
  104:25
whistleblower (1)
  105:8
whistleblowers (1)
  104:12
whole (2)
  9:8;27:7
whose (2)
  59:8;81:1
William (3)
  16:6;48:18;82:10
willing (1)
  88:19
withdraw (2)
  44:22;99:5
within (2)
  11:23;23:17
without (1)
  68:10
witness (14)
  5:11;7:9;21:5;22:22;
  23:1;63:23;64:2;85:15;
  95:21;104:17;105:3,
  10;106:4;108:20
witnessed (3)
  46:17;54:10,14
witnesses (2)
  20:7;63:3
witnessing (1)
  47:3
woman (1)
  55:17
word (4)
  6:14;81:3,19;82:4
work (34)
  7:24;8:4,13;9:4;
  11:20;27:8;29:6;32:24;
  33:3,14,17;34:1,10,19,
  20,22,25;35:7;38:23;
  39:20;49:10;51:2;52:6,
  11;53:15;61:17;79:14;
  88:11;89:11,22;90:22;
  102:12;106:10,16
workday (5)
  33:1,6,21

worked (11)
  7:16;9:5,6,9;10:7;
  17:16;41:7;46:25;
  49:24;51:23;91:3
worker (1)
  49:9
workers' (1)
  34:13
working (6)
  16:2;55:20;57:1,14;
  68:23;89:2
works (1)
  41:11
write (4)
  43:21;67:8;76:16;
  93:19
writes (1)
  87:15
write-up (1)
  67:25
written (11)
  47:3,6,7,9,18,19;
  54:23;63:3;80:16;
  82:16;94:23
wrong (2)
  57:3;82:1
wrote (25)
  38:11,22;39:8,19;
  42:15;46:12,14;48:24;
  49:15;53:2;55:18;
  57:25;60:18;61:4;78:1;
  80:24;81:3,19;83:17;
  96:14;97:6,7;98:18;
  100:4,8
Wylds (5)
  42:7,15;67:3;79:12,
  13

## Y

y'all (1)
  83:1
year (5)
  13:7;26:7;49:1;55:8;
  100:25
years (28)
  5:25;7:17,20;8:2,11;
  9:12;10:1,5,21;11:22;
  17:16;23:17;24:16,21;
  26:12;27:16;28:17,22;
  43:8;47:12;50:20;52:2;
  103:16;104:7,11,14;
  105:12,18
you-all (1)
  63:25

## Z

zone (11)
  33:23;37:10;39:11;
  41:16;97:20;99:19,20,
  23,24,25;100:17
Zoom (2)

7:7;89:7

## 0

**04 (1)**
9:6

## 1

**1 (2)**
6:20;94:14
**1:03 (1)**
97:5
**1:03:43 (1)**
70:6
**1:04:42 (1)**
71:19
**1:05:24 (1)**
76:13
**1:06:22 (1)**
93:17
**1:07 (1)**
96:13
**1:07:40 (1)**
102:9
**1:08:32 (1)**
64:12
**1:30 (1)**
93:6
**10 (4)**
13:10;17:16;23:5;
35:6
**10:36 (1)**
44:5
**10:49 (1)**
44:6
**10-15 (1)**
50:7
**10-minute (1)**
44:2
**11:00 (1)**
83:18
**11:21 (1)**
64:7
**11:24 (1)**
64:8
**11:54 (1)**
84:12
**12 (3)**
104:14;105:12,18
**12:00 (1)**
84:6
**12:05 (1)**
93:11
**12:14 (1)**
93:12
**12:21 (4)**
77:13,21;78:13;
82:16
**12:47 (1)**
94:8
**12:48 (1)**
108:18

**12-hour (2)**
34:2,4
**12-months (1)**
68:6
**15 (3)**
26:19,22,24
**15-minute (1)**
93:5
**17 (1)**
81:15
**17th (10)**
33:19;75:25;76:5;
81:23;82:22;83:1;
92:11,14,19,25
**19 (2)**
48:18;99:17
**1993 (1)**
6:8

## 2

**2 (1)**
50:7
**2:00 (1)**
31:22
**20 (2)**
9:12;27:16
**2000 (1)**
8:10
**2000s (2)**
9:10,22
**2001 (1)**
9:24
**2002 (1)**
9:24
**2003 (1)**
9:6
**2009 (3)**
6:11,15,25
**2013 (6)**
6:12,17,20;8:1;9:19;
10:17
**2020 (2)**
35:17;65:8
**2021 (24)**
11:24;15:20,24;16:3,
16;20:23;22:10,14;
23:10,19;24:18,20;
33:19;40:14;42:8;
48:13,18;59:6;63:11;
77:13;81:15;83:18;
99:17;100:25
**2023 (5)**
9:12;23:18,19;47:11;
50:23
**20th (3)**
16:16;45:21;48:13
**21 (6)**
10:1;43:1;77:6,9;
80:4;82:15
**21st (1)**
81:25
**24 (1)**

42:8
**24th (2)**
43:1,17
**25 (3)**
7:17,20;103:16
**26 (6)**
94:5,11,14;96:20;
100:23,24
**27 (3)**
40:14;96:8,10
**27th (7)**
12:23;17:25;18:10;
40:7;72:13;73:2;83:5
**28 (1)**
83:18
**28th (10)**
72:13;77:12,20;80:4;
81:6;82:12,22;87:7;
96:24;97:16

## 3

**3 (8)**
48:2,5;58:7;60:17,
21;63:3;94:8;98:13
**3:00 (1)**
81:15
**3:18 (1)**
98:14
**30 (5)**
26:12;64:11,23;
104:7,11
**30-year (1)**
26:18
**31 (3)**
80:18,21,22
**31st (1)**
12:3
**32 (3)**
86:12,15;92:4
**33 (3)**
42:1,4,6
**35 (3)**
97:1,3,18
**36 (4)**
82:19;91:10;98:8,10
**37 (2)**
99:10,12
**39 (3)**
37:1,3;39:13
**3rd (8)**
94:15,19,25;95:14;
96:12;97:5;99:14;
100:21

## 4

**4.4 (5)**
85:20;86:3,9;87:1;
88:3
**4.4.1 (2)**
87:3,13
**45 (1)**

93:4
**4th (1)**
94:12

## 5

**5:00 (1)**
31:22
**5c (1)**
37:11

## 6

**6:00 (1)**
99:14

## 7

**7 (3)**
97:20;99:20,25
**7:00 (1)**
31:7

## 8

**80 (1)**
26:7
**8-hour (2)**
33:22;34:2

## 9

**9/28/2021 (1)**
80:24
**96 (4)**
6:8,10,24;7:15
**97 (6)**
7:6,9,13,15,25;8:9